## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| RFE/RL, INC., | |
| *Plaintiff*, | |
| v. | Case No. 1:25-cv-00799 |
| KARI LAKE, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media; | |
| VICTOR MORALES, in his official capacity as acting Chief Executive Officer of the United States Agency for Global Media; and | |
| UNITED STATES AGENCY FOR GLOBAL MEDIA, | |
| *Defendants*. | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 4

    A.     RFE/RL. ................................................................................................ 4

    B.     Congress Directly Appropriates Funds for RFE/RL. .............................................. 6

    C.     USAGM Withholds Congressionally Appropriated Funds from RFE/RL and Terminates Its Grant on the Basis that it "No Longer Effectuates Agency Priorities" and a View that Funding RFE/RL Is Not a "Statutory Function" of the Agency. ..................................................................... 9

    D.     Significant and Immediate Consequences of USAGM's Unlawful Withholding of Congressionally Appropriated Funds. ........................................ 11

LEGAL STANDARD........................................................................................................ 14

ARGUMENT .................................................................................................................. 15

I.     RFE/RL Is Likely to Succeed on the Merits. ...................................................... 15

    A.     This Court Has Jurisdiction. .............................................................................. 15

    B.     USAGM Contravened Its Statutory Obligation to Disburse Congressionally Appropriated Funds to RFE/RL. ............................................... 17

    C.     RFE/RL Is Likely to Succeed on Its APA Claims. .............................................. 21

          1.     Defendants' Actions Are Unlawful and Exceed Statutory Authority. ............................................................................................ 22

          2.     Defendants' Actions Are Arbitrary and Capricious.................................. 23

          3.     Defendants Unlawfully Withheld RFE/RL's Congressionally Appropriated Funds. ................................................................................ 27

    D.     RFE/RL Is Likely to Succeed on Its Constitutional Claims. ................................ 27

    E.     RFE/RL Is Likely to Succeed on Its Mandamus and Ultra Vires Claims. ........... 32

II.     RFE/RL Will Suffer Irreparable Harm Without a Temporary Restraining Order and Preliminary Injunction. ............................................................................. 34

        A.      The Halt in Funding Threatens RFE/RL's Essential Operations........................... 35

        B.      The Halt in Funding Threatens the Physical Safety of RFE/RL Journalists and Staff. ................................................................................................... 37

        C.      RFE/RL's Inability to Access Its Funds Threatens Irreparable Damage to RFE/RL's Reputation as a Trusted Employer and Purveyor of Uncensored Media. ......................................................................................................... 39

III.    The Balance of Equities and Public Interest Weigh in Favor of Preliminary Relief. ........ 40

        CONCLUSION ..................................................................................................... 42

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B.-B. v. Morgan*,
548 F. Supp.3d 209 (D.D.C. 2020) ..................................................................39

*\*AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*,
Civ. Nos. 25-00400, 25-00402, 2025 WL 752378 (D.D.C. Mar. 10, 2025).................. *passim*

*\*In re Aiken County*,
725 F.3d 255 (D.C. Cir. 2013) .................................................................17, 18, 30

*All. for Retired Ams. v. Bessent*,
No. CV 25-0313, 2025 WL 740401 (D.D.C. Mar. 7, 2025)....................................37

*Am. Ass'n of Pol. Consultants v. U.S. Small Bus. Admin.*,
613 F. Supp. 3d 360 (D.D.C. 2020), *aff'd*, 810 F. App'x 8 (D.C. Cir. 2020)...................34, 41

*Armour & Co. v. Freeman*,
304 F.2d 404 (D.C. Cir. 1962).......................................................................40

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015)...................................................................................28

*Atlas Air, Inc. v. Int'l Bhd. of Teamsters*,
280 F. Supp. 3d 59 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019)...........................39

*Bennett v. Spear*,
520 U.S. 154 (1997)...................................................................................22

*Bowen v. Massachusetts*,
487 U.S. 879 (1988)...................................................................................15

*Burlington Truck Lines v. United States*,
371 U.S. 156 (1962)...............................................................................24, 25

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) .......................................................................34

*\*City & County of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ...........................................................29, 30, 31, 32

*Climate United Fund v. Citibank, N.A.*,
    No. 25-cv-735, ECF 15 (D.D.C. Mar. 18, 2025) ................................................17

*Clinton v. City of New York*,
    524 U.S. 417 (1998).........................................................................................29

*Corley v. United States*,
    556 U.S. 303 (2009).........................................................................................20

*Crowley Gov't Servs., Inc. v. GSA*,
    38 F.4th 1099 (D.C. Cir. 2022)..................................................................15, 16

*Dellinger v. Bessent*,
    No. CV 25-0385, 2025 WL 471022 (D.D.C. Feb. 12, 2025) .................................14

*Devitri v. Cronen*,
    289 F. Supp. 3d 287 (D. Mass. 2018) ................................................................39

*DHS v. Regents of the Univ. of Cal.*,
    140 S. Ct. 1891 (2020).....................................................................................25

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016).........................................................................................25

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
    502 F. Supp. 3d 492 (D.D.C. 2020)...................................................................39

*Fed. Express Corp. v. U.S. Dep't of Com.*,
    39 F.4th 756 (D.C. Cir. 2022)....................................................................33, 34

*Friedman v. FAA*,
    841 F.3d 537 (D.C. Cir. 2016).........................................................................22

*Hershey Foods Corp. v. U.S. Dep't of Agric.*,
    158 F. Supp. 2d 37 (D.D.C. 2001), *aff'd sub nom. Hershey Foods Corp. v.*
    *Dep't of Agric.*, 293 F.3d 520 (D.C. Cir. 2002)..................................................20

*Kendall v. United States ex rel. Stokes*,
    37 U.S. (12 Pet.) 524 (1838)...........................................................................29

*League of Women Voters of the U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016).......................................................................36, 41

*Md. Dep't of Hum. Res. v. Dep't. of Health and Hum. Servs.*,
    763 F.2d 1441 (D.C. Cir. 1985).......................................................................15

iv

*Me. Cmty. Health Options v. United States*,
140 S. Ct. 1308 (2020) .................................................................................18, 19

*Medellin v. Texas*,
552 U.S. 491 (2008) ...........................................................................................31

*In re Medicare Reimbursement Litig.*,
414 F.3d 7 (D.C. Cir. 2005) ...............................................................................32

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .......................................................................................24, 25

*N. Air Cargo v. USPS*,
674 F.3d 852 (D.C. Cir. 2012) ...........................................................................33

*N.S. v. Hughes*,
335 F.R.D. 337 (D.D.C. 2020) ...........................................................................41

*Nat. Res. Def. Council v. EPA*,
643 F.3d 311 (D.C. Cir. 2011) ...........................................................................23

*Nat'l Ass'n of Postal Supervisors v. USPS*,
26 F.4th 960 (D.C. Cir. 2022) ...........................................................................33

*Nat'l Ctr. for Mfg. Scis. v. United States*,
114 F.3d 196 (Fed. Cir. 1997) ...........................................................................16

*New York v. Trump*,
No. 25-CV-39, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ...................................26

*NextWave Pers. Commc'ns, Inc. v. FCC*,
254 F.3d 130 (D.C. Cir. 2001) ...........................................................................23

*Nken v. Holder*,
556 U.S. 418 (2009) ...........................................................................................41

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......................................................................................27, 28

*Nyunt v. Chairman, Broad. Bd. of Governors*,
589 F.3d 445 (D.C. Cir. 2009) ...........................................................................33

*Oceana, Inc. v. Locke*,
670 F.3d 1238 (D.C. Cir. 2011) .........................................................................23

*Omar v. Harvey*,
   No. CIV. A. 05-2374, 2006 WL 286861 (D.D.C. Feb. 6, 2006) .............................................38

*PFLAG, Inc. v. Trump*,
   No. CV 25-337, 2025 WL 510050 (D. Md. Feb. 14, 2025) ...............................................28, 29

*Potomac Elec. Power Co. v. ICC*,
   702 F.2d 1026 (D.C. Cir. 1983) ..........................................................................................32

*Power v. Barnhart*,
   292 F.3d 781 (D.C. Cir. 2002) ............................................................................................32

*Rochester Pure Waters Dist. v. EPA*,
   960 F.2d 180 (D.C. Cir. 1992) ............................................................................................28

*Shawnee Tribe v. Mnuchin*,
   984 F.3d 94 (D.C. Cir. 2021) ..............................................................................................41

*Tennessee v. Lane*,
   541 U.S. 509 (2004)............................................................................................................20

*Tex. Educ. Agency v. U.S. Dep't of Educ.*,
   992 F.3d 350 (5th Cir. 2021) ..............................................................................................28

*Train v. City of New York*,
   420 U.S. 35 (1975)..............................................................................................................30

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision*,
   967 F.2d 598 (D.C. Cir. 1992), *overruled on other grounds by Perry Cap.*
   *LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) .................................................................17

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
   665 F.3d 1339 (D.C. Cir. 2012) ..........................................................................................28

*Viet. Veterans of Am. v. Shinseki*,
   599 F.3d 654 (D.C. Cir. 2010) ............................................................................................32

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)................................................................................................................14

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) ............................................................................................36

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952)......................................................................................................30, 31

**Statutes**

2 U.S.C. § 683 ................................................................................................................ 31

5 U.S.C. § 704 ............................................................................................................ 15, 21

*5 U.S.C. § 706 ..................................................................................................... *passim*

22 U.S.C. § 6201 ...................................................................................................... 1, 3, 41

22 U.S.C. § 6204 ............................................................................................ 1, 6, 18, 19, 23

*22 U.S.C. § 6207 .................................................................................................. *passim*

22 U.S.C. § 6541 .............................................................................................................. 5

28 U.S.C. § 1331 ............................................................................................................ 15

28 U.S.C. § 1491 ............................................................................................................ 16

*American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024) ......................... *passim*

Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-
344, 88 Stat. 297 ...................................................................................................... 31

*Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, 138
Stat. 1524 (2024) ................................................................................................... 8, 9

