# Exhibit B

## Declaration of James Landis

I, James Landis, declare as follows:

1. I am the Head of Corporate Security of RFE/RL, Inc., commonly known as Radio Free Europe/Radio Liberty ("RFE/RL"). The statements made in this declaration are based on my personal knowledge and the information made available to me pursuant to my duties as Head of Corporate Security.

2. If RFE/RL is denied access to its appropriated funds, RFE/RL and its journalists will face threats to their personal and physical security, as well as threats to their cyber security and the personal identifying information contained in RFE/RL's systems. Journalists will also face potential deportation to dangerous countries where they could be persecuted for their reporting for RFE/RL.

**Immediate Harms of USAGM's Refusal to Provide RFE/RL's Congressionally Appropriated Funding to Journalists' Personal Security**

3. RFE/RL relies on freelance journalists in other countries to do some of its most critical reporting. Many of these journalists are from countries where RFE/RL personnel are considered foreign agents and in many cases they have faced threats to their physical safety associated with reporting from or about those countries. For many of the freelancers who have managed to leave their native country and continue to work for RFE/RL from the relative safety of a third country, their family members continue to face intimidation, harassment and persecution from state intelligence services and the police. Family members of RFE/RL freelancers in Iran, Russia, Afghanistan, and Belarus have reported threats of arrest and the seizure of property and assets in an effort to compel RFE/RL freelance staff and employees to return.

4. RFE/RL has already begun to terminate contracts with freelance journalists due to RFE/RL's dire cash flow situation. RFE/RL will likely terminate the remainder of their freelance journalists in April 2025 if RFE/RL does not receive its funding soon. For these freelance journalists, the effects of termination include not only their salaries, but also the security provided by RFE/RL to ensure their safety.

5. Without the ability to draw on its congressionally appropriated funds, RFE/RL will no longer be able to protect its journalists from the threats they routinely face. Withholding RFE/RL funds poses considerable risk to journalists operating in authoritarian countries, as the sudden interruption in funding will halt the security services that RFE/RL provides to its journalists. This support comes in various forms, including training and risk assessments for individual journalists. These security services are necessary for RFE/RL journalists to do their work in countries where reporting involves great personal and physical risk.

6. RFE/RL journalists have been the object of specific and credible threats from foreign governments and organized criminal elements associated with foreign governments. These

threats have extended beyond the borders of the country where the threats originated and have been conveyed to RFE/RL security staff from U.S. and allied security services who considered the threats credible and significant enough to warrant briefing the affected personnel and, in some cases, providing additional security to these same employees.

7. For example, RFE/RL worked closely with Ukrainian security services on specific threats targeting RFE/RL journalists in Ukraine. These threats were conveyed in online forums, identified specific RFE/RL journalists by name, and included detailed and personal biographic information, including residential information. Ukrainian police relocated our staff, provided police security and armed escorts, and worked to identify the individuals involved who, on at least one occasion, carried out an act of arson at a previous residence of one of our journalists. Without RFE/RL playing this important role in the security of its employees and journalists, their lives and their work as journalists would be at increased risk.

8. RFE/RL also provides essential security training known as Hostile Environment and First Aid Training ("HEFAT") to staff who operate in hostile environments. This training is augmented in some countries, such as Ukraine, with additional, more intensive first-aid training tailored to the unique threats faced in covering a war.

9. Due to RFE/RL's shortage of funds, RFE/RL has suspended planned HEFAT training courses and will be unable to schedule future training if RFE/RL cannot access its funds.

10. In addition to training, RFE/RL provides personal protective equipment ("PPE")—ballistic vests, helmets, goggles and gas masks—to staff in countries where journalists face risks covering demonstrations, which are not uncommon in many of the countries where we operate. Withholding funding will significantly impair our ability to procure new PPE, thus putting some of our journalists in physical jeopardy.

11. RFE/RL Corporate Security has worked with U.S. and allied security services in managing credible threats targeting journalists in our Russian and Persian-language services, as well as journalists from Belarus. For example, Russian journalists in exile across Europe have been tracked by Russian intelligence operations. They face harassment, abduction, and threats of assassination.

12. When RFE/RL corporate security services have identified credible threats to journalists and staff, RFE/RL collaborates with the relevant local law enforcement to provide security support. Local law enforcement have, for example, provided 24-hour police protection to journalists and staff when needed. RFE/RL Corporate Security personnel are a vital component to this support and provide needed liaison with the relevant police authorities.

13. When there is an identified threat to staff within RFE/RL's operating region, Corporate Security personnel often collaborate with the relevant U.S. Embassy to mitigate the identified threats. In the past two years, Corporate Security has collaborated with U.S. Embassy personnel in Moscow, Riga, Tbilisi, Kyiv and Vilnius on a variety of threats.

14. These threats to our staff have included the unlawful detention and imprisonment of Alsu Kurmasheva in Russia and Andrey Kuznechyk in Belarus, ongoing harassment and counter-intelligence concerns to staff in Latvia and Lithuania, and the physical assault of our journalists in Georgia, Romania, Kyrgyzstan, and Tajikistan in connection with their work for RFE/RL. In other countries where we operate, our journalists are frequently called in for questioning by local security services and threatened with arrest and/or legal action for their reporting.

15. Continuing to withhold RFE/RL's resources would eliminate RFE/RL's ability to retain security personnel who are qualified to provide security support to staff receiving threats, liaise with host-nation security personnel, and collaborate with the U.S government to ensure that RFE/RL's journalists are protected.

