**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RFE/RL, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>KARI LAKE, in her official capacity, *et al*.,<br><br>                    Defendants. | No. 25-cv-00799-RCL |

**<u>DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION</u>**
**<u>FOR A TEMPORARY RESTRAINING ORDER</u>**

## INTRODUCTION

United States Agency for Global Media (USAGM); Kari Lake, in her official capacity as Senior Advisor to the Acting CEO of USAGM; and Victor Morales, in his official capacity as Acting CEO of USAGM (together, Defendants) respectfully submit this opposition to Plaintiff Radio Free Europe/Radio Liberty (RFE/RL)'s request for a temporary restraining order, ECF No. 6 (Plaintiff's Motion).

Although Plaintiff focuses its Complaint and submission in support of its Motion, (Pl.'s Mem.) on argument about Congressional appropriations, at heart, this is essentially a contractual dispute. Plaintiff is a grantee that received funding through a grant agreement with USAGM. Now, via a request for a temporary restraining order, Plaintiff asks this Court to order USAGM to pay for past performance under the grant agreement, and to reinstate its terminated contract. This, the Court cannot do.

It is well established that, no matter how pleaded, such an action can only be heard by the Court of Federal Claims. Earlier this month, another Judge of this Court held that the Court had no jurisdiction to grant such relief, citing Circuit precedent holding that "jurisdiction could not lie in the district court because the suit was inherently contractual." *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 2025 WL 763738, at *8 (D.D.C. Mar. 11, 2025), *appeal docketed* USCA Case No. 25-5066, (citing *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985)). Guided by that precedent, Judge McFadden held there was no jurisdiction to hear a claim by a federal grantee seeking specific performance on a federal grant agreement. As to the D.C. Circuit precedent, *Ingersoll-Rand Co. v. United States*, the Court wrote: "[t]he Court squints in vain to see any daylight. Like those plaintiffs, the [plaintiff] asks the Court to order the Government to cancel the termination, pay money due, and reinstate the contracts. That is

something this Court lacks the power to do." *Id.* at *6. Just so in this case.

Moreover, the lack of subject matter jurisdiction is but one of several reasons why the Plaintiff cannot demonstrate a likelihood of success on the merits in this matter. Indeed, none of the four factors informing whether a party is entitled to preliminary relief favors entry of temporary restraining order here. Plaintiff has made no showing of cognizable irreparable harm likely to result in the absence of preliminary relief; and the balance of equities and the public interest cut against the Plaintiff's request. As discussed further herein, Congress assessed that it was in the public interest to imbue USAGM with broad discretion to oversee its grantees; even if this Court had jurisdiction to grant the Plaintiff's request to override USAGM's judgment, it would not be in the public interest to do so.

For all the reasons discussed herein, the Court should deny the Plaintiff's request for a temporary restraining order.

## **BACKGROUND**

The mission of United States Agency for Global Media (USAGM) is to inform, engage, and connect people around the world in support of freedom and democracy. *See* https://www.usagm.gov/who-we-are/mission/. In furtherance of that mission, USAGM oversees multiple entities, including Plaintiff RFE/RL. *See id.*; *see also* 22 U.S.C. § 6207. To effectuate that oversight responsibility, Congress granted USAGM's Chief Executive Officer (CEO) with the authority to, *inter alia*: "supervise all broadcasting activities conducted" by such entities; "review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, all such [entities'] activities within the context of the broad foreign policy objectives of the United States"; and "[t]o undertake such studies as may be necessary to identify areas in which broadcasting activities under its authority could be made more efficient

and economical." 22 U.S.C. §§ 6204(a)1, (a)(2), (a)(8).

Congress further required that USAGM employ grants, in particular, to fund the entities under its supervision.  Section 6204(a) provides authority for USAGM's CEO to:  "make and supervise grants and cooperative agreements for broadcasting and related activities" and "allocate funds appropriated for international broadcasting activities among the various elements of the [USAGM] and grantees, subject to reprogramming notification requirements in law for the reallocation of funds." 22 U.S.C. §§ 6204(a)(5), (a)(6); *see also Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020) (recognizing "Congress's choice to grant the USAGM CEO broad, unilateral powers over grant-making") *opinion vacated as moot, appeal dismissed*, No. 20-5195, 2021 WL 11096700 (D.C. Cir. Mar. 16, 2021).[1]

Section 6207 sets forth "limits on grants for Radio Free Europe and Radio Liberty."  22 U.S.C. § 6207.  Among other limitations, this section set a ceiling for "the total amount of grants made for the operating costs of RFE/RL" for a particular year, and provided that "[g]rants to RFE/RL, Incorporated, by [USAGM] shall only be made in compliance with a grant agreement." 22 U.S.C. §§ 6207(c), (g).

