# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

RFE/RL, INC.,

               *Plaintiff,*

v.

KARI LAKE, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media;

VICTOR MORALES, in his official capacity as acting Chief Executive Officer of the United States Agency for Global Media; and

UNITED STATES AGENCY FOR GLOBAL MEDIA,

               *Defendants.*

Case No. 1:25-cv-00799

## PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 2

I.     RFE/RL Is Likely to Succeed on the Merits. ............................................................ 2

     A.    Defendants Cannot Avoid This Court's Jurisdiction. ............................................ 2

     B.    Defendants Misstate Their Statutory Obligations. ................................................ 9

     C.    RFE/RL's APA Claims Are Likely to Succeed. .................................................. 13

     D.    RFE/RL's Non-APA Claims Are Likely To Succeed. ......................................... 15

II.    RFE/RL Has Demonstrated Irreparable Injury. ...................................................... 17

     A.    RFE/RL Has Established Irreparable Harm to Its Ongoing Operations,
          Reputation, and Its Very Existence ........................................................................ 17

     B.    The Court May Consider Irreparable Harms to RFE/RL's Employees. ............... 21

III.   The Balance of Equities and Public Interest Favor Relief. ..................................... 23

IV.   The Court Should Not Require a Bond Under Rule 65(c) ........................................ 24

CONCLUSION ................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State,*
2025 WL 752378 (D.D.C. Mar. 10, 2025)..............................................................4, 6, 19, 21

*In re Aiken Cnty.,*
725 F.3d 255 (D.C. Cir. 2013) ...........................................................................................9

*Am. Ass'n of Colleges for Teacher Educ. v. McMahon,*
2025 WL 863319 (D. Md. Mar. 19, 2025)...........................................................................5

*Ams. for Immigrant Just. v. U.S. Dep't of Homeland Sec.,*
2023 WL 1438376 (D.D.C. Feb. 1, 2023) ..........................................................................22

*Bowen v. Massachusetts,*
487 U.S. 879 (1988)......................................................................................................4, 5, 6, 7

*California v. U.S. Dept. of Educ.,*
2025 WL 878431 (1st Cir. Mar. 21, 2025) .....................................................................3, 4, 5

*Cause of Action Institute v. IRS,*
390 F. Supp. 3d 84 (D.D.C. 2019) ......................................................................................5

*Cemex Inc. v. Dept. Of the Interior,*
560 F. Supp. 3d 268 (D.D.C. 2021) .....................................................................................3

*Church v. Biden,*
573 F. Supp. 3d 118 (D.D.C. 2021) ...................................................................................22

*Climate United Fund v. Citibank, N.A.,*
2025 WL 842360 (D.D.C. Mar. 18, 2025)............................................................................5

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.,*
38 F.4th 1099 (D.C. Cir. 2022).....................................................................................2, 6, 8

*Dalton v. Specter,*
511 U.S. 462 (1994).........................................................................................................16

*Does 1-26 v. Musk,*
2025 WL 840574 (D. Md. Mar. 18, 2025).........................................................................24

*DSE, Inc. v. United States,*
169 F.3d 21 (D.C. Cir. 1999) ............................................................................................24

*E. Bay Sanctuary Covenant v. Trump*,
  354 F. Supp. 3d 1085 (N.D. Cal. 2018) ................................................................22

*Everglades Harvesting & Hauling, Inc. v. Scalia*,
  427 F. Supp. 3d 101 (D.D.C. 2019) ....................................................................19

*Guadamuz v. Ash*,
  368 F. Supp. 1233 (D.D.C. 1973) .......................................................................15

*Ingersoll-Rand Co. v. United States*,
  780 F.2d 74 (D.C. Cir. 1985) ................................................................................8

*League of Women Voters of United States v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016) ......................................................................1, 21, 23

*Luokung Tech. Corp. v. Dep't of Def.*,
  538 F. Supp. 3d 174 (D.D.C. 2021) .....................................................................19

*Maine Cmty. Health Options v. United States*,
  590 U.S. 296 (2020) ...............................................................................................6

*Massachusetts v. Nat'l Insts. of Health*,
  2025 WL 702163 (D. Mass. Mar. 5, 2025) .......................................................6, 21

*\*Md. Dep't of Hum. Res. v. Dep't. of Health and Hum. Servs.*,
  763 F.2d 1441 (D.C. Cir. 1985) ..........................................................................4, 5

*Nat. Res. Def. Council, Inc. v. Morton*,
  337 F. Supp. 167 (D.D.C. 1971) ..........................................................................24

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*,
  2025 WL 573764 (D. Md. Feb. 21, 2025) ...........................................................24

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
  440 F.3d 459 (D.C. Cir. 2006) .............................................................................14

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
  2025 WL 368852 (D.D.C. Feb. 3, 2025) .........................................................21, 22

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
  2025 WL 597959 (D.D.C. Feb. 25, 2025) ............................................................24

*Nat'l Mining Ass'n v. Jackson*,
  768 F. Supp. 2d 34 (D.D.C. 2011) .......................................................................20

*Nat'l Park Hosp. Ass'n v. Dep't of Interior*,
  538 U.S. 803 (2003) .........................................................................................14, 15

*New Mexico v. Musk*
  2025 WL 520583 (D.D.C. Feb. 18, 2025) ........................................................22

*Normandy Apts. Ltd. v. HUD,*
  554 F.3d 1290 (10th Cir. 2009) .....................................................................3

*Open Tech. Fund v. Pack,*
  470 F. Supp. 3d 8 (D.D.C. 2020) ..................................................................11

*Perry Capital LLC v. Mnuchin,*
  864 F.3d 591 (2017).......................................................................................3

*P.J.E.S. ex rel. Escobar Francisco v. Wolf,*
  502 F. Supp. 3d 492 (D.D.C. 2020) ..............................................................24

*Providence v. Barr,*
  954 F. 3d 23 (1st Cir. 2020).....................................................................12, 13

*Schumann v. Comm'r of Internal Revenue,*
  857 F.2d 808 (D.C. Cir. 1988) ......................................................................11

*SEC v. Chenery Corp.,*
  318 U.S. 80 (1943).................................................................................10, 17

*Sierra Club v. Trump,*
  929 F.3d 670 (9th Cir. 2019) ........................................................................16

*Swan v. Clinton,*
  100 F.3d 973 (D.C. Cir. 1996)......................................................................15

*Teva Pharms. USA, Inc. v. Sebelius,*
  595 F.3d 1303 (D.C. Cir. 2010)...............................................................14, 15

*Train v. City of New York,*
  420 U.S. 35 (1975).........................................................................................12

*Transohio Sav. Bank v. Dir., Office of Thrift Supervision,*
  967 F.2d 598 (D.C. Cir. 1992), *abrogated in part on other grounds by Perry Cap. LLC v. Mnuchin,* 864 F.3d 591 (D.C. Cir. 2017) ................................... *passim*