*Full-Year Continuing Appropriations and Extensions Act, 2025, H.R. 1968,
119th Cong. § 1101(a) (2025) ........................................................................ 8, 9, 19, 27

*Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat.
460, 735 (2024) ............................................................................................. 2, 7, 19, 20

*H. Comm. on Appropriations, 118th Cong., Further Consolidated Appropriations
Act, 2024 – Committee Print ..................................................................................... 8, 19

International Broadcasting Act, Pub. L. No. 93-129, 87 Stat. 456 (1973) ........................... 5, 6, 7

*United States International Broadcasting Act of 1994, Pub. L. No. 103-236, 108
Stat. 382, 437 (1994) .............................................................................................. *passim*

**United States Constitution**

U.S. Const. art. I, § 8, cl. 1 .............................................................................................. 28

U.S. Const. art. II, § 3 ................................................................................................... 29

**Regulations**

2 C.F.R. § 200.340, ...............................................................................................................25

**Other Authorities**

American RFE/RL Reporter Alsu Kurmasheva Released from Russian Custody,
USAGM (Aug. 1, 2024), https://perma.cc/YNF3-KPCF ........................................39

B-316010, Consolidated Appropriations Act, 2008 – Incorporation by Reference,
GAO (Feb. 25, 2008), https://www.gao.gov/assets/b-316010.pdf ..........................21

Def.'s Opp. to Pls.' Mot. TRO, *Open Technology Fund v. Pack*,
No. 20-cv-1710, ECF 7, 2020 WL 7041426 (D.D.C. filed June 26, 2020)........................1, 19

Exec. Order 14238, "Continuing the Reduction of the Federal Bureaucracy" (Mar.
15, 2025), https://www.whitehouse.gov/presidential-
actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/...............10

RFE/RL Fact Sheet, USAGM (Jan. 7, 2025), https://www.usagm.gov/wp-
content/uploads/2025/01/USAGM-RFERL-OneSheet-01-07-25.pdf ......................5

William Rehnquist, *Presidential Authority to Impound Funds Appropriated for
Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303, 309
(1969)..................................................................................................................30

**INTRODUCTION**

The United States Agency for Global Media ("USAGM") is currently defying multiple Acts of Congress by refusing to provide congressionally appropriated funds to RFE/RL, Inc.—commonly known as Radio Free Europe/Radio Liberty. For generations, Radio Free Europe/Radio Liberty ("RFE/RL") has provided accurate, uncensored news and open debate in countries where a free press is threatened. RFE/RL is not a part of the U.S. Government. But it is funded almost entirely through congressional appropriations, consistent with Congress's finding that "it is in the interest of the United States to support broadcasting to other nations." 22 U.S.C. § 6201(3). USAGM's unprecedented withholding of congressionally appropriated funds from RFE/RL is imperiling the very existence of Radio Free Europe/Radio Liberty. RFE/RL therefore respectfully requests urgent relief from this Court, in the form of a temporary restraining order and a preliminary injunction restoring access to RFE/RL's appropriated funds.

RFE/RL satisfies all the requirements for a temporary restraining order and preliminary injunction. *First*, RFE/RL is likely to succeed on the merits because USAGM has multiple statutory obligations to make congressionally appropriated funds available to RFE/RL, but has refused to do so. Under the International Broadcasting Act, USAGM is required to "make annual grants" to RFE/RL. 22 U.S.C. § 6207(f). In 2020, USAGM recognized that this language "*dictate[s]* how the CEO *must exercise* his § 6204 grant-making authority when dealing with [RFE/RL]." Def.'s Opp. to Pls.' Mot. TRO at 4, *Open Technology Fund v. Pack*, No. 20-cv-1710, ECF 7, 2020 WL 7041426 (D.D.C. filed June 26, 2020) (emphasis added). Further, applicable appropriations laws direct USAGM that specified funds "*shall be allocated* in accordance with the table included under this heading in the explanatory statement described in section 4," which in

1

turn specifies that $142,212,000 must be allocated to RFE/RL for fiscal year 2024. Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 735 (2024) (emphasis added). Through a series of laws, including one signed by President Trump the very same day the agency took the actions at issue, Congress extended the same appropriation to RFE/RL for fiscal year 2025.

USAGM has violated these statutory duties by refusing to make those appropriated funds available to RFE/RL and instead purporting to terminate RFE/RL's grant. The agency's stated reason for doing so was that funding RFE/RL "no longer effectuates agency priorities," and that it is "eliminat[ing] all non-statutorily required activities and functions." Decl. Stephen Capus ("Capus Decl."), Ex. 1, Letter from Kari Lake, Senior Advisor to the Acting CEO, to RFE/RL (Mar. 15, 2025) (hereinafter "March 15 Letter"). But *Congress's* priorities have not changed, and funding RFE/RL remains a *statutory* function and responsibility of USAGM. USAGM's actions are contrary to law, they are arbitrary and capricious, and they violate the most basic tenets of the Constitution. In this country, Congress—not a senior advisor to the acting CEO of an agency—holds the power of the purse.

*Second*, RFE/RL is suffering, and will continue to suffer, irreparable harm from this unlawful withholding of funds. Virtually all of RFE/RL's funding comes from USAGM's grant. As a result, RFE/RL has already been forced to begin winding down its operations. That wind-down process requires terminating staff who are not easily re-hired; terminating leases and other contracts, including those related to the security of RFE/RL employees and freelancers; and reduction of RFE/RL's news operations. Moreover, due to the loss of funds, RFE/RL will have to reduce the protections it can provide to its journalists, putting them at risk of harm, as well as its

cybersecurity protections, putting RFE/RL at risks of cyberattacks. Ultimately, RFE/RL's very existence is threatened. Even if RFE/RL's funding were restored after a final judgment in this lawsuit, that would not redress these irreparable harms: RFE/RL would not be able to simply rehire its staff, reinstate its leases and other contracts, cure the harms suffered by targeted journalists, unwind the results of cyberattacks, or restore its reputation as a reliable partner to journalists and a reliable provider of uncensored news in places where freedom of the press is weak.

Moreover, the withholding of funding will not only harm RFE/RL itself, but also will harm its journalists, many of whom depend on RFE/RL for their physical security and rely on their employment with RFE/RL to secure legal status in the countries in which they work. Should their employment with RFE/RL abruptly end, these journalists may face deportation to authoritarian countries where their security—and perhaps even their lives—will be at risk. It will also harm the 47 million individuals who rely on RFE/RL to provide impartial reporting in 23 different countries every week.

*Third*, both the balance of equities and the public interest overwhelmingly support the grant of injunctive relief here. It is always in the public interest for federal agencies to follow the law. And here Congress has made it clear that "[i]t is in the interest of the United States to support broadcasting to other nations," including through the continued funding of Radio Free Europe and Radio Liberty. 22 U.S.C. § 6201(3); *see also id.* § 6207(f).

Because time is of the essence, RFE/RL concurrently moves for both a temporary restraining order and a preliminary injunction. In the first instance, to address the immediate emergency caused by USAGM's actions, RFE/RL respectfully requests a narrow temporary restraining order requiring USAGM to disburse to RFE/RL the remainder of the funds Congress

appropriated through March 14, 2025, an amount of approximately $7.5 million. That amount has been appropriated since December, and the outstanding amount covers a period of performance (March 1–14, 2025) that RFE/RL has already performed and that predates USAGM's actions at issue here. *Cf. AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, Civ. Nos. 25-00400, 25-00402, 2025 WL 752378, at *23 (D.D.C. Mar. 10, 2025) (granting a preliminary injunction requiring immediate payment for already completed work). Immediate disbursement of that modest amount of appropriated funds is the bare minimum necessary to prevent imminent irreparable harm to RFE/RL.

To be clear, however, release of the long-appropriated funds covering March 1–14 will be only a temporary reprieve, permitting RFE/RL to ward off the worst of the irreparable harms for a brief period of additional time, perhaps a couple of weeks. RFE/RL is thus also seeking a preliminary injunction to restore disbursement of its appropriated funds on a monthly basis pending final resolution of this lawsuit. Without that relief, RFE/RL's ongoing operations and viability will be irreparably harmed—and so will the express will of Congress. RFE/RL thus requests that this Court promptly hold a hearing and enter the requested TRO, and it further requests that the Court set a briefing schedule and hold a hearing on RFE/RL's preliminary injunction request within 21 days of this filing, *see* LCvR 65.1(d).

## BACKGROUND

### A. RFE/RL.

RFE/RL, Inc. is a private, nonpartisan, nonprofit 501(c)(3) news organization. Capus Decl. ¶¶ 2–3. Over the course of its 75-year existence, RFE/RL has developed into one of the most comprehensive news operations in the world. *Id.* ¶ 3. RFE/RL reaches more than 47 million

people every week.  *Id.*; *see also, e.g.*, USAGM, RFE/RL Fact Sheet (Jan. 7, 2025).[1]  RFE/RL has

been funded by the U.S. government since its inception.  Capus Decl. ¶ 3.

The U.S. government conceived of Radio Free Europe and Radio Liberty to serve as

broadcasters providing trustworthy, locally relevant news, analysis and cultural programming to

audiences subject to communist propaganda.  *Id.* ¶¶ 4–6.  In 1950, Radio Free Europe first started

broadcasting to Poland, Czechoslovakia, Hungary, Romania, and Bulgaria.  *Id.* ¶ 6.  In 1953, Radio

Liberty began broadcasting to the Soviet Union.  *Id.*  Radio Free Europe and Radio Liberty were

alternative news sources to the media controlled by the Soviet Union and other communist

governments.  *Id.*

In 1973, Congress enacted the International Broadcasting Act of 1973, Pub. L. No. 93-129,

87 Stat. 456, which found that "it is the policy of the United States to promote the right of freedom

of opinion and expression" and that "open communication of information and ideas among the

peoples of the world contributes to international peace and stability," *id.* at 457; 22 U.S.C.