**Immediate Harms of USAGM's Refusal to Provide RFE/RL's Congressionally Appropriated Funding to Physical Security**

16. Without its congressionally appropriated funding, RFE/RL will be forced to reduce or cancel its contracts with guards and other essential security services that safeguard RFE/RL facilities and staff in a number of countries where staff have been targeted.

17. RFE/RL staff and journalists abroad have been targeted for attack by terrorist organizations, criminal elements, and governments that are hostile to RFE/RL's reporting. RFE/RL will no longer be able to provide physically secure office locations and facilities for staff if it is forced to cancel its contracts with security services.

18. RFE/RL currently has guard contracts for our facilities in Prague, Yerevan, and Riga. These guards are essential for providing perimeter security, identifying and responding to threats, and screening staff and visitors. In Prague, where our reporting headquarters has robust physical security features, guard services are required to operate the cameras, barriers, ballistic doors, and screening access points.

**USAGM's Refusal to Provide RFE/RL's Congressionally Appropriated Funding Will Cause Journalists to be Deported to Dangerous Countries**

19. RFE/RL's workforce comprises hundreds of journalists who fled from authoritarian regimes in countries such as Russia and Iran.

20. In many countries where these journalists operate, their residency is based on employment contracts with RFE/RL.

21. If RFE/RL is not funded, it will be forced to lay off the remainder of its employees in April 2025.

22. RFE/RL journalists whose residency relies on their employment may be forced to return to their home countries. In many cases, these journalists will face the threat of torture and imprisonment because of their work for RFE/RL.

23. RFE/RL employs over three hundred exiled Russian journalists, who operate from Prague, Riga, and Vilnius. The Russian government has labeled dozens of these journalists as "foreign agents," a designation which imposes fines and can carry criminal punishment of up to five years' imprisonment. They cannot return to Russia due to the real threat of repression and arrest.

24. Alsu Kurmasheva, a dual U.S.-Russian citizen RFE/RL journalist, exemplifies this peril. Russian authorities arrested her in October 2023 during a trip she took to the country, convicted her in July 2024 on fabricated charges of spreading "false information" about Russia's war in Ukraine, and sentenced her to six-and-a-half years in prison. Designated "wrongfully detained" by the U.S. State Department, Ms. Kurmasheva was released via a prisoner swap in August 2024. RFE/RL's Russian staff lacking U.S. citizenship face bleaker prospects—prolonged detention or harsher fates—without RFE/RL's operational shield.

25. Termination of RFE/RL's funding will trigger visa expirations for these journalists, leaving them without legal status within months. For example, among Prague-based employees, Russian, Belarusian, Iranian, Afghan, and other foreign citizens who do not enjoy the visa-free regime that U.S. citizens enjoy can remain in the Czech Republic only for an additional sixty days after the formal termination of their employment. U.S. nationals, who benefit from a visa-free regime, can remain as a tourist for ninety days following termination of their employment, but during those ninety days they are not allowed to work.

26. Journalists without legal status could be deported back to their home countries where they will be exposed to criminal prosecution for their work as journalists as described above.

27. Belarusian staff working in Lithuania also risk being deported to Belarus if they are expelled from Lithuania, where they will be exposed to criminal prosecution. For example, RFE/RL journalist Ihar Losik was detained on June 25, 2020, in advance of Belarus' election in August 2020, and tried on charges including "organization of mass riots" and "incitement to hatred" for his journalistic work. He was convicted on December 14, 2021, and sentenced to fifteen years in prison. Losik currently is enduring harsh conditions in a penal labor colony.

28. Iranian staff without a firm employment contract from RFE/RL face the legal possibility of being returned to a country that considers them traitors and that has a track record of imprisoning, torturing and even executing journalists. In October of 2024, Reza Valizadeh, a dual Iranian-U.S. national and former RFE/RL employee, was arrested when he returned to Iran. He is currently facing charges stemming from his work with RFE/RL.

**Immediate Harms of USAGM's Refusal to Provide RFE/RL's Congressionally Appropriated Funding to Cyber Security**

29. RFE/RL is constantly targeted by cyber-attacks. RFE/RL employs a variety of Microsoft and other security tools to protect against cyber-attacks.

30. Without its congressionally appropriated funding, RFE/RL will be forced to shutter its cyber defenses. Some of its critical cybersecurity defense tools have monthly licenses that will lapse in thirty days if there is a delay in payment.

31. Shutting down RFE/RL cyber defenses virtually guarantees that cyber attackers will gain access to sensitive RFE/RL systems and the personal data of over 1,000 people in over twenty countries, including in dictatorships where RFE/RL freelancers risk their lives to send RFE/RL their reports. Allowing cyber criminals and regimes interested in eliminating free press to access that information endangers the lives of those journalists.

32. A common targeted attack, such as a distributed denial-of-service attack, can make our servers inaccessible by overwhelming them with traffic, making RFE/RL's servers unavailable to legitimate users. A more sophisticated attack can also disrupt our web services and alter the content of our websites, making fake news appear credible.

**Long-Term Impacts of the Funding Freeze on RFE/RL's Operations**

33. If RFE/RL is forced to close its doors and cease its activities, including essential security services, journalists will be left unprotected and, in many cases, face deportation to dangerous countries. This will destroy the trust, credibility, and relationships RFE/RL has built over decades with its journalists, who rely on RFE/RL to provide for their continued safety.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 19, 2025.

James Landis
Head of Corporate Security
RFE/RL, Inc.