Congressional appropriations statutes make funding available for grant awards to RFE/RL without mandating that any sum within the appropriation be directly granted to RFE/RL. The relevant table sets a "Budget Authority" for USAGM, not a mandated payment amount for RFE/RL.  *See* ECF No. 6-2, at A-15.  Public Law 118-47's statement that the "funds

---

[1] The district court's opinion in *Open Tech. Fund v. Pack* was vacated under *United States v. Munsingerwear, Inc.*, 340 U.S. 36 (1950), after the case became moot while on appeal. Thus, the district court's reasoning retains its persuasive value.  *See, e.g.*, *National Black Police Ass'n v. District of Columbia*, 108 F.3d 346, 354 (D.C. Cir. 1997) ("[S]ince the district court's opinion will remain 'on the books' even if vacated, albeit without any preclusive effect, future courts will be able to consult its reasoning.").

appropriated under this heading shall be *allocated* in accordance with the table," Further

Consolidated Appropriations Act, 2024, Pub. L. 118-47, 138 Stat. 460, 735 (emphasis added),

also does not mandate a payment.  Furthermore, Congressional appropriations recognize

flexibility for reprogramming among different USAGM grantees, and do not categorically

mandate specific payment amounts.  *See* Further Consolidated Appropriations Act, 2024, Pub. L.

118-47, 138 Stat. 460, 735 (noting that "funds may be reprogrammed within and between

amounts designated in such table [i.e., for each USAGM grantee or federal entity], subject to the

regular notification procedures of the Committees on Appropriations, except that no such

reprogramming may reduce a designated amount by more than 5 percent.").

Accordingly, as noted in the Declaration of Stephen Capus, President and CEO of

RFE/RL, "[e]very year, RFE/RL enters into a grant agreement with [USAGM]."  Capus Decl.

¶ 13.  The Federal Award Identification Number (FAIN) for the grant agreement controlling

through March 14, 2025 was 1060-24-GO-00001.  *See id.* ¶ 18.  On March 15, 2025, USAGM

terminated that agreement via a letter.  *See* Capus Decl., Ex. 1.

On March 18, 2025, RFE/RL initiated this action, and, on March 19, 2025, RFE/RL filed

its motion for preliminary relief.[2]  As part of its request for a temporary restraining order,

Plaintiff asks the Court to order payment of $7,464,559.  Mr. Capus explains that, "[o]n March

17, after the period of performance under [the relevant] specific agreement had passed, RFE/RL

sent USAGM an invoice demanding payment" of that sum, Capus Decl. ¶ 18, but avers that it

---

[2] Although Plaintiff seeks both a temporary restraining order and a preliminary injunction in its motion, Defendants herein focus solely on their opposition to Plaintiff's request for a temporary restraining order.  Defendants understand Plaintiff to contemplate subsequent briefing to address Plaintiff's request for a preliminary injunction.  *See* Pl.'s Mem. at 4 (requesting that the Court set a briefing schedule and hold a hearing on RFE/RL's preliminary injunction request within 21 days of Plaintiff's filing).

has not been paid.  *See id.*  Plaintiff also requests that the Court order Defendants to "take no steps and impose no obligations relating to closing out Plaintiff's grant."  Proposed Order, ECF 6-5.

## LEGAL STANDARD

"A temporary restraining order is 'an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion.'" *State v. Musk*, --- F. Supp. 3d ---, 2025 WL 520583, at *2 (D.D.C. Feb. 18, 2025) (quoting *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021)).  To warrant preliminary relief,[3] the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  The third and fourth factors of the analysis—harm to others and the public interest— "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"Although the Court of Appeals has not yet expressly held that a plaintiff must make a clear showing on each of the four *Winter* factors, current caselaw in this jurisdiction favors that approach."  *Cmty. Oncology All. v. Becerra*, No. 23-CV-2168 (CJN), 2023 WL 9692027, at *3 (D.D.C. Dec. 21, 2023); *see also In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (requiring proof on all four factors); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that, after *Winter*, "the old sliding-scale

---

[3] "[T]he same substantive standard generally applies to both temporary restraining orders and preliminary injunctions."  *Sterling Com. Credit-Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 13 (D.D.C. 2011).  *See also*, *e.g.*, *Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977).

approach to preliminary injunctions—under which a very strong likelihood of success could make up for a failure to show a likelihood of irreparable harm, . . . is no longer . . . viable") (internal quotation and citation omitted). Indeed, relief that "deeply intrudes into the core concerns of the executive branch"—including foreign affairs and national security—may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978).