*Trump v. New York,*
  592 U.S. 125 (2020)......................................................................................14

*United States Conference of Catholic Bishops v. United States Department of State,* 2025 WL 763738 (D.D.C. Mar. 11, 2025), *appeal docketed,* No. 25-5066 (D.C. Cir. Mar. 14, 2025).........................................................6, 7, 8

*Wannall v. Honeywell, Inc.*,
  775 F.3d 425 (D.C. Cir. 2014) ......................................................................13

*Wi-LAN USA, Inc. v. Apple Inc.*,
  830 F.3d 1374 (Fed. Cir. 2016) .....................................................................11

*Wis. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ......................................................................21

**Statutes**

5 U.S.C. § 702 ..................................................................................................5

5 U.S.C. § 704 ..................................................................................................3

5 U.S.C. § 706 ................................................................................................15

22 U.S.C. § 6201 ............................................................................................24

*22 U.S.C. § 6207 ...........................................................................1, 8, 9, 10, 11

28 U.S.C. § 1491(a)(1) ....................................................................................2

*Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat.
  460, 735 (2024) .........................................................................................1, 12

National Defense Authorization Act for Fiscal Year 2021, Pub. L. 116-283, 134
  Stat. 3388, 4024 (2021) ................................................................................11

National Defense Authorization Act for Fiscal Year 2023, Pub. L. 117-263, 136
  Stat 2395, 3915 (2022) .................................................................................11

**Regulations and Rules**

2 C.F.R. § 200.344 .....................................................................................13, 17

Fed. R. Civ. P. 65(c) ...................................................................................24, 25

**Other Authorities**

ALLOCATE, Black's Law Dictionary (12th ed. 2024) ......................................11

13A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure
  § 3531.9.3 (3d ed. 2024) ..............................................................................22

## INTRODUCTION

Defendants' opposition reads as though it is about a different case. They describe a "funding pause," Defs.' Opp. to Mot. for TRO ("Opp.") 17, without mentioning Defendant Lake's announcement that USAGM is treating RFE/RL funding as a "non-statutory function" that the agency is "eliminat[ing]," Declaration of Stephen Capus ("Capus Decl."), Ex. 1, Letter from Kari Lake, Senior Advisor to the Acting CEO, to RFE/RL (Mar. 15, 2025) (hereinafter "March 15 Letter"). They treat this case as "essentially a contractual dispute," Opp. 1, when RFE/RL has not invoked a single contractual provision as the basis of its claims, but instead claims that Defendants are violating their statutory and constitutional obligations. They claim "considerable discretion" to fund or not fund RFE/RL as they please, Opp. 8, but do not once acknowledge that grants "shall be available" "for RFE/RL," 22 U.S.C. § 6207(f), or explain how they can avoid a specific congressional instruction that a particular amount "shall be allocated" to RFE/RL, Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 735 (2024). And they say that without relief, RFE/RL will only "lose profits" it can recover later, Opp. 18, ignoring RFE/RL's well-documented showing of imminent and irreparable harm to its *non-profit* mission of delivering reliable, uncensored journalism in places where the free press is under attack.

This Court has jurisdiction. RFE/RL's case is strong, and its situation is dire. The Court should grant the modest TRO that RFE/RL has requested to avoid irreparable harm before the preliminary injunction motion can even be heard.[1]

---

[1] Contrary to Defendants' suggestion, *see* Opp. 5, there is no heightened burden on RFE/RL on each individual TRO factor. Rather, "[a] party seeking a preliminary injunction must make a clear showing that four factors, *taken together*, warrant relief." *League of Women Voters of United States v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (emphasis added). RFE/RL has made that showing.

**ARGUMENT**

**I.      RFE/RL Is Likely to Succeed on the Merits.**

**A.      Defendants Cannot Avoid This Court's Jurisdiction.**

Rather than offer a substantial defense on the merits, Defendants principally argue that RFE/RL can sue only in the Court of Federal Claims ("CFC") because RFE/RL merely seeks money damages stemming from a breach of its grant agreement. Opp. 6–11. That argument depends on mischaracterizing RFE/RL's claims and disregarding binding precedent. This is not a run-of-the-mill breach-of-contract action. RFE/RL claims that Defendants have violated statutory and constitutional duties and seeks equitable relief compelling Defendants to do what the law requires. The fact that USAGM transmits RFE/RL's congressionally appropriated funds through a grant agreement is incidental to RFE/RL's claims—a grant is involved only because Congress requires USAGM to transmit congressionally appropriated funds to RFE/RL that way. RFE/RL does not in this case complain of a breach of the grant agreement, and it does not ask this Court to interpret or apply a single one of its provisions.

The CFC has exclusive jurisdiction over claims "founded … upon" a "contract with the United States." 28 U.S.C. § 1491(a)(1). A claim against the federal government "falls within the exclusive jurisdiction of the Claims Court pursuant to the Tucker Act" only if the claim is "at its essence" a contract claim. *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (emphasis omitted) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). "Whether a claim is 'at its essence' contractual for the Tucker Act 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'" *Id.* (quoting *Megapulse*, 672 F.2d at 968). Here, both considerations demonstrate that RFE/RL's claims belong in this Court, not the CFC.

*Source of Rights.*  The D.C. Circuit has explained that the jurisdictional question "depends not simply on whether a case involves contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are founded only on a contract, or whether they stem from a statute or the Constitution." *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992).[2]  While "litigants may bring common-law contract claims only as actions for money damages in the Claims Court," "they may bring statutory and constitutional claims for specific relief in federal district court." *Id.* at 610.  "Crucially," the court explained, "litigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government." *Id.*  Further, jurisdiction is proper "over a statutory or constitutional claim for injunctive relief even where the relief sought is an order forcing the government to obey the terms of a contract." *Id.*; *see also, e.g.*, *Normandy Apts. Ltd. v. HUD*, 554 F.3d 1290, 1300 (10th Cir. 2009) ("[W]hen a party asserts that the government's breach of contract is contrary to federal regulations, statutes, or the Constitution, and when the party seeks relief other than money damages, the APA's waiver of sovereign immunity applies and the Tucker Act does not preclude a federal district court from taking jurisdiction."); *California v. U.S. Dept. of Educ.*, 2025 WL 878431, at *2 (1st Cir. Mar. 21, 2025) (same).

Defendants' brief mentions none of this.  Instead, it casually asserts that "[t]he grant agreement is a contract," and that RFE/RL "is seeking to require the payment of funds it says it is entitled to under the contract."  Opp. 7.  Actually, RFE/RL is seeking to require the payment of funds it says it is entitled to *under laws passed by Congress*.  Under circuit precedent, the fact that a grant agreement exists, and even the possibility that injunctive relief might "forc[e] the

---

[2] In *Perry Capital LLC v. Mnuchin*, the D.C. Circuit abrogated *Transohio*'s unrelated holding concerning the "adequate remedy" bar of 5 U.S.C. § 704.  864 F.3d 591, 620 (2017).  Courts continue to favorably cite *Transohio*'s analysis of what type of claims fall within the Tucker Act. *See, e.g.*, *Cemex Inc. v. Dept. Of the Interior*, 560 F. Supp. 3d 268, 276 (D.D.C. 2021).

government to obey the terms" of the agreement, cannot divest this Court of jurisdiction. *Transohio*, 967 F.2d at 610. "[I]t would be quite extraordinary to consider [RFE/RL's] claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached." *AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*, 2025 WL 752378, at *9 (D.D.C. Mar. 10, 2025).