§ 6541(1)–(2).  The International Broadcasting Act of 1973 stated that "Radio Free Europe and

Radio Liberty" "have demonstrated their effectiveness in furthering the open communication of

information and ideas in Eastern Europe and the Union of Soviet Socialist Republics" and found

that "the continuation of Radio Free Europe and Radio Liberty as independent broadcast media

. . . is in the national interest."  87 Stat. at 457.  The International Broadcasting Act of 1973

authorized USAGM's predecessor, the Board of International Broadcasting, to "make grants to

Radio Free Europe and Radio Liberty in order to carry out the purposes" of "freedom of opinion

---

[1] https://www.usagm.gov/wp-content/uploads/2025/01/USAGM-RFERL-OneSheet-01-07-25.pdf.

and expression" as stated in section 2 of the International Broadcasting Act of 1973.  *Id.* at 457–58.  Radio Free Europe and Radio Liberty combined to form a single corporate entity, RFE/RL, in 1976.  Capus Decl. ¶ 6.

Toward the end of the Cold War, RFE/RL began to expand its operations to respond to threats to democracy and media freedom.  *Id.* ¶ 7.  For example, after the violent breakup of Yugoslavia, RFE/RL began broadcasting in Serbian, Croatian, and Bosnian to the Yugoslav successor states.  *Id.*  In some countries that established democratic governments and free media, RFE/RL concluded that it had fulfilled its mission and ceased broadcasting, such as in Poland in 1997. *Id.*

Today, RFE/RL provides reporting to 23 countries spanning Europe, Central Asia, the Caucasus, Iran, Afghanistan, and Pakistan.  *Id.* ¶ 3; Compl. ¶ 16.  RFE/RL is able to publish news in 27 languages because of decades of sustained effort to recruit journalists and staff with the relevant language skills and cultural knowledge.  Capus Decl. ¶¶ 3, 8.  RFE/RL has adapted from being a broadcast radio service to embracing a multi-channel approach to news, with a news presence online and across social media platforms.  *Id.* ¶ 7.  RFE/RL employs over 1,300 staff around the world and contracts with over a thousand freelance journalists.  *Id.* ¶ 9.  Many of RFE/RL's journalists are unable to operate in their home countries due to threats of violence stemming from their independent journalism.  *Id.* ¶ 27.  They therefore operate abroad through work visas supported by their employment at RFE/RL.  *Id.*

**B.      Congress Directly Appropriates Funds for RFE/RL.**

USAGM is the federal agency tasked by Congress with making and supervising grants for broadcasting activities.  *See* 22 U.S.C. § 6204(a)(5).  RFE/RL is a non-profit news organization

that operates under grants from USAGM. *See, e.g.*, *id.* § 6207. RFE/RL is not itself a federal government entity, *see id.* § 6207(e), and it relies on funding from its federal grants to operate, *see* Capus Decl. ¶¶ 2, 11–15, 23–35.

USAGM is specifically required by statute to make grants to RFE/RL. The United States International Broadcasting Act of 1994 (the "International Broadcasting Act") provides that "[g]rants authorized under section [6204 of this title] for RFE/RL, Incorporated, *shall be available to make annual grants*" for RFE/RL's operations. Pub. L. No. 103-236, 108 Stat. 382, 437 (1994) (codified as amended at 22 U.S.C. § 6207(f)) (emphasis added). In accordance with the Act, RFE/RL and USAGM have regularly entered into grant agreements with respect to the funds Congress has appropriated for RFE/RL. Capus Decl. ¶¶ 13–14.

Congress has appropriated funds for RFE/RL every year since the enactment of the International Broadcasting Act of 1973. *Id.* ¶ 11. For example, Congress appropriated funds for RFE/RL in the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, 138 Stat. 460 (2024) ("2024 Appropriations Act").[2] In Division F of that law, under the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024, Congress appropriated funds for USAGM. In the text of the statute, Congress provided that the "funds appropriated under this heading shall be allocated in accordance with the table included under this heading in the explanatory statement described in section 4." *Id.* at 735. The table that Congress incorporated by reference in the text of the statute allocated $142,212,000 in funding for "Radio Free Europe/Radio Liberty" for the 2024 fiscal year (October 1, 2023, through September 30,

---

[2] For the convenience of the Court, RFE/RL is filing an addendum containing excerpts of the relevant statutory provisions.

2024).  *See* H. Comm. on Appropriations, 118th Cong., Further Consolidated Appropriations Act, 2024, Legislative Text and Explanatory Statement at 1167 (Comm. Print 2024).

Congress renewed RFE/RL's funding through December 20, 2024, in the Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, 138 Stat. 1524 (2024) ("First Continuing Resolution").  Division A of the First Continuing Resolution appropriated "[s]uch amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2024 and under the authority and conditions provided in such Acts, for continuing projects or activities . . . that are not otherwise specifically provided for in this Act, that were conducted in fiscal year 2024, and for which appropriations, funds, or other authority were made available" in "The Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (division F of Public Law 118-47)."  138 Stat. at 1524–25.

Congress again renewed RFE/RL's funding in the American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024) ("Second Continuing Resolution"), through March 14, 2025.  Division A of the Second Continuing Resolution amended the First Continuing Resolution by replacing the expiration date of December 20, 2024, with March 14, 2025.  The Second Continuing Resolution thus appropriated funding for the period January 1, 2025, through March 14, 2025, under the same conditions, as relevant to RFE/RL, as the First Continuing Resolution. On March 15, 2025, the President signed into law Congress's Full-Year Continuing Appropriations and Extensions Act, 2025 ("Third Continuing Resolution"), which, like the previous continuing resolutions, appropriated "[s]uch amounts as may be necessary, at the level specified . . . under the authority and conditions provided in applicable appropriations Act for fiscal year 2024" until September 30, 2025.  *See* H.R. 1968, 119th Cong. § 1101(a) (2025).

In sum, Congress appropriated approximately $23 million for RFE/RL in the First Continuing Resolution for October 1, 2024, to December 20, 2024. Congress appropriated approximately $41 million to RFE/RL in the Second Continuing Resolution for December 21, 2024, to March 14, 2025. Congress further appropriated approximately $77 million for RFE/RL in the Third Continuing Resolution for March 15, 2025, to September 30, 2025.[3]

### C. USAGM Withholds Congressionally Appropriated Funds from RFE/RL and Terminates Its Grant on the Basis that it "No Longer Effectuates Agency Priorities" and a View that Funding RFE/RL Is Not a "Statutory Function" of the Agency.

As required by the International Broadcasting Act, USAGM obligates funding appropriated by Congress to RFE/RL through a grant agreement. 22 U.S.C. § 6207(g). Following the passage of the First and Second Continuing Resolutions, USAGM executed grant agreements obligating those funds to RFE/RL through February 28, 2025. Capus Decl. ¶ 18. Under the Second Continuing Resolution, Congress appropriated funds for RFE/RL through March 14, 2025. *Id.* USAGM did not, however, obligate funds covering the period of performance of March 1–14, 2025—funds that total nearly $7.5 million—in the grant agreement, although the agreement required RFE/RL to perform through March 14.[4] *Id.* Throughout December 2024, USAGM informed RFE/RL that the reason for not obligating the funds was a policy of not providing partial-

---

[3] The total outstanding appropriated funds that RFE/RL has not received is approximately $85 million, with $7.5 million for the period of March 1–14, 2025, and $77 million for the remainder of the 2025 fiscal year. *See* Capus Decl. ¶¶ 18, 20, 22. The Complaint contains a typographical error in the "Relief Requested," stating that $70 million covers the remainder of the 2025 fiscal year. *See* Compl. at 22. The correct figure is $77 million, not $70 million. *See also* Compl. ¶ 29 (describing $77 million).

[4] "Obligating" funds entitles the grantee to receive the funds from the Executive Branch in the form of disbursements. *See* GAO, GAO-05-734SP, A Glossary of Terms Used in the Federal Budget Process (2005).

month payments to grantees, and that it would provide funds for that period once funds for all of March had been appropriated. *Id.*

RFE/RL has continued to engage with USAGM to secure formal obligation of its fiscal year 2025 funds through a signed grant agreement. *Id.* ¶ 19. In late February 2025, RFE/RL and USAGM exchanged drafts of the 2025 grant agreement. *Id.* After agreeing on some minor edits, on February 27, 2025, USAGM sent a final version of the grant agreement to RFE/RL and requested a "*signed* version of this Master Grant Agreement at your earliest convenience." *Id.* RFE/RL promptly responded with the signed grant agreement that same day. *Id.*

On March 14, 2025, President Trump announced the Executive Order "Continuing the Reduction of the Federal Bureaucracy."[5] The order provided that the "non-statutory components and functions of the following governmental entities shall be eliminated to the maximum extent consistent with the applicable law," and listed the "United States Agency for Global Media" as one of those governmental entities. *Id.* The Executive Order did not define what it considered the statutory or non-statutory components and functions of USAGM, and it did not purport to define USAGM's function of obligating appropriated funds for RFE/RL through grants as a non-statutory function. *Id.*

On March 15, 2025, Kari Lake, Senior Advisor to the Acting CEO of USAGM, sent a letter to RFE/RL purporting to terminate RFE/RL's grant agreement. Capus Decl. ¶ 21; March 15 Letter. In the letter, Defendant Lake represented that she was acting pursuant to authorities delegated to her by the Acting CEO. *See* March 15 Letter. According to Defendant Lake, USAGM terminated

---

[5] Exec. Order 14238, "Continuing the Reduction of the Federal Bureaucracy" (Mar. 15, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/.

the grant awarded to RFE/RL because it "no longer effectuates agency priorities," citing the President's executive order of the previous day directing that USAGM eliminate all non-statutorily required activities and functions. *Id.* Defendant Lake did not elaborate on the grant no longer effectuated agency priorities and why the agency had come to the decision to cease funding RFE/RL, and she did not explain on what basis the agency had determined that funding RFE/RL is not one of USAGM's "statutory functions."

USAGM's refusal to obligate and disburse funds appropriated by Congress for RFE/RL is unprecedented. Capus Decl. ¶ 22.