## ARGUMENT

I.    **Plaintiff Cannot Establish a Likelihood of Success on the Merits.**

   A.    **Plaintiff Cannot Establish that this Court Has Subject-Matter Jurisdiction over this Action.**

      1.    **The Tucker Act vests exclusive jurisdiction over Plaintiff's claims in the Court of Federal Claims.**

To begin, Plaintiff is unlikely to prevail on the merits because its claims, fundamentally, are an effort to enforce payment it claims it is entitled to under its grant agreement, and ultimately to reinstate its grant agreement as improperly terminated. That grant agreement isa contract with the federal government. Because Congress vested the Court of Federal Claims with exclusive jurisdiction over such claims, this Court lacks "the authority to afford the 'drastic' emergency relief that [Plaintiff] seeks." *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 2025 WL 763738, at *8 (D.D.C. Mar. 11, 2025), *appeal docketed* USCA Case No. 25-5066, (quoting *F.T.C. v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980)).

The Tucker Act, 28 U.S.C. § 1491(a)(1), provides for judicial review of breach claims for express or implied contracts over $10,000 in the Court of Federal Claims (or district court for claims less than $10,000) "unless such jurisdiction was explicitly withheld or withdrawn by statute." *Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (*en banc*). The D.C. Circuit has long "interpreted the Tucker Act as providing the *exclusive* remedy for contract

- 6 -

claims against the government." *U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *4

(quoting *Transohio Sav. Bank v. Dir. Off. Of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir.

1992) (emphasis in original)). Put another way, "[t]he only remedy to which the United States

has consented in cases of breach of contract is to the *payment of money damages* in either the

Court of Claims [now the Court of Federal Claims], if the amount claimed is in excess of

$10,000, 28 U.S.C. § 1491(a)(1), or the district courts, where the amount in controversy is

$10,000 or less. 28 U.S.C. § 1346(a)(1)." *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st

Cir. 1989) (emphasis in original). And "[f]ederal courts do not have the power to order specific

performance by the United States of its alleged contractual obligations." *Id.* at 3.

Plaintiff's claim is, at heart, contractual. The grant agreement is a contract, because it

sets out obligations that RFE must do in exchange for consideration from the government. *See*,

*e.g.*, FY 2024 RFE/RL GRANT AGREEMENT – FAIN: 1060-24-GO-00001 ("Grant

Agreement") at 2 ("USAGM agrees to make, and [RFE/RL] agrees to accept, the grant of funds

in accordance with the following provisions"). Plaintiff is seeking to require the payment of

funds it says it is entitled to under the contract. *See, e.g.*, Pl.'s Mem. at 4 (arguing that "the

outstanding amount covers a period of performance (March 1-14, 2025) that RFE/RL has already

performed"); Grant Agreement, Article VII, § (c) ("USAGM will make disbursements in

monthly increments or on such other basis as may be consistent with the Approved Financial

Plan.") And it says that its contract was improperly terminated. *See* Pl.'s Mem. at 16

(discussing "RFE/RL's request to set aside the unlawful termination of its grant agreement"); *id.*

at 24–25 (arguing that USAGM did not adequately explain its termination of the grant

agreement).

To attempt to avoid the jurisdictional bar of the Tucker Act, Plaintiff focuses its attention on Congressional appropriations, and depicts its claims as requests for equitable relief stemming from statutes. *See*, *e.g.*, Proposed Order, ECF No. 6-5 (requesting that the Court order USAGM to "immediately disburse to Plaintiff the amount of Plaintiff's congressionally appropriated funds"). In other words, it claims it is entitled to funds by statute, not by contract. Yet, in legislating concerning the USAGM, Congress made clear that any funds disbursed to grantees like Plaintiff are paid solely pursuant to grant agreements, *i.e.* contracts between USAGM and the grantees. *See* 22 U.S.C. §§ 6207(g) ("[g]rants to RFE/RL, Incorporated, by [USAGM] shall *only* be made in compliance with a grant agreement") (emphasis added). Although Plaintiff depicts USAGM's hands as tied, and characterizing the grants as "required," Pl.'s Mem. at 1, Congress imbued the agency with considerable discretion. *See Open Tech. Fund*, 470 F. Supp. 3d at 31 (recognizing "Congress's choice to grant the USAGM CEO broad, unilateral powers over grant-making"). Thus, although Plaintiff correctly quotes the government's submission in *Open Technology Fund*, as stating that Section 6207 "dictates how the CEO must exercise his § 6204 grant-making authority when dealing with [RFE/RL]," the same submission goes on to observe that: "Congress gave the CEO discretion to disregard those organizations altogether if they do not perform as expected." (citing 22 U.S.C.A. § 6207(d) ("If the [CEO] determines at any time that [Radio Free Europe] is not carrying out the functions described in this section in an effective and economical manner, the [CEO] may award the grant to carry out such functions to another entity.")