Defendants do not identify a single grant provision on which the merits of this case will turn. *See* Opp. 7. And while RFE/RL does say "that its contract was improperly terminated," *id.*, its claims before this Court do not turn on any *contractual provision in the agreement*. RFE/RL says the termination was improper because USAGM violated statutes mandating USAGM to make funds available through grants to RFE/RL, the Administrative Procedure Act ("APA"), and the Constitution. In other words, RFE/RL's claims "stem from … statute[s] [and] the Constitution." *Transohio*, 967 F.2d at 609; *see Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988) (district court had jurisdiction over "a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money"); *Md. Dep't of Hum. Res. v. Dep't. of Health and Hum. Servs.*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (claims "arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement"); *California*, 2025 WL 878431, at *2 (claims "at their core" assert "that the Department acted in violation of federal law -- not its contracts").

Defendants' only response is that this Court should ignore the statutory and constitutional nature of RFE/RL's claims, because "Congress imbued the agency with considerable discretion." Opp. 8. In other words, Defendants dispute that RFE/RL is "entitled to funds by statute." *Id.* Defendants are wrong, *see infra* § I.B, but they also miss the jurisdictional point. Whether RFE/RL is in fact entitled by statute to the funds goes to the merits. The jurisdictional question is whether

the plaintiff's "*claims* … stem from a statute or the Constitution." *Transohio*, 967 F.2d at 609 (emphasis added); *see also Cause of Action Institute v. IRS*, 390 F. Supp. 3d 84, 98 (D.D.C. 2019) (Brown Jackson, J.) ("Courts typically accept the merits of the plaintiff's claims in order to assess their own jurisdiction[.]" (cleaned up)).

*Relief Sought.*  The APA provides for judicial review of agency action where the plaintiff seeks "relief other than money damages."  5 U.S.C. § 702.  "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'"  *Bowen*, 487 U.S. at 893.  "[M]oney damages" are "given to the plaintiff to *substitute* for a suffered loss."  *Id.* at 895.

It is well established that a suit to enforce a statutory mandate—even one that requires payment of money—seeks equitable relief outside the scope of the Tucker Act.  *See id.* at 900; *Md. Dep't of Hum. Res.*, 763 F.2d at 1446; Plaintiff's Mem. in Support of Mot. for TRO and PI ("Mem.") 15–16.  That principle is dispositive.  RFE/RL does not seek compensation for past harm.  It seeks equitable relief in the form of "the very thing to which [it is] entitled," *Bowen*, 487 U.S. at 900: its congressionally appropriated funds.

Several recent cases reached this precise conclusion.  *See, e.g.*, *California*, 2025 WL 878431, at *2 ("Nor do the States seek damages owed on a contract or compensation for past wrongs.  Rather, they want the Department to once again make available already-appropriated federal funds for existing grant recipients." (internal citation omitted)); *Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, 2025 WL 863319, at *3–4 (D. Md. Mar. 19, 2025) (finding jurisdiction over "alleged statutory and regulatory violations" and noting "[a] hallmark of … equitable actions is the existence of prospective relief in ongoing relationships." (quotation omitted)); *Climate United Fund v. Citibank, N.A.*, 2025 WL 842360, at *6 (D.D.C. Mar. 18, 2025)

(plaintiffs did not seek "money damages" because they sought "to avail themselves 'of statutory and regulatory provisions and procedures that may, or may not, entitle [them] to a monetary recovery.'" (quoting *Tootle v. Sec'y of Navy*, 446 F.3d 167, 175 (D.C. Cir. 2006))); *AIDS Vaccine*, 2025 WL 752378, at *8 ("Plaintiffs are not seeking compensation for their losses due to the failure to pay them …; Plaintiffs seek only invalidation of the policy, including the withholding of payment that flowed from it."); *Massachusetts v. Nat'l Insts. of Health*, 2025 WL 702163, at *7 (D. Mass. Mar. 5, 2025) ("Plaintiffs do not bring claims for past pecuniary harms.  Rather, like the petitioners in *Bowen*, their claims are to preserve their ongoing and prospective agreements with NIH.").

Nor does it change the jurisdictional calculus that RFE/RL seeks to "reinstate its grant agreement as improperly terminated."  Opp. 6.  As noted, district courts have jurisdiction over statutory and constitutional claims seeking to "forc[e] the government to obey the terms of a contract -- that is, specific performance."  *Transohio*, 967 F.2d at 610.  An order setting aside the termination of the agreement as violating statutes and the Constitution is precisely this sort of relief, not "money damages" for a contractual violation.

Further demonstrating that RFE/RL does not seek "in essence" monetary relief, *Crowley*, 38 F.4th at 1107, is the Claims Court's lack of the "general equitable powers of a district court to grant prospective relief."  *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020) (quoting *Bowen*, 487 U.S. at 905).  The CFC could not grant RFE/RL's request for immediate equitable relief to prevent irreparable harm.  So as a practical matter, sending this case there would mean that RFE/RL could *never* obtain adequate relief.  *See infra* § II.A.

***Catholic Bishops Case.***  Against all of this, Defendants stake their case on a single recent decision in *United States Conference of Catholic Bishops v. United States Department of State*,

2025 WL 763738 (D.D.C. Mar. 11, 2025), *appeal docketed*, No. 25-5066 (D.C. Cir. Mar. 14, 2025).  That decision goes against the weight of authority, but even more importantly, it does not help Defendants on its own terms.  Defendants' heavy reliance on *Catholic Bishops* is especially surprising because they are contradicting *the government's own position* in that case.

In *Catholic Bishops*, the statutory scheme authorized the State Department to enter into agreements with private agencies, but did not require it to fund any particular entity.  *See id.* at *1, *7.  The government considered that crucial: in distinguishing *Bowen*, the government stressed that the plaintiff "is not seeking 'funds to which a statute allegedly entitles it.'"  Civ. No. 25-465, ECF 25, at 13 (D.D.C. filed Feb. 26, 2025) (quoting *Bowen*, 487 U.S. at 895); *see also id.* (statute "does not require the [government] to reimburse [the] [p]laintiff for providing resettlement services—only the terms o[f] the cooperative agreements address it"); *id.* at 15 (because "[t]he source of the right sought here arises from the [a]greements," "the terms of [the] [a]greements will determine whether the State Department had the authority to suspend" them (cleaned up)).  In another filing, the government stressed that "[n]o statute constrains the Secretary's discretion to determine how best to allocate the funding … among many different potential grant recipients," and that the plaintiffs "base[] their claims on violations [of] the terms and conditions of the grant awards."  Mem. in Supp. of Defs.' Emer. Mot. for Recons., *Am. Ass'n of Colleges for Teacher Educ. v. McMahon*, No. 25-cv-702, ECF 36-1, at 6, 8 (D. Md. filed Mar. 18, 2025).