**D.    Significant and Immediate Consequences of USAGM's Unlawful Withholding of Congressionally Appropriated Funds.**

As a result of RFE/RL's inability to access its congressionally appropriated funds, RFE/RL is currently facing and will continue to face irreparable harms to its mission and with regard to the security of its journalists. Capus Decl. ¶¶ 23–34. Those harms jeopardize RFE/RL's very existence and put individuals in harm's way. *Id.*

Because of the withholding of congressionally appropriated funding, RFE/RL has already been forced to significantly scale back its operations and begin terminating its contracts with freelance journalists. *Id.* ¶¶ 23–24. Without access to its congressionally appropriated funds, RFE/RL will soon be nearly unable to operate, as it will be forced to (among other things) terminate its relationships with the rest of its freelance journalists, terminate its leases and contracts, and lay off staff. *Id.* ¶¶ 23–34.

RFE/RL reaches over 47 million people every week. *Id.* ¶ 25. Stopping news coverage in countries where there may be few, if any, alternative news sources apart from state-controlled media means that millions of people will be cut off from access to free and independent media

coverage of critical events. *Id.* This will irrevocably harm RFE/RL's reputation and credibility among those who rely on RFE/RL for news, in addition to jeopardizing RFE/RL's mission. *Id.*

RFE/RL's loss of funding will also impose unrecoverable financial losses on the organization. *Id.* ¶ 31. RFE/RL is responsible for multiple leases and obligations on which it will be forced to default without Congress's appropriated funds. *Id*. For example, RFE/RL has payments due on leases in Prague, Czech Republic; Riga, Latvia; and Kyiv, Ukraine; in April 2025 that it will not be able to pay without access to its congressionally appropriated funds. *Id*. Moreover, because USAGM is a co-obligor RFE/RL's Prague lease, the agency's decision to withhold RFE/RL's funding will financially harm the agency itself. *Id*.

More broadly, RFE/RL exists to provide independent news coverage that is outside of the control of the governments in the countries where it operates. *Id.* ¶ 34. Ceasing news coverage, even temporarily, will allow the state-controlled or state-influenced media in these countries to fill the gap with coverage that is skewed towards the particular narratives favorable to the local governments, rather than objective reporting. *Id.* This could have an immeasurable impact in reducing access to information and set back the work of independent journalism in these countries. *Id.*

Given the nature of RFE/RL's work to support journalistic freedom, it is constantly targeted by cyber-attacks. Decl. James Landis ("Landis Decl.") ¶ 29. If RFE/RL does not receive its congressionally appropriated funding, it will be forced to "shutter" its cyber defenses. *Id.* ¶ 30. Some of RFE/RL's critical cybersecurity defense tools have monthly licenses that will lapse in thirty days if there is a delay in payment. *Id.* Any data breach will risk exposing the personal

information of journalists working in authoritarian states, putting their security, and potentially their lives, at risk. *Id.* ¶ 31.

In addition to the harms faced by RFE/RL as an organization, many individual journalists employed by RFE/RL face grave threats to their safety and security if RFE/RL's funding is abruptly ended. *Id.* ¶¶ 2, 5. RFE/RL relies on freelance journalists in other countries to do some of its most critical reporting. *Id.* ¶ 3. Many of these journalists operate in the field in countries that are hostile to journalistic freedoms. *Id.* These journalists therefore face threats to their physical safety and have been the object of specific and credible threats to their safety from foreign governments and organized criminal elements associated with foreign governments. *Id.* ¶¶ 3, 6. If RFE/RL's funding is not restored, it will not be able to pay for security services for its journalists, or for security services that protect RFE/RL facilities and staff in a number of countries where RFE/RL journalists have been targeted for attack by terrorist organizations, criminal elements, and governments that are hostile to RFE/RL's reporting. *Id.* ¶¶ 12–13, 16–18. For example, RFE/RL Corporate Security "has worked with U.S. and allied security services in managing credible threats targeting journalists in our Russian and Persian-language services, as well as journalists from Belarus," *id.* ¶ 11, where threats to RFE/RL staff have included "unlawful detention and imprisonment" and "physical assault," *id.* ¶ 14.

RFE/RL's workforce also relies on journalists who have fled from authoritarian countries such as Russia and Iran. *Id.* ¶ 19. In many countries where these journalists operate, their residency is based on employment contracts with RFE/RL. *Id.* ¶ 20. If RFE/RL is not funded, it will be forced to terminate its contracts with freelance journalists and lay off the remainder of its employees in April 2025. *Id.* ¶ 21. RFE/RL journalists whose residency relies on their

13

employment may be forced to return to their home countries. *Id.* ¶ 22. In many cases, these journalists could be tortured and imprisoned because of their work for RFE/RL. *Id.*

Further, absent prompt judicial relief to ensure the restoration of access to congressionally appropriated funding, RFE/RL's mission and reputation will be harmed long into the future. Capus Decl. ¶ 32. Many RFE/RL journalists operate in unstable and/or conflict-torn environments. Landis Decl. ¶¶ 3, 5, 7, 16–17. It takes time and effort for RFE/RL to build trust and credibility with its journalists. Capus Decl. ¶ 32. RFE/RL will also suffer irreparable harm if forced to close its doors, even for a short period of time, as its credibility will be damaged. Landis Decl. ¶ 33. If RFE/RL is not able to protect its current journalists, it will be very difficult for RFE/RL to persuade journalists to join RFE/RL in the future. *Id.*; *see also* Capus Decl. ¶ 32. The lack of access to congressionally appropriated funding therefore severely undermines RFE/RL's journalistic mission and the contributions it makes to freedom of the press around the world.

## LEGAL STANDARD

A motion for temporary restraining order is analyzed under the same four-factor test as applies to a motion for preliminary injunctive relief. *See, e.g.*, *Dellinger v. Bessent*, No. CV 25-0385, 2025 WL 471022, at *4 (D.D.C. Feb. 12, 2025). To obtain either a temporary restraining order or preliminary injunction, a movant must demonstrate "1) it is likely to succeed on the merits; 2) it is likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in [its] favor; and 4) an injunction serves the public interest." *Id.* (internal quotation marks omitted) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

**ARGUMENT**

**I.      RFE/RL Is Likely to Succeed on the Merits.**

**A.      This Court Has Jurisdiction.**

RFE/RL brings this action to enjoin unlawful action by a federal agency and to compel it to perform its non-discretionary statutory and constitutional obligations. RFE/RL's claims are premised on the Administrative Procedure Act ("APA"), other federal statutes, and the Constitution itself. Accordingly, they are properly before this Court. *See* 5 U.S.C. § 704; 28 U.S.C. § 1331; *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1113 (D.C. Cir. 2022).

However, in recent cases involving issues of federal funding, the government has suggested that certain claims must proceed in the Court of Federal Claims pursuant to the Tucker Act, and not in federal district court. Any such suggestion here would fail. RFE/RL is not seeking "money damages," which are "given to the plaintiff to *substitute* for a suffered loss." *Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988). RFE/RL instead seeks an order giving it "the very thing to which [it is] entitled," *id.*: its congressionally appropriated funds.

RFE/RL's request to terminate the impoundment of its congressionally appropriated funds is a request for specific relief for a violation of the Constitution and federal statutes, even though it would "result in the payment of money from the federal treasury." *Id.* at 900; *see also id.* ("The State's suit to enforce § 1396b(a) of the Medicaid Act, which provides that the Secretary 'shall pay' certain amounts for appropriate Medicaid services, is not a suit seeking money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money."); *Md. Dep't of Hum. Res. v. Dep't. of Health and Hum. Servs.*,

763 F.2d 1441, 1446 (D.C. Cir. 1985) ("Maryland is seeking funds to which a statute allegedly entitles it, rather than money in compensation for the losses, whatever they may be, that Maryland will suffer or has suffered by virtue of the withholding of those funds."); *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997) ("[the plaintiff's] demand for the release of the remaining funds referred to in the Appropriations Act is not a demand for 'money damages'" and is thus reviewable under the APA). Indeed, this Court recently concluded that the APA (and not the Tucker Act) provided jurisdiction over claims challenging the Executive's failure to disburse congressionally appropriated funds. *AIDS Vaccine*, 2025 WL 752378, at *8–9.

The same reasoning applies to RFE/RL's request to set aside the unlawful termination of its grant agreement: the Tucker Act does not apply to that request because this suit is not "founded . . . upon" a "contract with the United States." 28 U.S.C. § 1491(a)(1). The sources of RFE/RL's claims are not the terms of the grant agreement, but rather the "statutes identified in [RFE/RL's] complaint[]," *AIDS Vaccine*, 2025 WL 752378, at *9, namely the International Broadcasting Act and the relevant appropriations laws, all of which require USAGM to obligate congressionally appropriated funds to RFE/RL through a grant agreement. Moreover, the failure to abide by those statutes also violates the Constitution. RFE/RL's claims therefore do not sound in breach of contract. *See id.* ("[I]t would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach."); *Crowley*, 38 F.4th at 1107 ("[W]e have explicitly rejected the broad notion that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act because to do so would deny a court jurisdiction to

consider a claim that is validly based on grounds other than a contractual relationship with the government." (internal quotation marks omitted)); *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (whether a claim belongs under the APA or the Tucker Act "depends not simply on whether a case involves contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are founded *only* on a contract, or whether they stem from a statute or the Constitution" (emphasis added)), *overruled on other grounds by Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017). Just yesterday, Judge Chutkan held that claims seeking to compel the disbursement of federal grant awards could proceed in this Court because "Plaintiffs do not challenge a contract between the parties—they challenge an action," and "Plaintiffs were awarded this grant pursuant to a statute authorized by Congress." *Climate United Fund v. Citibank, N.A.*, No. 25-cv-735, ECF 15, at 11 (D.D.C. Mar. 18, 2025). The same reasoning applies here.

**B.      USAGM Contravened Its Statutory Obligation to Disburse Congressionally Appropriated Funds to RFE/RL.**

RFE/RL advances a number of claims, but the core of this case is straightforward: USAGM is refusing to fund RFE/RL on the grounds that such funding is not a "statutory function" of the agency, when in fact it *is* a statutory function of the agency. Thus, before turning to its specific claims, RFE/RL explains the basic statutory obligations that Congress has imposed on USAGM and that USAGM is disregarding.