The government acknowledges that the grant is funded via appropriations, but that is true for all government contracts—after all, no federal funds can be paid absent appropriations. *Seila*

*L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 207 (2020) (noting that most agencies rely on the annual appropriations process for funding).

Nothing in the statutory framework provides for payment other than via grant agreement, *see supra* at 3, and Plaintiff ultimately acknowledges that its request is "to set aside the [allegedly] unlawful termination of its grant agreement." Pl.'s Mem. at 16; *see also* Capus Decl. ¶ 18 (averring that "[o]n March 17, after the period of performance under this specific agreement had passed, RFE/RL sent USAGM an invoice demanding payment of the $7,464,559"). However cloaked, relief Plaintiff seeks in its proposed temporary restraining order "sounds in contract." *U.S. Conf. of Catholic Bishops*, 2025 WL 763738, *5 (quoting *Albrecht v. Comm. On Emp. Benefits of Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 68 (D.C. Cir. 2004)).

It is well-established that a plaintiff cannot avoid the Court of Federal Claims simply by artful pleading. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985) ("We begin with the well-accepted proposition that a plaintiff may not avoid the jurisdictional bar of the [Contract Disputes Act, vesting jurisdiction in the Court of Federal Claims] merely by alleging violations of regulatory or statutory provisions rather than breach of contract."). In a case challenging an agency's decision to terminate a contract for convenience, the D.C. Circuit explained "[t]hat the termination also arguably violates certain other regulations does not transform the action into one based solely on those regulations. Nor does plaintiff's decision to allege only a violation of the regulations change the essential character of the action." *See id.* at 78 (citing *J.C. Products, Inc. v. United States,* 608 F. Supp. 92, 94 (W.D. Mich. 1984) for the proposition that "where plaintiff was awarded contract and government terminated for convenience, cause of action is on the contract despite plaintiff's allegations of statutory and constitutional violations").

Just ten days ago, another Judge of this Court—relying on *Ingersoll-Rand*—held that the Court lacked jurisdiction to order strikingly similar relief. *See U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *4–8. In *U.S. Conf. of Catholic Bishops*, a grantee that had been receiving funds via cooperative agreements with the State Department, sought a temporary restraining order after the State Department terminated its cooperative agreements with that grantee. *Id.* at *2–3. The Court noted that the grantee, at that time, had millions of dollars in requested reimbursements pending with State, and that, without ongoing funding, the grantee averred that "thousands of refugees already in its care would soon lack enough support." *Id.* at *2. Nonetheless, the Court declined to grant preliminary relief, holding that it lacked the authority to do so under the Tucker Act. *See U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *4–8.

Noting that "courts are to be wary of plaintiffs artfully pleading their way around the jurisdictional strictures of the Tucker Act," the Court explained that "the ultimate inquiry of whether a claim is 'essentially a contract action' turns on two key considerations: '[t]he source of rights upon which the plaintiff bases its claims' and the type of relief sought." *Id.* at *5 (quoting *Albrecht*, 357 F.3d at 68). The Court found the latter factor to be dispositive, reasoning that the relief the plaintiff sought in that case "sounds in contract.' *Id.* (quoting *Albrecht*, 357 F.3d at 68). There, as here, the grantee sought an order enjoining the government from taking steps to give effect to a letter terminating the plaintiff's grant. *See id.* As the Court explained, "[s]tripped of its equitable flair, the requested relief seeks one thing: [plaintiff] wants the Court to order the Government to stop withholding the money due under [its grant agreements]." *Id.* at *7. The Court held that treating the remedies sought in that case as equitable "would be to distort the obvious": "Sure, the [plaintiff] seeks to set aside agency action. But the agency

action it asks the Court to reverse is the Government's decision to cease a financial relationship with the [plaintiff]." *Id.*

Plaintiff cites *Climate United Fund v. Citibank, N.A.*, --- F.Supp.3d ---- 2025 WL 842360 (D.D.C. Mar. 18, 2025), as having reached the opposite conclusion. *See* Pl's Mem. at 17. Therein, Judge Chutkan held that claims seeking disbursement of federal grants could proceed "because 'Plaintiffs do not challenge a contract between the parties—they challenge an action." *Id.* (quoting *Climate United Fund*, 2025 WL 842360, at *17). Yet such an exception would swallow the entirety of the jurisdiction reserved to the Court of Federal Claims; *any* action taken in relation to a contract by an agency is an agency action. Defendants respectfully submit that the Court's interpretation in *U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *7, is more consistent with Congress's purpose in enacting the Tucker Act and with the law of this Circuit, *see supra*.