Now, however, Defendants abandon this distinction.  They "acknowledge[] that the grant is funded via appropriations," but say "that is true for all government contracts."  Opp. 8.  Most government contracts, however, do not go to an entity to which Congress has specifically directed money be allocated, and to which Congress has required an agency to award grants.  This case is precisely the type of case the government sought to distinguish in *Catholic Bishops*: RFE/RL *is*

seeking "funds to which a statute allegedly entitles it," Civ. No. 25-465, ECF 25, at 13.  Mem. 19–
21; *infra* § I.B.

The court in *Catholic Bishops* likewise emphasized that the State Department is authorized
by statute to "enter into annual cooperative agreements with private resettlement agencies" with a
particular mission, and that the State Department retains "discretion on *how* to spend" the
appropriated money."  2025 WL 763738, at *1, *7 (quotation omitted).  Under that statutory
scheme, it was at least arguable that the plaintiff's right to funding derived directly from the
cooperative agreements, not from the underlying statute.

No such argument can be made here, where Congress made it crystal clear that USAGM
"shall" make "annual grants" available to "RFE/RL, Incorporated" from appropriated funds, 22
U.S.C. § 6207(f), and that a specified amount of funds "shall be allocated" specifically to RFE/RL,
*see* Mem. 7–9; *infra* § I.B.  RFE/RL's claims are therefore "based on grounds other than a
contractual relationship with the government," *Crowley*, 38 F.4th at 1107, and are certainly not
"founded *only* on a contract," *Transohio*, 967 F.2d at 609 (emphasis added).  And again, even if
Defendants offer a halfhearted argument that they have no statutory duty to spend the funds as
Congress directed, that goes to the merits, not jurisdiction.

Defendants, and *Catholic Bishops*, also rely on *Ingersoll-Rand Co. v. United States*, 780
F.2d 74 (D.C. Cir. 1985).  Opp. 10–11; 2025 WL 763738, at *5.  There, the plaintiff claimed that
the government's request for proposals was unambiguous and that its decision to terminate the
plaintiff's contract was arbitrary and capricious.  *Ingersoll-Rand Co.*, 780 F.2d at 75.  The D.C.
Circuit held that the plaintiff's claims were contractual because "the essential rights at stake …
[were] contractual," and the dispute could be "conceive[d] of … as entirely contained within the
terms of the contract."  *Id.* at 77–78; *see also id.* at 78 ("The question presented by the complaint

could be phrased as whether the contract forbids termination under these conditions."). The court also stressed that the plaintiff's claims raised issues "within the unique expertise of the Court of Claims" because they turned on whether the government had "good reason to terminate the contract and begin resolicitation," which "call[ed] for knowledge of the government contracting process." *Id.* at 78.

None of that reasoning applies here. The "essential rights at stake," *id.* at 77, are statutory and constitutional. RFE/RL's claims do not turn on the terms of the grant agreement, which is simply the mechanism through which the USAGM is obligated by statute to pay RFE/RL's congressionally appropriated funds. And for that reason, this case presents straightforward matters of statutory interpretation that do not call for specialized knowledge of government contracting.

### B.    Defendants Misstate Their Statutory Obligations.

Tellingly, Defendants premise their defense on misconceived procedural arguments, without devoting a section of their argument to the core statutory question at the heart of this case: whether USAGM is statutorily required to make grants to RFE/RL and to provide congressionally appropriated sums to RFE/RL. They do make passing comments about the "considerable discretion" they believe Congress has "imbued" them with. Opp. 8. In doing so, Defendants ignore critical parts of the statutory text and misconstrue others. Indeed, the collection of statutory grants of discretion that Defendants are able to muster are most relevant for what they glaringly omit: any provision vesting Defendants with the sweeping authority to simply refuse to provide congressionally appropriated funds to RFE/RL because the agency has other priorities. Defendants "may not decline to follow a statutory mandate or prohibition simply because of policy objections." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013).

1. As RFE/RL explained, 22 U.S.C. § 6207(f) provides that "[g]rants authorized under section 6204 of this title for RFE/RL, Incorporated, shall be available to make annual grants" to

RFE/RL.  Mem. 18–19.  Defendants never even discuss that language, much less dispute that it requires USAGM to provide grants to RFE/RL.

Defendants instead cite the USAGM CEO's authority to "award the grant … to another entity" if the CEO finds that RFE/RL "is not carrying out the functions described in this section in an effective and economical manner."  Opp. 8 (quoting 22 U.S.C. § 6207(d)), 15, 18.  But Defendants do not and could not claim that is what happened here.  USAGM said it was terminating the grant because the grant "no longer effectuates agency priorities" and it was discontinuing the agency's "non-statutory functions."  March 15 Letter.  The CEO made no findings about the effective and economical performance of RFE/RL's functions, nor did the CEO award the grant to another entity.  Defendants decided that they do not want to fund RFE/RL's functions *at all*.  So whatever the CEO's authority under section 6207(d), it has nothing to do with the agency action at issue here.  *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based.").

None of the other provisions Defendants cite helps their case.  The fact that Congress limited the amount of RFE/RL's grant in fiscal year 2003, *see* 22 U.S.C. § 6207(c), hardly implies an authority to refuse to disburse funds that Congress said "shall be allocated" to RFE/RL in FY 2025.  And the requirement that grants be made "in compliance with a grant agreement," *id.* § 6207(g), cannot be divorced from the statutory requirement that grants "shall be available" "for RFE/RL, Incorporated," *id.* § 6207(f).

Indeed, the specific statutory authorities Defendants cite only confirm USAGM's overarching obligation to make grants to RFE/RL.  For instance, Congress would not have needed to provide that USAGM "may award the grant" "to another entity" under specifically defined

conditions, if USAGM had a far broader authority to award the grant to whomever it pleases, in whatever amount, for whatever reason, or to not award any grant at all. 22 U.S.C. § 6207(d); *see generally Schumann v. Comm'r of Internal Revenue*, 857 F.2d 808, 811 (D.C. Cir. 1988) ("Congress' specific enumeration of certain exceptions indicates that no other exceptions were intended.")