It is a "settled, bedrock principle[] of constitutional law" that "the President must follow statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to the statute." *In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.). While "a President sometimes has policy reasons . . . for wanting to spend less

17

than the full amount appropriated by Congress for a particular project or program," "even the President does not have unilateral authority to refuse to spend the funds," but must "[i]nstead . . . propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *Id.* at 261 n.1.

Two different statutes require USAGM to disburse congressionally appropriated funds to RFE/RL. These statutes are unambiguous, and USAGM has raised no constitutional objection to them—to the contrary, until now USAGM has faithfully executed these statutes. Either statute would be sufficient to place the agency under a legal obligation to fund RFE/RL. Together, they leave no doubt that it has such an obligation.

*First*, the International Broadcasting Act grants to the Chief Executive Officer of USAGM the authority to "make and supervise grants and cooperative agreements for broadcasting and related activities in furtherance of the purposes of [the International Broadcasting Act]." 22 U.S.C. § 6204(a)(5). The statute then proceeds to instruct how the CEO must exercise that authority with respect to RFE/RL:

> Grants authorized under section 6204 of this title for RFE/RL, Incorporated, *shall be available to make annual grants* for the purpose of carrying out similar functions as were carried out by RFE/RL, Incorporated, on the day before April 30, 1994, with respect to Radio Free Europe and Radio Liberty, consistent with section 2 of the Board for International Broadcasting Act of 1973 . . . as in effect on such date.

*Id.* § 6207(f).

By its plain language, § 6207(f) imposes a duty on USAGM to exercise its general grant-making authority under 22 U.S.C. § 6204 to "make annual grants" to RFE/RL. The use of "shall" "connotes a requirement" that is nondiscretionary. *Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1320 (2020). This is not a controversial reading of § 6207(f), but rather one

USAGM embraced during President Trump's first term.  As the agency explained in a court filing in 2020, the International Broadcasting Act identifies certain organizations in order to "*dictate how the CEO [of USAGM] must exercise* his § 6204 grant-making authority when dealing with those organizations."  Def.'s Opp. to Pls.' Mot. TRO at 4, *Open Tech. Fund v. Pack*, No. 20-cv-1710, ECF 7, 2020 WL 7041426 (D.D.C. filed June 26, 2020) (emphasis added).  And USAGM specifically pointed to RFE/RL as an organization for which Congress, in § 6207(f), "dictated how the CEO must exercise his . . . grant-making authority."  *Id.*  The agency had it right in 2020: the International Broadcasting Act imposes a plain and unambiguous duty for USAGM to make grants to RFE/RL.  USAGM cannot disregard Congress's dictates by unilaterally declaring that funding RFE/RL "no longer effectuates agency priorities" or that it is eliminating the agency's "non-statutory" functions.  March 15 Letter.

*Second*, Congress has enacted appropriations legislation requiring USAGM to provide a specific amount of funds to RFE/RL for fiscal year 2025.  In the 2024 Appropriations Act, Congress appropriated funds to USAGM, and then specified as part of the statutory text that "funds appropriated under this heading *shall be allocated* in accordance with the table included under this heading in the explanatory statement described in section 4."  138 Stat. 460, 735 (emphasis added).  Again, the use of "shall" connotes a non-discretionary requirement.  *See Me. Cmty. Health Options*, 140 S. Ct. at 1320.  The referenced table allocates $142,212,000 for RFE/RL in fiscal year 2024, which Congress extended for fiscal year 2025 via the First, Second, and Third Continuing Resolutions.  *See* H. Comm. on Appropriations, 118th Cong., Further Consolidated Appropriations Act, 2024, Legislative Text and Explanatory Statement at 1167 (Comm. Print 2024) ("Explanatory Statement").  While Congress afforded USAGM a modicum of discretion to

"reprogram[]" funds "within and between amounts designated in such table," it carefully circumscribed that authority to "no more than 5 percent" of the designated amount. 138 Stat. 460, 735. That narrow conferral of discretion would have been superfluous had Congress meant to leave USAGM with the far more sweeping authority to deny funds to RFE/RL entirely. *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (cleaned up)). And in a series of laws, the most recent of which President Trump signed just days ago, Congress has extended through September 30, 2025, the appropriations "at the level specified . . . under the authority and conditions provided in applicable appropriations Act for fiscal year 2024." H.R. 1968, 119th Cong. § 1101(a) (2025).

USAGM is bound by the clear instructions from Congress in these relevant appropriations laws. That includes the specific amount allocated to RFE/RL in the table in the Explanatory Statement. Congress incorporated that table by reference into law, instructing in statutory text that USAGM's appropriation "shall be allocated in accordance with the table." Such incorporation by reference is a well-accepted tool of statutory design, and results in the incorporated text having the force and effect of law. *See, e.g.*, *Tennessee v. Lane*, 541 U.S. 509, 517 (2004); *Hershey Foods Corp. v. U.S. Dep't of Agric.*, 158 F. Supp. 2d 37, 38 (D.D.C. 2001) (holding that unenacted bill incorporated by reference into the appropriations statute carried the force of law), *aff'd sub nom. Hershey Foods Corp. v. Dep't of Agric.*, 293 F.3d 520 (D.C. Cir. 2002). As the Government Accountability Office has explained (drawing on precedent from the Supreme Court, the D.C. Circuit, and this Court), when an appropriations law "incorporate[s] by reference an explanatory

20

statement," "the affected agencies are required to obligate and expend the appropriations in accordance with the referenced provisions of the explanatory statement." B-316010, Consolidated Appropriations Act, 2008 – Incorporation by Reference (Feb. 25, 2008).[6]

In sum, USAGM is currently flouting not just one but two clear statutory directives from Congress: the requirement imposed by the International Broadcasting Act to make grants available to RFE/RL, and the requirement imposed by the relevant appropriations laws to provide RFE/RL the specific amount of funds Congress allocated to it. The resulting violations of the APA, the relevant statutes, and the Constitution all stem from this basic and fundamental disregard of USAGM's statutory obligations.

## C. RFE/RL Is Likely to Succeed on Its APA Claims.

Under the APA, a reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). A court must also "compel agency action" that is "unlawfully withheld or unreasonably delayed." *Id.* § 706(1). Defendants' decisions to withhold congressionally appropriated funding and to terminate RFE/RL's grant award are unlawful agency actions, and RFE/RL is likely to prevail in showing that it is entitled to relief under the APA.

Defendants' decisions to impound RFE/RL's congressionally appropriated funds and terminate its grant award are final agency actions reviewable under 5 U.S.C. § 704. "[A]gency action" includes an agency's "sanction," "denial" of "relief," and "failure to act." *Id.* § 551(13). In turn, "sanction" includes the "withholding of relief" or "property," *id.* § 551(10)(B), (D), and "relief" includes an agency's "grant of money" and "recognition of a claim[] [or] right," *id.*

---

[6] https://www.gao.gov/assets/b-316010.pdf.

§ 551(11)(A)–(B).  Defendants' decision to withhold congressionally appropriated funds from RFE/RL and its termination of RFE/RL's grant squarely fall within the definition of an agency action.

Defendants' decisions are also final.  Defendant Lake's March 15 Letter "mark[s] the consummation of the agency's decisionmaking process" from which "rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal quotation marks omitted).  In terminating RFE/RL's grant award agreement, Defendant Lake invoked the March 14, 2025, Executive Order's mandate that USAGM eliminate all non-statutorily required activities and functions and asserted that grants to RFE/RL "no longer effectuate[] agency priorities."  March 15 Letter.  In doing so, Defendant Lake left no doubt that USAGM had made a final decision not only to terminate one grant, but to refuse to make available RFE/RL's congressionally appropriated funds, on the basis that funding RFE/RL is not a "statutory function" of the agency.  In short, USAGM has "made up its mind" to not provide RFE/RL with its congressionally appropriated funding under a grant agreement or otherwise.  *Friedman v. FAA*, 841 F.3d 537, 543 (D.C. Cir. 2016).  Such decisions by Defendants constitute a determination of "rights or obligations" because they result in the withholding of RFE/RL's congressionally appropriated funds.  *Bennett*, 520 U.S. at 177–78.

### 1.  *Defendants' Actions Are Unlawful and Exceed Statutory Authority.*

RFE/RL is likely to succeed on its claim that USAGM's withholding of its congressionally appropriated funds and termination of its grant are "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2). "When a statute commands an agency without qualification to carry out a particular program in a particular way, the agency's

duty is clear; if it believes the statute untoward in some respect, then 'it should take its concerns to Congress,' for '[i]n the meantime it must obey [the statute] as written.'" *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1243 (D.C. Cir. 2011) (quoting *Nat. Res. Def. Council v. EPA*, 643 F.3d 311, 323 (D.C. Cir. 2011)). Under the APA, 5 U.S.C. § 706(2), the court must "invalidate agency action . . . if it conflicts with [] federal law." *NextWave Pers. Commc'ns, Inc. v. FCC*, 254 F.3d 130, 149 (D.C. Cir. 2001).

As discussed above, *supra* Section I.B, USAGM's impoundment of congressionally appropriated funds and termination of RFE/RL's grant agreement directly defy the agency's statutory obligations. Congress has instructed USAGM that grants under 22 U.S.C. § 6204 "shall be available to make annual grants" to RFE/RL. 22 U.S.C. § 6207(f). And applicable appropriations laws instruct USAGM that a specific amount of money "shall be allocated" to RFE/RL. *See supra* Section I.B.

Whatever authority USAGM might otherwise have to withhold funds and terminate grants based on "agency priorities," Congress's express statutory priorities override the priorities of the agency. Similarly, whatever authority USAGM might otherwise have to eliminate its "*non-statutory* functions," it cannot override Congress's assignment to the agency of the *statutory* function of making grants available to RFE/RL, and disbursing the funds Congress specifically appropriated for RFE/RL. USAGM's actions here are not in accordance with law and exceed the agency's statutory authority.