The Court of Appeals has been clear that, where "the essence of [a] claim is a request for specific performance of the original contract"—whether or not it is pled as a contract claim at all—the jurisdiction for that action lies with the Court of Federal Claims. *Ingersoll-Rand*, 780 F.2d at 80. That is so for all of the relief requested in Plaintiff's proposed temporary restraining order. Because Plaintiff cannot establish jurisdiction, it cannot succeed on the merits, and its request for extraordinary injunctive relief should be rejected on that basis alone.

      **2. Plaintiff's request for payment of $7,464,559 is not ripe, or, in the alternative, is not agency action unlawfully withheld or unreasonably denied.**

Plaintiff also cannot establish a likelihood of success on its request for payment of $7,464,559, the primary request for relief if seeks in its TRO motion, for the additional reason that any claim for recovery of those funds is not ripe or, in the alternative, such funds have not

been unlawfully withheld or unreasonably denied within the meaning of 5 U.S.C. § 706(1), *see* Compl. ¶¶ 55–60 (Count II).  Rooted in Article III limitations and prudential considerations, ripeness requires that an alleged injury be "certainly impending."  A claim is not ripe if it is "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 529 U.S. 125, 131 (2020) (citation omitted).  A claim that is unripe fails for lack of subject-matter jurisdiction. "Determining whether administrative action is ripe for judicial review requires [courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003*)* (citation omitted).

Relatedly, to state any claim under the APA, including under Section 706(1), a plaintiff must allege that the conduct by the agency constitutes "final agency action."  5 U.S.C. § 704.  To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).  Plaintiff has not plausibly alleged that USAGM has taken such a final agency action.

Here, the Plaintiff demands an emergency order requiring immediate disbursement of funds, but cites neither any final agency decision not to pay out those funds, nor any provision in the grant agreement requiring the funds to be paid out by a date certain.  *See* Pl.'s Mem., *generally*.  The grant agreement itself merely requires disbursements be made "in monthly increments or on such other basis as may be consistent with the Approved Financial Plan." Grant Agreement at pp 8.  Plaintiff cites to no requirement for the agency to disburse funds any faster.  This is fatal to Plaintiff's Section 706(1) claim, which "'can proceed only where a

plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 64 (2004)); *see also* 5 U.S.C. § 551(13) (defining "agency action" as including "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"). Moreover, Section 706(1) only permits a court to "compel an agency 'to perform a ministerial or non-discretionary act.'" *SUWA*, 542 U.S. at 64. For all the reasons explained below, Congress gave USAGM broad discretion in its oversight of its grantee, and its role cannot be characterized as ministerial. *See infra* 14–15.

Furthermore, by Plaintiff's admission, the funds cover a period of performance that ended on March 14, 2025, *see* Pl.'s Mem. at 4, just a week ago. On these facts, Plaintiff cannot establish a likelihood of success on a claim that those funds must be disbursed immediately, as opposed to in the ordinary course.

### 3. Plaintiff's Mandamus Claim Fails for Lack of Jurisdiction.

Plaintiff presents its mandamus claim as a backstop to its Administrative Procedure Act ("APA") claim. *See* Pl.'s Mem. at 32 ("even if APA relief were deemed unavailable, RFE/RL would still be likely to succeed . . . via mandamus relief"). But Plaintiff is mistaken. Mandamus jurisdiction "is strictly confined. . . mandamus is 'drastic'; it is available only in 'extraordinary situations'; it is hardly ever granted; those invoking the court's mandamus jurisdiction must have a 'clear and indisputable' right to relief.'" *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc); *Citizens for Resp. & Ethics in Washington v. Trump* ("*CREW*"), 924 F.3d 602, 606 (D.C.

Cir. 2019) ("[T]he remedy of mandamus is a drastic one, to be invoked only in extraordinary

situations.").

 To establish a court's jurisdiction over such a claim, a plaintiff seeking mandamus relief

must show (1) "a 'clear and indisputable right to relief,'" (2) "that the defendant has a "'clear

duty to act,'" and (3) "that 'no adequate alternative remedy exists.'"  *Id.* (quoting *Am. Hosp.*

*Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016)); *see also Lovitsky v. Trump*, 949 F.3d 753,

759 (D.C. Cir. 2020).  "These three threshold requirements are jurisdictional; unless all are met,

a court must dismiss the case for lack of jurisdiction."  *CREW*, 924 F.3d at 606.  And, even when

these requirements are met, "a court may grant relief only when it finds compelling equitable

grounds."  *Lovitsky*, 949 F.3d at 759.  As discussed below, Plaintiff fails to establish either the

first or the second requirement.