Defendants also cite *Open Technology Fund v. Pack* to suggest that Congress granted "the USAGM CEO broad, unilateral powers over grant-making and oversight of USAGM grantees." 470 F. Supp. 3d 8, 31 (D.D.C. 2020).  But at issue there was only the USAGM CEO's power to remove the head of the Open Technology Fund, not any question about denying grants or withholding appropriated funds. *See id.* at 18.  Critically, *Open Technology* does not cite, much less analyze, the restrictions imposed on USAGM by 22 U.S.C. § 6207.  Further, any suggestion that the decision implies some broader powers exist is undercut by the fact that Congress responded by amending the statute to remove the authority at issue, preventing the CEO from unilaterally removing the heads of grantees.  *See* National Defense Authorization Act for Fiscal Year 2021, Pub. L. 116-283, 134 Stat. 3388, 4024 (2021); *see also* National Defense Authorization Act for Fiscal Year 2023, Pub. L. 117-263, 136 Stat 2395, 3915 (2022) (removing the authority of the USAGM CEO to condition grants on the authority to name and replace the board of any grantee).

2. Defendants do not dispute that in the governing appropriations law, Congress instructed that "funds appropriated" to USAGM "shall be allocated in accordance with the table," which includes a specific amount directly for RFE/RL.  Opp. 3–4.  They simply respond, in a single conclusory sentence, that this "does not mandate a payment."  *Id.* at 4.  The plain meaning of the text says otherwise.  The word "shall" connotes a mandate.  And the word "allocate" means "to distribute."  ALLOCATE, Black's Law Dictionary (12th ed. 2024)*; see also Wi-LAN USA, Inc. v.*

11

*Apple Inc.*, 830 F.3d 1374, 1383 (Fed. Cir. 2016) ("To 'allocate' something is to distribute it among multiple recipients."). Indeed, in a leading case on President Nixon's attempt to impound federal funds, the Supreme Court held that the government had a duty to spend the full amount Congress said was "allotted"—and specifically pointed out that the word "allot" has the same meaning as the word "allocate." *Train v. City of New York*, 420 U.S. 35, 43 n.9 (1975). The Court held that a statutory provision providing that "(s)ums authorized to be appropriated pursuant to [another section of the statute] … shall be allotted by the Administrator," *id.* at 42, conferred no discretion on the agency administrator to "withhold funds" at the allotment stage, *id.* at 44. Congress's instruction that a sum certain "shall be allocated" to RFE/RL is just as mandatory.

The agency's limited reprogramming authority, Opp. 4, only confirms the statute's mandatory requirement. Congress provided that "no such reprogramming [between USAGM grantees] may reduce a designated amount by more than 5 percent." Pub. L. 118-47, 138 Stat. 460, 735. Congress thus placed a specific limit on USAGM's authority—the agency may *only* reprogram 5% of RFE/RL's congressionally appropriated funds—making clear that the other 95% of the funds *must* go to RFE/RL. Even then, reprogramming entails notice requirements and refers to re-allocating funds among grantees, *id.*—that authority does not allow USAGM to withhold and refuse to spend even 5% of RFE/RL's allocation, much less 100%. Congress's sharp limitation on reprogramming confirms that it did not confer a far broader authority on USAGM to refuse to provide RFE/RL any of its appropriated funds. *See, e.g.*, *Providence v. Barr*, 954 F. 3d 23, 43 (1st Cir. 2020) ("Why … would Congress have bothered to specify that the DOJ may withhold up to ten percent of a [specific] grant from a state [for reporting failures] … if [a] section [of the statute] allowed it to withhold the entire grant for the same reason through the imposition of a special

condition?").  If USAGM had the broad discretion it claims to spend or not spend the appropriated

amounts, the reprogramming limitation would be "render[ed] meaningless."  *Id.* at 43.

### C.    RFE/RL's APA Claims Are Likely to Succeed.

Defendants do not engage with the merits of RFE/RL's APA claims at all, disputing only

finality and ripeness.[3]  But Defendants have taken definitive action on RFE/RL's grant and have

imposed immediate consequences and obligations on RFE/RL.   RFE/RL is thus properly

challenging final agency action and its claims are ripe.[4]

Defendants' assertions that there is no "final agency decision not to pay out those funds,"

Opp. 12, and USAGM has merely "paused" funding, *id.* at 19, are puzzling: Defendant Lake's

letter says unequivocally that it "provides notice that [USAGM] is terminating [RFE/RL]'s federal

grant, FAIN: 1060-25-GO-00001 and *any other grants with USAGM*, effective March 15, 2025,"

March 15 Letter (emphasis added).  Defendants have imposed "closeout responsibilities" and

demanded that RFE/RL "refund any unobligated funds," *id.*, making their assertion that

Defendants might pay out funds in the future especially implausible.   Indeed, under federal

regulations, the March 15 letter imposes obligations on RFE/RL *now*, *see* 2 C.F.R. § 200.344,

---

[3] Having not engaged with RFE/RL's arguments that Defendants acted contrary to law, as well as arbitrarily and capriciously, Defendants have conceded that RFE/RL is likely to succeed on the merits of those claims if Defendants' procedural objections are rejected.  *See, e.g.*, *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion … and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.").

[4] Defendants' opposition focuses solely on RFE/RL's claim to the $7.5 million in appropriated funds, so RFE/RL responds here accordingly.  *See* Opp. 4 n.2.  To be clear, RFE/RL's position is that the entire dispute regarding USAGM's denial of access to appropriated funds for fiscal year 2025 is ripe, that USAGM's March 15, 2025, termination of grants constitutes final agency action, and the USAGM's failure to pay RFE/RL its appropriated funds is agency action unlawfully withheld.  *See* Mem. 21–27.

which is part of the reason a TRO is needed to forestall those immediate consequences.[5]  Further, the March 15 letter recites that USAGM is acting to "eliminate all non-statutorily required activities and functions," indicating that the agency has concluded that providing appropriated funds to RFE/RL via a grant agreement is "non-statutorily required" and not something it will do any longer.  Mem. 22 (citations omitted).  Accordingly, the March 15 Letter constitutes reviewable final agency action.  Defendants' suggestion that this is just a funding "pause"—made without a citation to anything, and ignoring the reasons the agency actually gave for its action—must be rejected.

RFE/RL's claims are also ripe.  Its entitlement to funds under the relevant statutes is a "purely legal" issue that is "presumptively reviewable." *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 464 (D.C. Cir. 2006) (citation omitted); *see also Teva Pharms. USA, Inc. v. Sebelius*, 595 F.3d 1303, 1308 (D.C. Cir. 2010) ("questions of statutory construction" are "purely legal").  And prudential considerations favor review now.  Defendants identify no "contingent future events that may not occur as anticipated," *Trump v. New York*, 592 U.S. 125, 131 (2020) (citation omitted), or any "further factual development [that] would significantly advance our ability to deal with the legal issues presented," *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003) (internal quotation marks omitted).  As Defendants acknowledge, "Congress made clear that any funds disbursed to grantees like Plaintiff are paid solely pursuant to grant agreements."  Opp. 8 (citing 22 U.S.C. § 6207(g)).  There is thus no

---

[5] The opposition references "FAIN: 1060-24-GO-00001," which is RFE/RL's grant for fiscal year 2024.  *See* Opp. 4.  To clarify, FAIN: 1060-25-GO-00001 is the grant agreement pertaining to the March 1-14 funds, and the relief Plaintiff seeks in this temporary restraining order relates to the funds covered by that grant agreement.  In any case, USAGM's termination of "any other grants with USAGM" leaves no ambiguity as to USAGM's intent.  March 15 Letter.