### 2. *Defendants' Actions Are Arbitrary and Capricious.*

RFE/RL is also likely to succeed in its claim that USAGM's withholding of RFE/RL's congressionally appropriated funds and termination of its grant are arbitrary and capricious. The

APA requires USAGM to "cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983) (collecting authorities). That requirement compels the agency to "examine the relevant data and articulate a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Id.* at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

An agency acts arbitrarily and capriciously when it "relie[s] on factors which Congress has not intended it to consider, entirely fail[s] to consider an important aspect of the problem, offer[s] an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* USAGM's withholding of funds appropriated for RFE/RL and termination of its grant are arbitrary and capricious because USAGM failed to provide any specific explanation—let alone a cogent or satisfactory one—for its action, and has given no consideration to the reliance interests in RFE/RL's continued funding and operations.

First, USAGM failed to provide any reason for its decision to withhold congressionally appropriated funds and attempt to terminate the grant agreement. The agency's reasoning in the March 15 Letter was as follows: "The award no longer effectuates agency priorities." March 15 Letter. The letter also asserted that USAGM was eliminating "all non-statutorily required activities and functions." *Id.* A boilerplate regurgitation of the language in 2 C.F.R. § 200.340, and a mere assertion that funding RFE/RL is not statutorily required, with no elaboration at all, is far from "a satisfactory explanation." *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43; *see also AIDS Vaccine*, 2025 WL 752378, at *11 & n.10 (describing identical language in termination notices as

24

"boilerplate"). Nor can such boilerplate language permit anyone to draw a "rational connection between the facts found and the choice made," *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168), given that USAGM found no facts at all. USAGM's explanation is nothing more than two conclusory statements devoid of any specifics whatsoever; the agency's deficient reasoning alone is a sufficient basis for finding USAGM's withholding arbitrary and capricious.

USAGM's decision, however, is also arbitrary and capricious for another reason. The agency failed to consider a critical aspect of the problem: the substantial reliance interests in RFE/RL's continued funding and operation. The government has funded RFE/RL consistently for 75 years. Capus Decl. ¶ 3. That funding has created "serious reliance interests that must be taken into account." *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)). Several are particularly significant. *First*, RFE/RL reaches over 47 million individuals weekly, some of whom reside in countries where there may be few, if any, alternative news sources in the local language free from state control or influence. *See* Capus Decl. ¶ 25. Cessation of RFE/RL's operations would deprive those listeners of access to free and independent media coverage of critical events. *See id.* ¶ 34.

*Second*, the agency's withholding will harm RFE/RL's employees. *Id.* ¶ 26. Many of those journalists and staff work outside their home countries because they would be subject to arrest in their home countries because of their affiliation with RFE/RL, so refusal to fund RFE/RL puts those employees at risk of losing their visas and subsequently being deported. *Id.* ¶ 27; Landis Decl. ¶ 22. Moreover, many RFE/RL journalists have been targeted by specific and credible threats from foreign governments and associated organized criminal elements, and they rely on

security and protection provided by RFE/RL. Landis Decl. ¶¶ 5–6. Relatedly, terminating RFE/RL's operations and laying off its staff will harm its reputation as a reliable partner and its brand, both of which RFE/RL has spent decades and significant resources building. Capus Decl. ¶ 32.

*Third*, RFE/RL is subject to several leases and other obligations that it will be forced to default on without Congress's appropriated funds. *See id.* ¶ 31. In fact, USAGM is a co-obligor on the lease for RFE/RL's Prague branch, *see id.*, so USAGM's continued withholding of the appropriated funds would ultimately obligate the agency to bear the financial brunt of RFE/RL's default. It is arbitrary and capricious for an agency to take precipitous action without even considering the financial and legal impacts of its decision on itself and its own stewardship of taxpayer dollars.

USAGM's complete failure to even consider any of the harms that withholding RFE/RL's funds would inflict is the exact type of arbitrary and capricious decision-making that the APA prohibits. Unsurprisingly, courts have found other unexplained funding pauses arbitrary and capricious for the same reason. *Cf., e.g.*, *AIDS Vaccine*, 2025 WL 752378, at *10 (finding that the agency failed to show that it had considered "the immense reliance interests among businesses and other organizations across the country"); *New York v. Trump*, No. 25-CV-39, 2025 WL 715621, at *12 (D.R.I. Mar. 6, 2025) (finding that the agency failed to consider "the catastrophic consequences" of its "funding freeze" and noting that it was "difficult to perceive any rationality in this decision—let alone thoughtful consideration of practical consequences").

Because USAGM has completely failed to consider significant reliance interests and because its explanation is virtually non-existent and not specific to RFE/RL's circumstances, the

Court should find USAGM's withholding of the funds appropriated by Congress for RFE/RL to be arbitrary and capricious and set the agency's decision aside.

<em>3.     Defendants Unlawfully Withheld RFE/RL's Congressionally Appropriated Funds.</em>

RFE/RL is also likely to succeed in showing that the Court should "compel" USAGM to release its funding, which has been "unlawfully withheld." 5 U.S.C. § 706(1). Under the APA, 5 U.S.C. § 706(1), a plaintiff must identify a "discrete agency action" that the agency is "required to take," either by statute or regulation. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Defendants' refusal to disburse RFE/RL's congressionally appropriated funds meets that requirement.

As discussed above, USAGM has a non-discretionary duty to make "annual grants" available to RFE/RL from those funds. 22 U.S.C. § 6207(f). In the Second and Third Continuing Resolutions, Congress appropriated funds for RFE/RL that USAGM must make available to RFE/RL for use during the statutorily prescribed annual timeframe. But USAGM has not complied with its non-discretionary duties to make appropriated funds available to RFE/RL or make a grant of those funds. Capus Decl. ¶¶ 19, 22. USAGM has not obligated RFE/RL's appropriated funds, despite repeated attempts by RFE/RL to secure release of those funds. *Id.* ¶¶ 18–22. In so doing, Defendants have failed to take "discrete" actions on statutorily "required" items. *Norton*, 542 U.S. at 64–65.

**D.     RFE/RL Is Likely to Succeed on Its Constitutional Claims.**

Defendants' unlawful impoundment of RFE/RL's congressionally appropriated funds violates the Constitution's separation of powers. Several clauses of the Constitution, along with general separation-of-powers principles, compel this conclusion. And while these constitutional

violations are additional reasons why RFE/RL is likely to succeed on its APA claims, *see* 5 U.S.C. § 706(2)(B), this Court also has authority to enjoin constitutional violations by federal officials even absent the APA's cause of action, *see Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (recognizing "[t]he ability to sue to enjoin unconstitutional actions by . . . federal officials").

**Appropriations & Spending Clauses.** Congress has the "exclusive power over the federal purse." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). This power is enshrined in the Appropriations Clause and the Spending Clause. *See AIDS Vaccine*, 2025 WL 752378, at *16 (finding that the "Constitution *explicitly* vests in Congress the power to spend, U.S. Const. art. I, § 8, cl. 1, and appropriate funds, *id.* art. I, § 9, cl. 7"). The Constitution thus "empowers Congress, *not the Executive*, to spend for the general welfare." *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021) (emphasis added). By declining to disburse funds lawfully appropriated by Congress, the Executive Branch is unconstitutionally encroaching on Congress's Appropriations Clause and Spending Clause authority. *See PFLAG, Inc. v. Trump*, No. CV 25-337, 2025 WL 510050, at *17 (D. Md. Feb. 14, 2025) ("Because there is no evidence that the Administration asked Congress to rescind appropriated funds, the Court finds that the Executive Orders unconstitutionally intrude upon the Congressional prerogative to control the public fisc.").

**Presentment Clause.** "There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Here, where USAGM has withheld the funds that Congress has appropriated to

RFE/RL, the Executive Branch is as a practical matter effecting an amendment or repeal of duly enacted statutes, in violation of the Presentment Clause. *See City & County of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) ("Aside from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress."); *PFLAG*, 2025 WL 510050, at \*18 (the Constitution "does not allow the President to circumvent Bicameralism and Presentment by unilaterally amending or cancelling federal appropriations").

**Take Care Clause.** Under Article II, the President is obligated to "take care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *see also Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838) ("To contend that the *obligation* imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible." (emphasis added)). Both the International Broadcasting Act and the relevant appropriations statutes are laws enacted by Congress, and so the Executive Branch must take care that such laws are faithfully executed. *See PFLAG, Inc.*, No. CV 25-337, 2025 WL 685124, at \*14 (D. Md. Mar. 4, 2025) ("Where Congress has failed to give the President discretion in allocating funds, the President has no constitutional authority to withhold such funds and violates his obligation to faithfully execute the laws duly enacted by Congress if he does so." (internal quotation marks omitted)). "Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations. Moreover, the obligation is an affirmative one, meaning that failure to act may be an abdication of the [Executive Branch's] constitutional role." *City & County of San Francisco*, 897 F.3d at 1234. Here, by withholding funds duly appropriated by statute, Defendants are in dereliction of their duty to take care that the laws be faithfully executed.

***Separation-of-Powers Principles.*** Each of these specific constitutional clauses buttresses the overall conclusion that the Constitution's separation of powers principles forbid the Executive Branch from declining to disburse lawfully appropriated funds. Ultimately, the Executive Branch's authority to act "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Here, no such authority to withhold funds exists. *See City & County of San Francisco*, 897 F.2d at 1233–34 ("[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon."). As explained by then-Judge Kavanaugh, "a President sometimes has policy reasons (as distinct from constitutional reasons) for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds. Instead, the President must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken County*, 725 F.3d at 261 n.1 (internal citation omitted) (citing the Impoundment Control Act, 2 U.S.C. § 683); *see also Train v. City of New York*, 420 U.S. 35, 41, 47–49 (1975) (invalidating a Presidential directive to "withhold[]" funding because it could not be "squared with the statute"); William Rehnquist, *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303, 309 (1969) (rejecting the notion of a presidential power to "decline to spend appropriated funds" as unsupported by "reason" or "precedent").