 For the reasons explained above, *see supra* 6–13, Plaintiff does not have the clear and

indisputable right to relief that is necessary to establish mandamus jurisdiction.  Nor can Plaintiff

establish the requisite duty to act.  In the context of mandamus, the duty to be performed must be

"ministerial and the obligation to act peremptory, and clearly defined." *13th Reg'l Corp. v. U.S.*

*Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980) (quoting *United States ex rel. McLennan v.*

*Wilbur*, 283 U.S. 414, 420 (1931)).  A ministerial duty "is one that admits of no discretion, so

that the official in question has no authority to determine whether to perform the duty."  *Swan v.*

*Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).

 Plainly, the USAGM's duties as to its oversight of its grantees are not merely

"ministerial."  To the contrary, the Court in *Open Tech. Fund* recognized "Congress's choice to

grant the USAGM CEO broad, unilateral powers over grant-making."  *See Open Tech. Fund*,

470 F. Supp. 3d at 31.  Several statutory provisions discussed above reflect USAGM's

substantial discretion in this regard.  USAGM's CEO is empowered to "review and evaluate the mission and operation of, and to assess the quality, effectiveness, and professional integrity of, all [grantees'] activities within the context of the broad foreign policy objectives of the United States"; and "[t]o undertake such studies as may be necessary to identify areas in which broadcasting activities under its authority could be made more efficient and economical."  22 U.S.C. §§ 6204(a)1, (a)(2), (a)(8).  And, as to RFE/RL in particular, the statute provides that "[i]f the Chief Executive Officer determines at any time that RFE/RL, Incorporated is not carrying out the functions described in this section in an effective and economical manner, the Agency may award the grant to carry out such functions to another entity."  22 U.S.C. §§ 6207(d).  All of these authorities make clear that execution and termination of the agreement are not ministerial responsibilities.

For all these reasons, Plaintiff cannot show a likelihood of success on its mandamus claim.

### B.   Plaintiff Is Not Likely to Prevail on its Constitutional Claims.

Plaintiff's constitutional claims are barred because they are, at their heart, purely statutory.  As to the Presentment Clause, Plaintiff alleges, "Defendants' unlawful impoundment of RFE/RL's congressionally appropriated funds constitutes an unconstitutional modification and *de facto* partial veto of duly enacted appropriations legislation in violation of the Presentment Clause."  Compl. ¶ 65.  As the Appropriations and Spending Clauses, Plaintiff addresses them together, and states simply that "[b]y declining to disburse funds lawfully appropriated by Congress, the Executive Branch is unconstitutionally encroaching on Congress's Appropriations Clause and Spending Clause authority."  Pl.'s Mem. at 28.  Likewise, as to the Take Care Clause, Plaintiff alleges "by withholding funds duly appropriated by statute, Defendants are in dereliction of their duty to take care that the laws are faithfully executed.  *Id.* at 29.  And, on

- 15 -

Separation of Powers, Plaintiff argues "the Executive Branch's withholding of funds is incompatible with both the International Broadcasting Act and the appropriations statutes." *Id.* at 31. Finally, as to its ultra vires claim, Plaintiff asserts "No statute, constitutional provision, or other source of law authorizes Defendants to impound RFE/RL's congressionally appropriated funds." Compl. ¶ 90.

In sum, each claim hinges, in turn, on Plaintiff's allegation concerning its statutory claims. The Supreme Court has made clear that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims, subject to judicial review . . . ." *Dalton v. Specter*, 511 U.S. 462, 473 (1994). This keeps with the long tradition of "distinguish[ing] between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* at 472. Because Plaintiff's claims here comprise restatements of the allegation that USAGM acted in excess of its statutory duty, Plaintiff cannot prevail on its claims alleging constitutional violations.