"colorable factual dispute" that the termination letter has closed off the only avenue through which RFE/RL can obtain its appropriated funds. *Teva Pharms*, 595 F.3d at 1309.

Defendants suggest that RFE/RL's claim is unripe because "the funds cover a period of performance that ended … just a week ago," such that RFE/RL cannot demonstrate that the funds "must be disbursed immediately, as opposed to in the ordinary course." Opp. 13. But the "ordinary course" of obtaining grant funds has been terminated; there is no "ordinary course" remaining by which RFE/RL can obtain its funds, which in the ordinary course are promptly disbursed. RFE/RL has also provided ample proof of ongoing "hardship" if judicial review is postponed. *Nat'l Park Hosp. Ass'n*, 538 U.S. at 812; *see infra* § II.

As to RFE/RL's claim that the refusal to disburse congressionally appropriated funds is agency action "unlawfully withheld," 5 U.S.C. § 706(1), Defendants argue that there is no "provision in the grant agreement requiring the funds to be paid out by a date certain" and that "Plaintiff cites to no requirement for the agency to disburse funds any faster," Opp. 12. But RFE/RL's claim is that USAGM has refused to pay the $7.5 million and made clear that it has decided to *never* pay the $7.5 million. And again, RFE/RL is in this Court to enforce statutes and the Constitution, not any "provision in the grant agreement" (Opp. 12). Disbursement of appropriated funds, an action mandated by the International Broadcasting Act and the relevant appropriations laws, is a "non-discretionary" duty that "the official in question has no authority to determine whether to perform." *Swan v. Clinton*, 100 F.3d 973, 977 (D.C. Cir. 1996).

### D. RFE/RL's Non-APA Claims Are Likely To Succeed.

1. Defendants try recast RFE/RL's constitutional claims as mere statutory claims, Opp. 15–16, but impoundment of appropriated funds has long been recognized as raising constitutional issues. *See. e.g.*, *Guadamuz v. Ash*, 368 F. Supp. 1233, 1244 (D.D.C. 1973) ("Money has been appropriated by the Congress to achieve the purposes of both programs and the Executive has no

residual constitutional power to refuse to spend these appropriations." (citing *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579 n.55 (1952))).

Nor is *Dalton v. Specter*, 511 U.S. 462, 473 (1994), relevant. *See* Opp. 16. There, the Supreme Court held only that claims "simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims[] subject to [non-APA] judicial review" (important there because the President is not subject to the APA). *Dalton*, 511 U.S. at 473. Here, RFE/RL is not arguing that exceeding statutory authority is always a constitutional violation. It is arguing more specifically that failing to disburse funds lawfully appropriated by Congress, in violation of multiple statutory directives to do so, violates the Constitution. *See Sierra Club v. Trump*, 929 F.3d 670, 696-97 (9th Cir. 2019) (distinguishing *Dalton* and permitting constitutional claims that the defendants "acted in violation of constitutional separation of powers principles because [they] lack[ed] any background constitutional authority to appropriate funds—making [the] [p]laintiffs' claim fundamentally a constitutional one").

2. Defendants' cursory merits arguments also fail. *See supra* § I.B. Defendants point to statutory provisions related to performance by grantees under the terms of their grant agreements, Opp. 16–17, but Defendants have never invoked them in their decision to withhold RFE/RL's congressionally appropriated funding. *See* March 15 Letter. Similarly, Defendants argue that "the mere fact that a grant agreement is funded through line-item appropriations does not mean that the routine execution of that grant agreement takes on statutory—let alone constitutional— dimensions." Opp. 17. This case, however, does not involve the "routine execution of a grant agreement." Defendants are refusing to disburse specifically appropriated funds to a congressionally designated recipient through a congressionally mandated grant. *See* Mem. 9–10,

16

21–22.  That is a violation of the Executive Branch's constitutional responsibility to take care that the laws be faithfully executed, and to respect Congress's constitutional power of the purse.[6]

## II.  RFE/RL Has Demonstrated Irreparable Injury.

### A.  RFE/RL Has Established Irreparable Harm to Its Ongoing Operations, Reputation, and Its Very Existence.

RFE/RL has shown that it will suffer irreparable harm in the absence of a TRO.  Ninety-nine percent of RFE/RL's funding comes from its USAGM grant, and the approximately $7.5 million that has been withheld from RFE/RL was intended to cover the March 1–14, 2025 period of performance.  Capus Decl. ¶¶ 12, 18.  Given that, it is unsurprising that the termination of RFE/RL's grant funding is causing immediate, irreparable harm.  Indeed, because of the lack of grant funds, "RFE/RL has begun the process of winding down its operations."  *Id.* ¶ 23.[7]

The harms to RFE/RL caused by this wind-down process are already occurring.  For example, "RFE/RL is already closing an office in Almaty, Kazakhstan and has terminated freelancers across its broadcast region because USAGM has withheld funding since March 1."  *Id.* ¶ 24.  "RFE/RL has already begun to terminate contracts with freelance journalists due to RFE/RL's dire cash flow situation."  Declaration of James Landis ("Landis Decl.") ¶ 4.  The

---

[6] Defendants oppose mandamus relief by citing USAGM's oversight duties.  Opp. 14–15.  But the agency did not claim to be exercising those authorities when it acted and cannot rely on them now.  *Chenery*, 332 U.S. at 196.  Defendants also do not respond substantively to the *ultra vires* claim.

[7] In addition, having received the termination letter, RFE/RL must also meet its closeout obligations to stop incurring certain costs and wind-down its operations.  The March 15 Letter states that RFE/RL must "discharge" its "closeout responsibilities" under the relevant regulations, and failure to do so "will result in the USAGM … taking [] enforcement actions …."  According to those regulations, RFE/RL "must liquidate all financial obligations incurred under the Federal award no later than 120 calendar days after the conclusion of the period of performance [*i.e.*, March 15, 2025]."  2 C.F.R. § 200.344(c).  This process must begin now, *see id.* § 200.472(a)(2) ("Any [closeout] costs continuing after termination due to the negligent or willful failure of the recipient or subrecipient [of a federal award or grant] to *immediately* discontinue the costs are unallowable") (emphasis added), which is why RFE/RL requests a TRO to suspend the grant closeout process.  Proposed TRO Order 1 (requesting an order that Defendants "take no steps and impose no obligations relating to closing out Plaintiff's grant").

termination of freelancers has harmed RFE/RL's important reporting of the news in Russia and Iran. Supplemental Declaration of Stephen Capus ("Suppl. Capus Decl.") ¶¶ 3–5. In addition, "RFE/RL has suspended planned [security] training courses and will be unable to schedule future training if RFE/RL cannot access its funds." Landis Decl. ¶ 9.