Moreover, "'[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb,' and the Court can sustain his actions 'only by disabling the Congress from acting upon the subject.'" *Medellin v. Texas*, 552 U.S. 491, 525

(2008).  Here, the Executive Branch's withholding of funds is incompatible with both the International Broadcasting Act and the appropriations statutes, and so the withholding of funds cannot be sustained.[7]  Recent case law demonstrates this.  In *AIDS Vaccine*, the district court applied this framework and determined that because "Congress ha[d] explicitly appropriated foreign aid funds for specified purposes" and the Administration was seeking to "rescind or defer the funds Congress has appropriated" without complying with the Impoundment Control Act, the freezing of foreign aid funds was "a circumstance in which the Executive's power is 'at its lowest ebb.'"  2025 WL 752378, at *14–15 (quoting *Youngstown*, 343 U.S. at 637).  In such circumstances, the Executive Branch is required to follow Congress's directives: "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals."  *City & County of San Francisco*, 897 F.3d at 1235.  If anything, this case is even more straightforward than *AIDS Vaccine*: Congress has not only appropriated funds "for specified purposes," 2025 WL 752378, at *14–15, but has

---

[7]  The withholding of funds is also incompatible with the Congressional Budget and Impoundment Control Act ("ICA"), which creates a narrow statutory grant of presidential impoundment authority.  *See City & County of San Francisco*, 897 F.3d at 1234 ("[E]ven if the President's duty to execute appropriations laws was once unclear, Congress has affirmatively and authoritatively spoken." (citing the ICA)); *AIDS Vaccine*, 2025 WL 752378, at *14 ("Congress has further asserted its spending power in the Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, 88 Stat. 297, which explicitly prohibits the President from impounding appropriated funds without following certain procedures.").  Under the ICA, permanent impoundments or "rescissions" are only permitted where, among other requirements, the President "transmit[s] to both Houses of Congress a special message" addressing the amount, reasons, impact, and other information related to the proposed recission of funds.  2 U.S.C. § 683(a).  Congress then has 45 days to rescind its appropriation—if such a rescission does not occur, the funds must be made available for obligation.  *Id*. § 683(b).  Here, Defendants have not acted within the narrow confines of the ICA.

specifically dictated who must receive those funds (RFE/RL) and how much ($142 million in fiscal year 2025).

### E.     RFE/RL Is Likely to Succeed on Its Mandamus and Ultra Vires Claims.

Independent of its APA and constitutional claims, RFE/RL is likely to succeed on two additional bases: its request for mandamus relief and its ultra vires claim.

***Mandamus Relief.***   "The power grounded in 5 U.S.C. § 706(1) to compel agency action can also be effectuated through the use of a writ of mandamus." *Potomac Elec. Power Co. v. ICC*, 702 F.2d 1026, 1034 (D.C. Cir. 1983), *supplemented*, 705 F.2d 1343 (D.C. Cir. 1983).   Indeed, the "standard[] for obtaining relief [through mandamus and under the APA] are essentially the same." *Viet. Veterans of Am. v. Shinseki*, 599 F.3d 654, 659 n.6 (D.C. Cir. 2010).   "[A] district court may grant mandamus relief if '(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff.'" *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005) (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002)).

The reasons discussed above for why Defendants' conduct is an "agency action unlawfully withheld," 5 U.S.C. § 706(1), also support granting RFE/RL's request for mandamus relief. Therefore, even if APA relief were deemed unavailable, RFE/RL would still be likely to succeed in challenging Defendants' unlawful withholding of congressionally appropriated funds via mandamus relief.

***Ultra Vires.***   Judicial "[r]eview for ultra vires acts rests on the longstanding principle that if an agency action is unauthorized by the statute under which [the agency] assumes to act, the agency has violate[d] the law and the courts generally have jurisdiction to grant relief." *Nat'l*

*Ass'n of Postal Supervisors v. USPS*, 26 F.4th 960, 970 (D.C. Cir. 2022) (internal quotation marks and citation omitted).  To prevail on an ultra vires claim, a plaintiff must show that "(i) there is no express statutory preclusion of all judicial review; (ii) 'there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory.'" *Fed. Express Corp. v. U.S. Dep't of Com.*, 39 F.4th 756, 763 (D.C. Cir. 2022) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)).  "Moreover, an agency acts ultra vires when its decision is not supported by 'a contemporaneous justification by the agency itself,' but only a '*post hoc* explanation [by] counsel.'" *Nat'l Ass'n of Postal Supervisors*, 26 F.4th at 975 (quoting *N. Air Cargo v. USPS*, 674 F.3d 852, 860 (D.C. Cir. 2012)).

Again, even if an APA claim were for some reason unavailable, RFE/RL's ultra vires claim would still be likely to succeed.[8]  USAGM's withholding of RFE/RL's congressionally appropriated funding is an ultra vires act because it "disregard[s] a specific and unambiguous statutory directive." *Fed. Express Corp.*, 39 F.4th at 764.  Congress statutorily mandated that USAGM make "annual grants" available to RFE/RL from the authorized funds.  22 U.S.C. § 6207(f).  And Congress has instructed that a specific amount of funds "shall be allocated" to RFE/RL.  *Supra* Section I.B.  In the March 15 Letter, Defendant Lake invoked the March 14, 2025, Executive Order's mandate that USAGM eliminate all non-statutorily required activities and functions, indicating that USAGM has determined that grant-making with and providing

---

[8] The first two elements for an ultra vires claim are readily satisfied.  *See Fed. Express Corp.*, 39 F.4th at 763.  Section 6207 does not expressly preclude all judicial review, *see generally* 22 U.S.C. § 6207, and, if the court determines that RFE/RL cannot bring an APA claim, RFE/RL will not have an alternative procedure for review of its statutory claim.

congressionally appropriated funds to RFE/RL is not USAGM's statutorily required activity. *See* March 15 Letter. USAGM's decision to contravene an express directive from Congress is no "garden-variety error[] of law or fact," but a "clear departure by the agency from its statutory mandate." *Fed. Express Corp.*, 39 F.4th at 764 (citations omitted and alterations adopted).

## II. RFE/RL Will Suffer Irreparable Harm Without a Temporary Restraining Order and Preliminary Injunction.

To establish irreparable harm, an "injury must be both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Am. Ass'n of Pol. Consultants v. U.S. Small Bus. Admin.*, 613 F. Supp. 3d 360, 370 (D.D.C. 2020), *aff'd*, 810 F. App'x 8 (D.C. Cir. 2020) (internal quotation marks omitted); *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006) (injury is irreparable if it cannot later be remedied by "compensatory or other corrective relief").

The harms RFE/RL faces are grave and imminent—indeed, they are already occurring. They include harms to the essential operations and mission of RFE/RL, harm to the physical safety of its journalists and staff, and harm to RFE/RL's reputation as a reliable news source and employer. Ultimately, these harms threaten the very existence of RFE/RL. Those injuries become more severe with each passing day; the longer RFE/RL goes without funds, the more essential operations RFE/RL must cut. Immediate judicial intervention is needed and warranted.

Because RFE/RL is already suffering irreparable harm due to the withholding of RFE/RL's congressionally appropriated funds, RFE/RL seeks a temporary restraining order to obtain access to the nearly $7.5 million in appropriated funds for the March 1–14 period of time. Those funds have been appropriated by Congress since December, and they cover a grant period on which

34

RFE/RL has already performed.  *See* Capus Decl. ¶ 18; see *also AIDS Vaccine*, 2025 WL752378,

at *4 (noting that the court had ordered "Defendants to unfreeze funds for work [previously]

completed" and to do so within 36 hours).

RFE/RL is cognizant of the extraordinary nature of a TRO and has accordingly framed its

request for such relief in extremely narrow terms.  For that reason, the TRO that RFE/RL requests

will only permit RFE/RL to operate for a brief period of additional time, perhaps a few weeks.

RFE/RL is thus also seeking a preliminary injunction to restore its funding on a monthly basis

pending final resolution of this lawsuit: without that relief, RFE/RL's irreparable harm will merely

be postponed, not prevented.  RFE/RL thus respectfully requests that the Court, in addition to

holding a prompt hearing and granting a TRO, also schedule a hearing on the preliminary

injunction within 21 days of this filing, *see* LCvR 65.1(d).

### A.     The Halt in Funding Threatens RFE/RL's Essential Operations.

Without its congressionally appropriated funds, RFE/RL will be forced to stop the vast

majority of its journalistic work.  Capus Decl. ¶ 23.  It is unable to access its appropriated funds

and has limited cash on hand to sustain basic institutional operating costs.  *Id.*  RFE/RL has already

begun the process of winding down its operations in light of the lack of access to its appropriations.

*Id.* ¶¶ 23–24.  That wind-down process will include "terminating all the organization's contracts

with freelance journalists, terminating RFE/RL's leases and contracts, and laying off staff."  *Id.*

¶ 23.  USAGM's refusal to provide RFE/RL's congressionally appropriated funds "threatens the

very existence" of the organization.  *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

Failing to provide RFE/RL its congressionally appropriated funding will require it to "halt

essentially all broadcasting and news operations."  Capus Decl. ¶ 25.  RFE/RL reaches over 47

million people every week. *Id.* ¶ 3. Stopping news coverage in countries where there are few, if any, alternative news sources apart from state-controlled or state-influenced media means that millions of people will be cut off from access to free and independent media coverage of critical events. *Id.* ¶¶ 3–5, 34. This will allow the state-controlled media in those countries to fill the gap with coverage that is favorable to the particular narratives favored by local governments. *Id.* ¶ 34. This will irrevocably harm RFE/RL's mission of providing reliable news coverage to people in countries where the free press is threatened and disinformation is pervasive. *See League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) ("[O]bstacles [that] unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of] irreparable harm.").