Nor, to any extent, are these claims viable. RFE is not funded through direct congressional appropriations, rather, it is explicitly funded through grant agreements. *See* 22 U.S.C. § 6207(g) ("Grants to RFE/RL, Incorporated, by the Agency shall only be made in compliance with a grant agreement."). Execution of that grant agreement—and its termination— are governed by the applicable grant agreement; and indeed, Congress contemplated in numerous contexts that the grant agreement could be terminated, notwithstanding the fact that there may be line-item appropriations applicable to RFE. *See*, *e.g.*, *id.* § 6207(g)(3) (stating "that failure to comply with the requirements of this section may result in suspension or termination of a grant without further obligation by the Agency or the United States"); *id.* § 6207(d) ("If the Chief Executive Officer determines at any time that RFE/RL, Incorporated is not carrying out the

functions described in this section in an effective and economical manner, the Agency may award the grant to carry out such functions to another entity."). USAGM's conduct under that grant agreement is reviewable—as Defendants argue, in the Court of Federal Claims—but the mere fact that a grant agreement is funded through line-item appropriations does not mean that the routine execution of that grant agreement takes on statutory—let alone constitutional— dimensions.

## II.    Plaintiff Cannot Establish Irreparable Harm.

Plaintiff likewise fails to establish that it will suffer irreparable harm absent a temporary restraining order. To demonstrate irreparable harm, Plaintiff must meet a "high standard"— Plaintiff must show that it faces injuries that are "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citation omitted), and that are "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Making that showing requires "proof" that the harm it identifies "is certain to occur in the near future." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam).

Plaintiff identifies three sources of irreparable harm: economic harms stemming from the funding pause, cybersecurity harms, reputational harms, and additional harms to third parties. *See* Pl.'s Mem. at 34–40. None is sufficient to justify the extraordinary relief of a temporary restraining order.

As to economic harms: Plaintiff identifies several harms that stem from its lack of access to grant funds, in the form of harms to its operations and efforts to fulfill its missions. But "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297

(quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)).  Rather, it is

black-letter law that economic harm is generally not irreparable.  *Wis. Gas Co.*, 758 F.2d at 674

(describing that principle as "well-settled").   The only exceptions are "where the loss threatens

the very existence of the movant's business," *id.* (citation omitted), or "where the claimed

economic loss is unrecoverable."  *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C.

2014) (citation omitted).

  The first exception is a narrow one—it encompasses only cases where the plaintiffs

demonstrate "extreme hardship to the business" or a threat to the business's "very existence."

*Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981).  Plaintiffs may be

forced to make difficult choices and lose profits in critical areas of their business without

incurring irreparable harm sufficient to warrant injunctive relief.  *Cf. Boivin v. U.S. Airways,*

*Inc.*, 297 F. Supp. 2d 110, 118–19 (D.D.C. 2003) ("[T]he forced sale of a house, a boat or stock. .

. . do[es] not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy

of a preliminary injunction.").  And Plaintiffs must document any claim that an alleged harm is a

threat to the business's very existence with specific details.  *Nat'l Mining Ass'n v. Jackson*, 768

F. Supp. 2d 34, 51–52 (D.D.C. 2011) (plaintiff needed to "offer a projection of anticipated future

losses, tie that to an accounting of the company's current assets, [and] explain with . . .

specificity how he arrived at the conclusion that he would be forced out of business in eighteen

months" to show irreparable harm on this theory).  Here, Plaintiff alleges that a lack of funds

"'threatens the very existence' of the organization," Pl.'s Mem. at 35 (quoting *Wis. Gas Co. v.*

*FERC*, 758 F.2d 669 (D.C. Cir. 1985)), but supplies none of the detailed projections required under the caselaw to substantiate such a claim, *see id.*; *see also* Capus Decl. ¶¶ 23, 24.

Notably, Plaintiff tries to expand the scope of the first exception, asserting that "[o]bstacles that unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes . . . [of] irreparable harm."  Pl.'s Mem. at 36 (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)).  But *Newby* involved *statutory* obstacles, not economic harm.  Here, Defendants have not enacted or enforced laws that make it more legally or logistically difficult for Plaintiffs to execute the missions they have identified.  Defendants have instead paused the government's *sponsorship* of those activities.  Plaintiff's reliance on *Newby* is therefore misplaced.

The second exception, for monetary harms unrecoverable because a defendant enjoys sovereign immunity, likewise does not apply.  As discussed above, *supra* at 6–7, Plaintiffs' economic injuries are reparable through the Tucker Act for contract disputes concerning monetary payments.  Sovereign immunity is not an obstacle for monetary recovery on Plaintiffs' claims because of that statute.  *See Safari Club Int'l*, 47 F. Supp. 3d at 37.

Plaintiff also claims severe "reputational harm" because of Defendants' conduct.  Pl.'s Mem. at 39–40.  But "[t]he loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms"—and therefore recoverable.  *Air Transport Ass'n of Am., Inc. v. Export-Import Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012).  Further, the alleged harm must "directly result from the action which the movant seeks to enjoin."  *Wis. Gas Co.*, 758 F.2d at 674.  When a harm is "based on independent market variables such as how [a company's] customers and/or retail consumers might react," that harm does not flow directly from the challenged action.  *Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F.