If RFE/RL is unable to obtain prompt access to the approximately $7.5 million of withheld funds, additional irreparable harms will continue to occur in the immediate future. For example, "RFE/RL has payments due on its leases in Prague, Riga, and Kyiv, to name just a few, that it will not be able to pay next month." Capus Decl. ¶ 31. Those payments are due on April 1, March 31, and April 10, respectively. Suppl. Capus Decl. ¶ 7. In addition, without additional funding, RFE/RL will need to both terminate approximately 90% of its freelance contracts and furlough its own employees on April 1, 2025. *Id.* ¶ 6. Obtaining the approximately $7.5 million in funding will delay some of these harms for roughly two weeks. *Id.* ¶ 8.

If RFE/RL does not obtain funding, these harms will occur and they will be irreparable. As a practical matter, terminating its freelance contracts and furloughing its employees means that RFE/RL "will be forced to stop the vast majority of its journalistic work." Capus Decl. ¶ 23. In addition, RFE/RL's reputation—as a reliable provider of news, as a partner to journalists, and as an employer—will be irrevocably tainted. *Id.* ¶¶ 25–26, 32. RFE/RL will not be able to reestablish contact with or recruit some of the same journalists again, and the decades of work it has spent to build up its staff, language capabilities, reputation, and brand will all be undone. *Id.* ¶¶ 26, 32.

Thus, RFE/RL's core operations are imminently imperiled. Defendants downplay this reality by suggesting that RFE/RL "may be forced to make difficult choices and lose profits in critical areas of their business" that do not show a threat to RFE/RL's "very existence." Opp. 18. But RFE/RL is a *nonprofit* journalistic enterprise, focused on providing accurate, uncensored

reporting to countries across the world.  Capus Decl. ¶ 4.  Contrary to Defendants' assertion, shuttering offices, shutting down critical security services, and laying off journalists are not mere "los[t] profits."  Instead, they are RFE/RL's core functions—functions that RFE/RL has already begun to wind down.  An organization dedicated to providing reporting cannot do so without its journalists.

These harms are irreparable.  For example, a "loss of talent and the inability to 'recruit and retain employees to build—or even maintain—[a plaintiff's] business' also constitutes irreparable harm."  *Luokung Tech. Corp. v. Dep't of Def.*, 538 F. Supp. 3d 174, 194 (D.D.C. 2021) (alteration in original).  Likewise, the "severe reputational harm" RFE/RL will suffer "if … forced to renege on [its] contracts … will almost certainly be irreparable."  *Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 116 (D.D.C. 2019).  Cutting journalistic staff and scaling back journalistic operations have been specifically recognized as irreparable harms.  *AIDS Vaccine*, 2025 WL 752378, at *18.  So too has injury to "goodwill, reputation, and relationships with employees, partners … and other stakeholders" caused by "deferring payments to suppliers, vendors, and landlords," and "disrupt[ing] relationships with longstanding partners whose trust had been cultivated over decades."  *Id.* at *19 n.19.

Next, the notion that "Plaintiffs' economic injuries are reparable through the Tucker Act for contract disputes concerning monetary payments" is wrong.  Opp. 19.  RFE/RL is facing dissolution as an organization *now*; it has already begun to roll back its operations.  The CFC cannot provide preliminary injunctive relief, *see supra* § I.A, and any contractual litigation would take time to reach a final judgment, during which time RFE/RL would effectively cease to exist without access to the Congressional appropriations that constitute "99 percent of RFE/RL's total funding."  Capus Decl. ¶ 12.

Even if RFE/RL were to receive money later, it will not be able to undo these harms.  For example, reestablishing journalistic networks in countries such as Afghanistan "will be challenging, if not impossible, due to the dangerous circumstances these networks operate in."  *Id.* ¶ 32.  Likewise, "terminating RFE/RL's operations and laying off its entire staff, even temporarily, will damage RFE/RL's reputation as an employer and reliable partner in these difficult-to-reach countries."  *Id.* ¶ 32.  More broadly, "news services are developed over years by dedicated journalists who have long-term relationships with RFE/RL," such that dismantling those services will cause RFE/RL to "lose access to important markets where we serve as an independent source of news outside of government control."  Suppl. Capus Decl. ¶ 15.  In addition, ceasing news coverage in various regions "will irrevocably harm RFE/RL's reputation and credibility with the millions of people that rely on RFE/RL for news."  Capus Decl. ¶ 25; Landis Decl. ¶ 33 (if RFE/RL is forced to "close its doors", it will "destroy the trust, credibility, and relationships RFE/RL has built over decades with its journalists").  Simply put, the harms that are occurring to RFE/RL now, and that will continue to escalate without access to additional funding, cannot be undone by receipt of funds many months from now.

Defendants also claim that RFE/RL must document that "an alleged harm is a threat to the business's very existence with specific details" and provide detailed projections of "anticipated future losses."  Opp. 18.  But *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34 (D.D.C. 2011), is inapposite.  There, the court noted that "the plaintiff's only support for its claim that its small business members will be driven out of business" was a "conclusory projection" that the relevant business would be "forced out of business in *eighteen months*," which the court found too "remote" and "speculative" to show irreparable harm.  *Id.* at 51–52 (emphasis added) (internal quotation marks omitted).  Here, as described above, RFE/RL is *already* suffering harm from Defendants'

decision to terminate its grant.  And RFE/RL is not "speculating" about "remote" harms over a year into the future; it has explained that without its funds, it "will have no choice but to close down the vast majority of the organization in April 2025."  Capus Decl. ¶ 23.  April begins nine days from now.  That harm is not "remote" or "speculative," and RFE/RL has demonstrated a "clear and present need" for a temporary restraining order.  *Wis. Gas Co.  v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (internal quotation marks omitted).

Finally, Defendants argue that *Newby*'s holding that "[o]bstacles that unquestionably make it more difficult for the [plaintiff] to accomplish [its] primary mission … provide injury for purposes … [of] irreparable harm" is inapplicable because "*Newby* involved *statutory* obstacles, not economic harm."  Opp. 19.  But nothing in *Newby* indicates that the court's reasoning was limited to statutory obstacles, and courts have applied *Newby* in this precise context, where the government has withheld funding from organizations.  *AIDS Vaccine*, 2025 WL 752378, at *19; *Massachusetts*, 2025 WL 702163, at *30; *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 368852, at *12 (D.D.C. Feb. 3, 2025).

## B.    The Court May Consider Irreparable Harms to RFE/RL's Employees.

Defendants incorrectly assert that the Court may not consider irreparable harms to RFE/RL's employees because those harms are to "third parties."  Opp. 20.