RFE/RL's loss of funding will impose unrecoverable financial losses on the organization. Capus Decl. ¶ 31. RFE/RL is responsible for multiple leases and obligations that it will be forced to default on without Congress's appropriated funds. *Id.* For example, RFE/RL has payments due on its leases in Prague, Riga, and Kyiv, and many other locations, which it will not be able to pay next month without appropriated funds. *Id.*

RFE/RL currently stores the majority of its content on unarchived, external platforms or on leased servers. Capus Decl. ¶ 33. Losing funding means that RFE/RL will no longer be able to maintain these platforms, and these "vital records of American history could be lost forever." *Id.* Additionally, RFE/RL will "be forced to shutter its cyber defenses" if it loses funding. Landis Decl. ¶ 30. This "virtually guarantees that cyber attackers will gain access to sensitive RFE/RL systems and the personal data of over 1,000 people in over twenty countries, including in dictatorships where RFE/RL freelancers risk their lives to send RFE/RL their reports from those

36

countries." *Id.* ¶ 31; *see also All. for Retired Ams. v. Bessent*, No. CV 25-0313, 2025 WL 740401, at *22 (D.D.C. Mar. 7, 2025) (in preliminary injunction context, plaintiffs may show irreparable harm by "demonstrating that such a [data] breach or improper disclosure is *likely* in the absence of an injunction" (internal quotation marks omitted)). This will endanger the lives of those journalists. Landis Decl. ¶ 31.

**B.      The Halt in Funding Threatens the Physical Safety of RFE/RL Journalists and Staff.**

RFE/RL relies on freelance journalists to do some of its most critical reporting. Landis Decl. ¶ 3. Many of these journalists operate in the field in countries where governments are "hostile to RFE/RL's reporting" and journalists "face threats to their personal and physical security" associated with reporting in those countries. *Id.* ¶¶ 2, 17. RFE/RL has already begun to terminate contracts with freelance journalists due to the lack of funding, and the remaining contracts will likely be severed in April 2025 absent additional funding. *Id.* ¶ 4. RFE/RL journalists have been the object of specific and credible threats from foreign governments and organized criminal elements associated with foreign governments. *Id.* ¶ 6. For example, RFE/RL security worked closely with Ukrainian security services "on specific threats targeting RFE/RL journalists in Ukraine." *Id.* ¶ 7. Without the ability to draw on its congressionally appropriated funds, RFE/RL will not be able to "retain security personnel who are qualified to provide security support to staff receiving threats, liaise with host-nation security personnel, and collaborate with the U.S government to ensure that RFE/RL's journalists are protected." *Id.* ¶ 15. RFE/RL's resources are also critical to protecting journalists who "face harassment, abduction, and threats of assassination." *Id.* ¶ 11. Where an individual "faces the possibility of transfer to a government where he might be tortured or indefinitely confined, [that] undeniably

would constitute irreparable harm."  *Omar v. Harvey*, No. CIV. A. 05-2374, 2006 WL 286861, at *2 (D.D.C. Feb. 6, 2006) (internal quotation marks omitted).

Relatedly, RFE/RL's work relies on journalists who fled from authoritarian countries such as Russia and Iran.  Landis Decl. ¶ 19.  In many countries where these journalists operate, their residency relies on employment contracts with RFE/RL.  *Id.* ¶ 20.  If RFE/RL is not funded, it will be forced to terminate its contracts with these journalists and lay off the vast majority its employees in April 2025.  *Id.* ¶ 21.  RFE/RL journalists whose residency relies on their employment may be forced to return to their home countries.  *Id.* ¶ 22.  In many cases, these journalists "will face the threat of torture and imprisonment because of their work for RFE/RL."  *Id.*; *see Omar*, 2006 WL 286861, at *2.  "The Russian government has labeled dozens" of exiled Russian journalists with whom RFE/RL contracts "as 'foreign agents,' a designation which imposes fines and can carry criminal punishment of up to five years' imprisonment."  Landis Decl. ¶ 23.  One RFE/RL journalist, for example, was arrested and sentenced to six-and-a-half years in prison in Russia based on "fabricated charges of spreading 'false information' about Russia's war in Ukraine."  *Id.* ¶ 24; *see also* USAGM, American RFE/RL Reporter Alsu Kurmasheva Released from Russian Custody (Aug. 1, 2024).[9]  *Cf., e.g.*, *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 544 (D.D.C. 2020) (noting irreparable harm occurs where petitioner is threatened with deportation to a country where he "face[s] the possibility of torture and death"); *Devitri v. Cronen*, 289 F. Supp. 3d 287, 296–97 (D. Mass. 2018) (declaration asserting likelihood of persecution if removed sufficient for irreparable harm).  "To say the least, this harm could not be remedied after

---

[9] https://perma.cc/YNF3-KPCF.

the court has an opportunity to rule on the merits of plaintiffs' complaint." *A.B.-B. v. Morgan*, 548 F. Supp.3d 209, 221 (D.D.C. 2020).

Finally, RFE/RL staff in RFE/RL facilities also face threats distinct from journalists in the field. Landis Decl. ¶ 16–18. Without its congressionally appropriated funding, "RFE/RL will be forced to reduce or cancel its contracts with guards and other essential security services that safeguard RFE/RL facilities and staff in a number of countries where staff have been targeted." *Id.* ¶ 16. RFE/RL will no longer be able to provide physically secure office locations and facilities for staff if it is forced to cancel its contracts with security services. *Id.* ¶ 17. In addition, RFE/RL provides "essential security training . . . to staff who operate in hostile environments." *Id.* ¶ 8. Due to its shortage of funds, "RFE/RL has suspended planned . . . training courses and will be unable to schedule future training if RFE/RL cannot access its funds." *Id.* ¶ 9.

## C. RFE/RL's Inability to Access Its Funds Threatens Irreparable Damage to RFE/RL's Reputation as a Trusted Employer and Purveyor of Uncensored Media.

RFE/RL's inability to access its congressionally appropriated funds would harm RFE/RL's long-term reputation. "Injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction." *Atlas Air, Inc. v. Int'l Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103–04 (D.D.C. 2017) (concluding that harm caused by shipping slowdown to the plaintiff's reputation among customers expecting express delivery was irreparable), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019). *See Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (finding irreparable harm where conduct "could not fail to damage [the plaintiff's] good name").

As discussed, RFE/RL cooperates with freelance journalists who work in the field in some of the countries most hostile to independent reporting in the world. Capus Decl. ¶ 26. Recruiting

freelance journalists in these countries is "challenging due to the personal and professional risks involved," and RFE/RL has "spent decades" developing relationships with local journalists and organizations to establish itself as a reliable and secure broadcaster of independent news. *Id.* If RFE/RL cannot access its congressionally appropriated funds, it will be forced to terminate the remaining contracts with these journalists, damaging RFE/RL's reputation as a reliable partner. *Id.*

Relatedly, if RFE/RL is forced to abruptly close its doors and cease its activities, including essential security services, journalists will be left unprotected and, in many cases, face deportation to dangerous countries. Landis Decl. ¶ 33. This will "destroy the trust, credibility, and relationships RFE/RL has built over decades with its journalists, who rely on RFE/RL to provide for their continued safety." *Id.* The reputational harms caused by RFE/RL's inability to access its funding means that it will lose relationships with journalists, even if funding resumes. Capus Decl. ¶ 32. This lasting damage to the organization's ability to carry out its functions is irreparable harm.

## III. The Balance of Equities and Public Interest Weigh in Favor of Preliminary Relief.

The final two factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Am. Ass'n of Pol. Consultants*, 613 F. Supp. 3d at 365 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, these factors weigh strongly in favor of a temporary restraining order and preliminary injunction.

*First*, RFE/RL is likely to succeed on the merits, as described above, and "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (quoting *Newby*, 838 F.3d at 12); *see also N.S. v. Hughes*, 335 F.R.D. 337, 355 (D.D.C. 2020) ("[T]he government has no legitimate interest in

acting unlawfully.").  By contrast, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  *Newby*, 838 F.3d at 12 (citation omitted).

*Second*, restoring funding to ensure the continued operations of RFE/RL is in the public interest.  Since its inception, RFE/RL has provided accurate, uncensored news in countries where a free press is threatened.  RFE/RL is one of the most comprehensive news operations in the world, reporting in 27 languages to 23 countries and reaching more than 47 million people every week.  *See, e.g.*, USAGM, RFE/RL Fact Sheet (Jan. 7, 2025).  Congress itself has found that "[i]t is in the interest of the United States to support broadcasting to other nations," 22 U.S.C. § 6201(3), and has chosen to advance that mission through the continued funding of RFE/RL, *see id.* § 6207(f); *supra* Background Section B (discussing the appropriations laws through which Congress has funded RFE/RL).  The continued functioning of RFE/RL is therefore in the public interest.  No meaningful countervailing interest weighs in favor of withholding RFE/RL's congressionally appropriated funding.

*Finally*, there is no equitable basis for withholding a temporary restraining order or preliminary injunction.  Since its very inception and over the course of decades, RFE/RL has been a recipient of uninterrupted federal funding.  Capus Decl. ¶¶ 11–15, 22.  Until now, USAGM had always complied with its statutory mandate to "make annual grants for the purpose of carrying out" RFE/RL's historic role.  22 U.S.C. § 6207(f); *see also* Capus Decl. ¶ 22.  RFE/RL seeks this Court's intervention to restore that longstanding status quo and to avert the irreparable harm it is facing from the unlawful withholding of its funding.

**CONCLUSION**

For the reasons set forth herein, this Court should grant the motion for a temporary restraining order and a preliminary injunction.

March 19, 2025                                    Respectfully submitted,

                                                 /s/ Marney L. Cheek

                                                 Marney L. Cheek (D.C. Bar No. 470596)
                                                 David M. Zionts (D.C. Bar No. 1013523)
                                                 Thomas Brugato (D.C. Bar No. 995170)

                                                 COVINGTON & BURLING LLP
                                                 850 Tenth Street NW
                                                 Washington, DC 20001-4956
                                                 (202) 662-6000
                                                 mcheek@cov.com
                                                 dzionts@cov.com
                                                 tbrugato@cov.com

                                                 *Attorneys for Plaintiff RFE/RL, Inc.*