Supp. 2d 38, 81 (D.D.C. 2013).  Here, it also requires speculation regarding those expected

reactions, which may ascribe blame to Defendants rather than Plaintiff.

    Likewise with the Plaintiff's assertions concerning potential cybersecurity risks, *see* Pl.'s

Mem. at 36; this risk is speculative and falls far short of the strong showing required to justify a

temporary restraining order.  In this Circuit any alleged irreparable injury "must be both certain

and great; it must be actual and not theoretical."  *Chaplaincy of Full Gospel Churches*, 454 F.3d

at 297.  It also must be of such "*imminence* that there is a clear and present need for equitable

relief."  *Id*. (citing *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam))

(emphasis in original).  Plaintiff's unsupported predictions regarding potential cyberattacks

cannot fulfill this standard.

    Finally, Plaintiff identifies other forms of harm that may flow to third parties, including

its employees, journalists with whom it contracts, or individuals served by Plaintiff's mission.

*See* Pl.'s Mem. at 36–39.  But "harm that might befall unnamed third parties does not satisfy the

irreparable harm requirement in the context of emergency injunctive relief, which must instead

be connected specifically to the parties before the Court."  *State v. Musk*. ---F. Supp. 3d ---, 2025

WL 520583, at *4 (D.D.C. 2025) (quoting *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C.

2021)).  Thus, in *State v. Musk*, although the Court noted that "[t]erminating thousands of federal

employees may cause extreme harm to the individual employees, and potentially the institution

writ large," *id.* at *4, the Court held that it could not consider alleged harm to parties not before

the Court on a request for emergency injunctive relief.  *See id.*  Likewise, in this case, Plaintiff's

allegations concerning possible harm to third parties cannot support the requested temporary restraining order.

### III.    The Balance of the Equities (Including the Public Interest) Does Not Favor a Temporary Restraining Order.

A temporary restraining order also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor.  *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party").  In this setting, granting the temporary restraining order that Plaintiff seeks would disrupt USAGM's oversight of its grantees to ensure taxpayer money is stewarded well, as intended by the statutory scheme that Congress provided.  *See supra* at 2–4, 8.

In another case seeking preliminary equitable relief against USAGM, the Court recognized that "thwarting the lawful exercise of authority of a duly appointed official would be inequitable and disserve the public interest."  *Open Tech. Fund*, 470 F. Supp. 3d at 31.  The Court held:  "[s]etting USAGM's priorities and managing, at a broad level, U.S. international broadcasting is the prerogative of the USAGM CEO—not that of plaintiffs, and certainly not of this Court.  Moreover, Congress's choice to grant the USAGM CEO broad, unilateral powers over grant-making and oversight of USAGM grantees is itself 'a declaration of public interest and policy which should be persuasive in inducing courts to give relief.'"  *Id.* (quoting Va. *Ry. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937)).  Meanwhile, Plaintiff, as discussed above, will suffer no cognizable irreparable harm from the denial of its motion, as each of the potential harms that Plaintiff identifies is economic, and therefore inherently not irreparable; speculative; or asserted on behalf of a third party not before this Court.  On these facts, the balance of the equities and the public interest align against the entry of relief.

IV.    **Plaintiff Should Be Ordered to Post Security in Connection with Any Temporary Injunctive Relief**

For the reasons stated above, Defendants submit that the Court can and should deny Plaintiff's motion in its entirety. However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiff to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues a temporary restraining order here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any such temporary order. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond"). As Plaintiff is seeking the payment of a particular sum, *i.e.* $7,464,559, the Court should order the posting of a bond equal to the size of any payment that the Court orders on a preliminary basis here. Without such a protective measure, there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that Defendants were "wrongfully enjoined." *See* Fed. R. Civ. P. 65(c).

## CONCLUSION

For the foregoing reasons, the Court should deny the Plaintiff's Motion for a Temporary Restraining Order.

Dated:  March 21, 2025                    Respectfully submitted,

                                          YAAKOV M. ROTH
                                          Acting Assistant Attorney General

                                          ERIC J. HAMILTON
                                          Deputy Assistant Attorney General
                                          Civil Division, Federal Programs Branch

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch

*/s/  Julia A. Heiman*
JULIA A. HEIMAN (D.C. Bar No. 986228)
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, DC  20005
Tel. (202) 616-8480 / Fax (202) 616-8470
julia.heiman@usdoj.gov
*Attorneys for Defendants*