1. Defendants' argument is beside the point, because RFE/RL is itself harmed by the harms to its employees.  Harm to RFE/RL's employees constitutes harm to RFE/RL's mission and operations—RFE/RL cannot provide reliable news coverage if its journalists are threatened and harmed.  Further, RFE/RL's reputation will suffer if it cannot protect journalists working for it from persecution.  *See* Landis Decl. ¶ 33 (ending security services for journalists will "destroy the trust, credibility and relationships RFE/RL has built over decades with its journalists").

21

2.  Next, none of the authorities Defendants cite involves harms to a plaintiff's employees. *New Mexico v. Musk* involved *states* challenging the termination of *federal* employees—there was no employer-employee relationship between the states and the harmed employees.  2025 WL 520583, at *4 (D.D.C. Feb. 18, 2025).  *Church v. Biden* involved individual plaintiffs seeking to raise the harms of other individuals.  573 F. Supp. 3d 118, 145–46 (D.D.C. 2021).

Here, by contrast, the harms to RFE/RL's employees are "connected specifically to the parties before the Court," precisely because they are RFE/RL's employees.  *Id.* at 146.  Third-party standing principles are instructive.  *See E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1085, 1092 (N.D. Cal. 2018) ("Defendants' argument that the Immigration Organizations *themselves* must have suffered 'irreparable harm,' … fails because [the] [d]efendants have not shown serious questions on third-party standing.").  As this Court has recognized, the "employer-employee" relationship is one of the "circumstances" where "it is necessary to grant third party standing to assert the rights of another."  *Ams. for Immigrant Just. v. U.S. Dep't of Homeland Sec.*, 2023 WL 1438376, at *9 (D.D.C. Feb. 1, 2023); 13A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 3531.9.3 (3d ed. 2024) ("Employers have been allowed to assert the rights of employees in circumstances that at least suggest a congruence rather than a conflict of interests.").  For the same basic reason, RFE/RL can assert its employees' interests in stopping the grave irreparable harm they face as a result of Defendants' actions.  Thus, courts have considered injuries to employees when evaluating irreparable harm to their employers.  *See Nat'l Council of Nonprofits*, 2025 WL 368852, at *13 (plaintiffs' member organizations whose "workers may be unable to pay for housing or food" demonstrated irreparable harm sufficient for an injunction).

3.  As RFE/RL has demonstrated, its employees face threats to their physical safety in the absence of a TRO.  Mem. 37–39.  For example, "RFE/RL worked closely with Ukrainian security services on specific threats targeting RFE/RL journalists in Ukraine."  Landis Decl. ¶ 7.  These threats have included "unlawful detention and imprisonment," "ongoing harassment and counter-intelligence concerns," and "physical assault."  *Id.* ¶ 14.  Without funding, RFE/RL will not be able to pay for security services to liaise with local police and to provide protection to RFE/RL employees, putting those employees at risk.  *Id.* ¶¶ 11–12, 15–16.  Additionally, RFE/RL has guard contracts with services that are "essential for providing perimeter security, identifying and responding to threats, and screening staff and visitors."  *Id.* ¶ 18.  These contracts are in imminent danger of being canceled, and cancellation would put RFE/RL employees at greater risk for "attack by terrorist organizations, criminal elements, and governments that are hostile to RFE/RL's reporting."  *Id.* ¶ 17.  Finally, employees who are let go due to a lack of funding may have their visas canceled, in which case certain of those employees "face the threat of torture and imprisonment because of their work for RFE/RL" if forced to return to their home countries.  *Id.* ¶¶ 22, 25; Suppl. Capus Decl. ¶ 9.  Indeed, RFE/RL has identified specific individuals who may be forced to return to their home countries and face imprisonment if RFE/RL is no longer able to employ them.  Landis Decl.  ¶¶ 10–14.  These are imminent and irreparable harms.

## III.    The Balance of Equities and Public Interest Favor Relief.

"There is generally no public interest in the perpetuation of unlawful agency action."  *Newby*, 838 F.3d at 12.  Missing the point, Defendants warn that a TRO would "disrupt USAGM's oversight of its grantees to ensure taxpayer money is stewarded well."  Opp. 21.  But whatever the agency's supervisory authorities entail, Defendants here do not want to oversee RFE/RL's stewardship of grant money.  They want to starve RFE/RL of the funds Congress

appropriated for it.  Ultimately, Defendants have no response to *Congress's* determination that funding RFE/RL's mission "is in the interest of the United States."  22 U.S.C. § 6201(3).

## IV.    The Court Should Not Require a Bond Under Rule 65(c).

The Court should exercise its discretion to deny Defendants' bond request, which would defeat the purpose of the emergency relief sought here.

Rule 65(c) "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (quoting *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 107 (D.D.C. 2012)).  A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action."  *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases).

Courts have thus routinely held that bonds are not required, or required the posting of only a nominal bond, in the context of challenges to unlawful agency action, including funding freezes. One court explained "it would defy logic—and contravene the very basis of this opinion—to hold [the] [p]laintiffs hostage for the resulting harm" of a federal funding freeze.  *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025).  That court noted such a bond was especially inappropriate when the defendants "personally face no monetary injury from the injunction."  *Id.*

Even where courts have required a bond in such cases, the bond amounts have been nominal.  *See, e.g.*, *Does 1-26 v. Musk*, 2025 WL 840574, at *32 (D. Md. Mar. 18, 2025) ("requir[ing] [under Rule 65(c)] the posting of only a limited bond [of $100] where there has been no showing that [the] [d]efendants will necessarily have to expend materially significant resources in order to comply with the injunction.");  *Nat'l Ass'n of Diversity Officers in Higher Educ. v.*

*Trump*, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025) (setting a "nominal bond of zero dollars under Rule 65(c)" because granting the defendants' request "would essentially forestall [the] [p]laintiffs' access to judicial review").  That is the most that could be appropriate here.

## CONCLUSION

For the reasons set forth herein, this Court should grant the motion for a temporary restraining order.


March 23, 2025                              Respectfully submitted,

                                           /s/ Marney L. Cheek
                                           Marney L. Cheek (D.C. Bar No. 470596)
                                           David M. Zionts (D.C. Bar No. 995170)
                                           Thomas Brugato (D.C. Bar No. 1013523)
                                           COVINGTON & BURLING LLP
                                           850 Tenth Street NW
                                           Washington, DC 20001-4956
                                           (202) 662-6000
                                           mcheek@cov.com
                                           dzionts@cov.com
                                           tbrugato@cov.com

                                           *Attorneys for Plaintiff RFE/RL, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2025, I filed the foregoing document with the Clerk of Court for the United States District Court for the District of Columbia using the court's CM/ECF filing system, which will send notification of such filing via e-mail to all counsel of record.

Respectfully submitted,

/s/ Marney L. Cheek
Marney L. Cheek (D.C. Bar No. 470596)
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000
mcheek@cov.com

*Attorney for Plaintiff RFE/RL, Inc.*