IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | | |
|---|---|---|
| RFE/RL, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL NO. 25-799 |
| v. | ) | |
| | ) | |
| KARI LAKE, et al., | ) | Monday, March 24, 2025 |
| | ) | |
| Defendants. | ) | |
| ____________________________ | ) | |

TRANSCRIPT OF TEMPORARY RESTRAINING ORDER

BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES SENIOR DISTRICT JUDGE

---

APPEARANCES:

COVINGTON & BURLING LLP
BY: DAVID M. ZIONTS, ESQ.
THOMAS R. BRUGATO, ESQ.
850 Tenth Street, NW
One City Center
Washington, DC 20001-4956
(202) 662-5987
Email: Dzionts@cov.com
Tbrugato@cov.com

For the Plaintiffs

DEPARTMENT OF JUSTICE
BY: ABIGAIL STOUT
JOSEPH BORSON
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-2000
Email: Abigail.Stout@usdoj.gov
Joseph.Borson@usdoj.gov

For the Defendants

---

COURT REPORTER:

CHANDRA R. KEAN, RMR
Official Court Reporter
333 Constitution Avenue, NW
Washington, DC 20001

**PROCEEDINGS**

(Court called to order at 2:04 p.m.)

DEPUTY COURTROOM CLERK: Your Honor, we are on the record in Civil Case 25-799, RFE/RL Inc. v. Kari Lake, et al.

Starting with plaintiff's counsel, please approach the podium and state your appearance for the record.

MR. ZIONTS: Good afternoon, Your Honor. David Zionts, Covington and Burling for the plaintiff. Also here with my colleague, Thomas Brugato.

MS. STOUT: Good afternoon, Your Honor. Abi Stout for the defendants. I'm here also with Joseph Borson.

THE COURT: I have this Notice of Disbursement. Let me start with that. If you would tell me about that and how you -- whether you've had an opportunity to talk to plaintiffs' counsel about it yet.

MS. STOUT: Yes, Your Honor.

THE COURT: If you speak into the microphone better so I can hear you better.

MS. STOUT: Yes, Your Honor. We did file the Notice of Disbursement earlier today, and before this hearing, conferred with plaintiffs' counsel, but they would like to proceed with the hearing.

THE COURT: Okay. And what's your position

regarding that disbursement, that that moots the TRO?

MS. STOUT: Your Honor, our position is that the disbursement is almost dispositive to the irreparable harm analysis.

Plaintiffs claim two relief forms in their proposed motion for temporary restraining order: The 7.5 million, which was disbursed, and then closeout costs. I believe -- and I don't purport to speak for plaintiffs, but I believe plaintiffs' position is that the closeout costs is the thing that is keeping this TRO from being completely moot. And so they are proceeding on that basis.

THE COURT: Okay. Let me ask the plaintiffs, then.

MR. BRUGATO: Good afternoon, Your Honor. Thomas Brugato for RFE/RL, Inc.

So our position is really set forth at Page 17, Footnote 7, of our reply brief, which addresses the closeout obligations that the March 15th letter purports to impose on RFE/RL. And there are two closeout obligations which effectively mean that the disbursement of the 7.5 million does not enable RFE- --

THE COURT: Why would that need to be resolved now on the TRO versus the PI?

MR. BRUGATO: Because the closeout requirements

effectively prohibit RFE/RL from using that 7.5 million for maintaining --

THE COURT: I'm sorry?

MR. BRUGATO: The closeout prohibitions effectively prohibit RFE/RL from using that funds to move forward with their ordinary course operations.

There's an obligation, and it's cited in the termination letter, "to liquidate all financial obligations incurred under the federal award no later than 120 calendar days after the conclusion of the period of performance."

And there's another obligation -- again, it's cited in Footnote 17 -- Footnote 7 on Page 17, "to use all reasonable efforts to terminate ongoing costs."

So the problem with the disbursement is we're still required to use all reasonable efforts to terminate costs going forward, which would presumably include furloughing employees on April 1st, continuing to terminate freelancer contracts, and take all the other steps we've outlined in our papers that would impose irreparable harm on RFE/RL.

THE COURT: Okay. All right. Then plaintiffs may proceed with your argument on the temporary restraining order.

MR. ZIONTS: Thank you, Your Honor. And as we

had notified chambers, I'm going to address the likelihood of success on the merits, and Mr. Brugato will cover the remaining factors. And he can, of course, speak -- add additional details about why these closeout obligations present immediate and ongoing --

THE COURT: Speak better in the microphone so everybody can hear you.

MR. BRUGATO: Yes. I apologize, Your Honor.

Your Honor, Radio Free Europe/Radio Liberty has been one of the great success stories of our country's commitment to a free press. But the question before this Court is not whether it is good policy for the United States to continue funding it. That's a decision Congress made, and Congress holds the power of the purse.

I think the best way to put this is what Justice Kavanaugh said when he was on the D.C. Circuit in *Aiken County*: "A federal agency sometimes has policy reasons for wanting to spend less than the full amount appropriated by Congress for a particular project, but" he said, "the executive branch does not have unilateral authority to refuse to spend the funds."

And that's exactly what's happening here.

Subject to the Court's questions, I propose to make three main points: One on jurisdiction, one on

finality, and then, finally, on the scope of the Agency's obligations under the statutes.

First on jurisdiction. This case is not at its essence contractual. The rights we are invoking come from outside the four corners of the contract of the grant agreement.

In other words, we are not saying we have a right to the funds because a grant agreement says so. We are saying we have a right to the grant and to the funds because statute say so.

So this case is squarely governed by what the D.C. Circuit said in *TransOhio*. "Litigants may bring statutory and constitutional claims in Federal District Court even when the claims depend on the existence and terms of a contract."

And to just briefly put this --

THE COURT: Now, *TransOhio* is an en banc decision by this Circuit in 1993. It was a long time ago.

MR. ZIONTS: Your Honor, that --

THE COURT: Never disturbed.

MR. ZIONTS: I don't think that's been disturbed.

THE COURT: It's good law and says you don't have to go to the Court of Claims, which is what the

government is arguing in their original papers here.

MR. ZIONTS: Yes.

THE COURT: That's all out the window in TransOhio, right?

MR. ZIONTS: That's my understanding, Your Honor.

THE COURT: So under TransOhio, then, they can -- you can bring this claim here, and I can adjudicate it as to whether there's a constitutional or APA violation.

MR. ZIONTS: Yes, Your Honor.

THE COURT: You're not seeking the money from the contract?

MR. ZIONTS: We are seeking -- we are asking for an order that the government do what the statutes require it to do that will result in the disbursement of money -- just as the Supreme Court said in *Bowen,* an APA case, "may result in the disbursement of funds." But that's not money damages as a contractual breach. And that's what the Tucker Act is about.

THE COURT: And that's exactly what happened in TransOhio, isn't it?

MR. ZIONTS: Exactly, Your Honor, yes.

So I can move on, then, from the jurisdictional point. And on finality, I think I can be very brief.

14:11:36 The government says there is no finality here because this is just -- and they say this in their papers -- "a funding pause in that no final decision has been made."

14:11:45 And with all respect, Your Honor, that cannot --

14:11:48 THE COURT: Congress decided to appropriate this money for this reason for Radio Free Europe.

14:11:56 MR. ZIONTS: Absolutely, Your Honor.

14:11:56 THE COURT: Congress decided that.

14:11:58 MR. ZIONTS: Congress decided that. And the Agency has decided it doesn't want to do it and it's not --

14:12:01 THE COURT: Now traditionally, if the President didn't want to use it for that purpose, he could go back and ask Congress to do a rescission, right?

14:12:10 MR. ZIONTS: That is not only "traditionally," that is what the President is supposed to do. That's exactly what Justice Kavanaugh said in his decision for the D.C. Circuit in *Aiken County*, that there is a process for this. It was established after --

14:12:22 THE COURT: So there's no reason for the Court to be involved unless the President just decides he's going to do it anyway and not consult with Congress.

14:12:29 MR. ZIONTS: That is correct, Your Honor.

14:12:29 THE COURT: The reason I'm sitting here is

14:12:31 because the President decided not to consult with Congress and engage in the rescission process.

14:12:36 That's why I'm sitting here?

14:12:37 MR. ZIONTS: That is correct, Your Honor.

14:12:39 THE COURT: So the Courts would have no reason to be involved unless the President was refusing to consult with Congress --

14:12:47 MR. ZIONTS: Absolutely --

14:12:48 THE COURT: -- which is the traditional way this has been done since TransOhio.

14:12:53 MR. ZIONTS: Yes, Your Honor. The only reason we're here -- we have clear-as-day statutory obligations. There is money that is appropriated for a very specific entity. There's an obligation for the President to disburse that money through grants to that entity.

14:13:09 The reason we are here is because the Agency says: We have other priorities. All -- that's all the Agency said: Our priorities have changed and we don't want to engage in our nonstatutory functions. And the basic problem with that is this is a statutory function.

14:13:24 Congress said, "Do this." Congress said --

14:13:26 THE COURT: And Congress thought Radio Free Europe was important enough that they wanted the money dedicated to just that, and the President is not free to

14:13:36 use it for any other purpose.

14:13:38 MR. ZIONTS: The President is not free to use
14:13:39 it for any other purpose. The President is not free to
14:13:42 just refuse to spend it.

14:13:44 There is, in the appropriations law, a very limited
14:13:47 authority, a reprogramming authority. So that's where
14:13:50 the law says there are a few different grantees that the
14:13:55 Agency has. And the Agency is given by Congress
14:13:58 authority to transfer some of the allocation from one to
14:14:01 another with a cap of five percent.

14:14:04 So it's really incredible for the government to
14:14:07 say, when there's this incredibly narrow grant of
14:14:10 authority -- they actually cite this in their brief.
14:14:13 And they say, Look, we have a reprogramming authority.
14:14:15 Congress said five percent.

14:14:17 So to infer from that that actually they can just
14:14:20 zero it out, not spend that money at all, is really
14:14:24 remarkable.

14:14:25 THE COURT: Now, as I understand it, Congress
14:14:31 enacted -- the most recent enactment is to go through
14:14:34 the fiscal year that they just did, that goes through
14:14:39 the end of the fiscal -- goes through December 2024,
14:14:42 right?

14:14:43 MR. ZIONTS: Yes, Your Honor. The same day
14:14:45 that the defendants took the actions at issue here,

14:14:48 President Trump signed a law that extended RFE/RL's appropriation through September 30th.

14:14:56 THE COURT: So on that very law, it's extended through December 2024, and Congress has extended the appropriation to Radio Free Europe in that appropriation.

14:15:08 MR. ZIONTS: Yes, it is now extended by law through September 30th, 2025.

14:15:13 THE COURT: And the most that the President could take out of that, for any other purpose, is five percent.

14:15:19 MR. ZIONTS: Yes, Your Honor.

14:15:19 THE COURT: Under that law.

14:15:20 MR. ZIONTS: That is what the law says.

14:15:21 THE COURT: And yet the President says he's going to impound, in effect, 100 percent.

14:15:28 MR. ZIONTS: Yes, Your Honor.

14:15:28 The only suggestion I would make there is I don't think the President has actually said any of that. All the President did was issue an Executive Order saying: Stop doing your non-statutory functions.

14:15:39 We're not challenging that because this is a statutory function.

THE COURT: Right.

14:15:43 MR. ZIONTS: This isn't even the -- I mean,

this would be a problem if the President tried to impound the fund. This is a senior advisor to USAGM saying, I'm going to impound the funds.

Otherwise, I agree with everything Your Honor has said.

THE COURT: And so the traditional way since TransOhio would have been for the President to work with Congress on trying to reprogram and do a reprogramming of the money, because it's appropriated to this very purpose.

MR. ZIONTS: Yes, Your Honor. Not just since TransOhio, since President Nixon, since the *Train* case.

THE COURT: Well, I mean, I remember -- I did an impoundment case for President Reagan when I was in the U.S. Attorney's Office so I know something about impoundment. The one I worked on was -- unlike this, it was an impoundment case. It was -- it was my second big case, I -- I represented President Reagan. And I had won the *Air Traffic Controller's* case so I was already in with the Reagan people. But the second one was $600 million, as I recall, in comprehensive education training funds that President Reagan decided to reprogram from the Department of Labor.

And what I remember best about it -- because it was argued in this court, before the chief judge of this

court. I was an assistant U.S. attorney arguing it for President Reagan. And he decided to -- all that law got enacted when Nixon was president about impoundments. But it was two-year money. And all we did was we were saying we weren't going to spend any this year. We could spend it the following year.

And I won it in the District Court. All 50 states came out against me, and I remember this vividly. And my mother was there for the argument. My mother was very nervous.

And I told her I think the President has this authority. And she said, "But all the states are against you, even Texas." She was quite perturbed that even Texas was opposed to me.

And I said, But I think the President has this authority. And I won it, and I won on appeal.

But we had -- the money was not targeted just for that specific vendor that was going to get the money, but it was for comprehensive education training funds, but it could have been spent the next year. So I won it on the basis that it wasn't totally impounded. We could just spend it next year. So I won the case.

So I know something about impoundment, but I don't understand if it's -- if Congress targeted it for Radio Free Europe, it's a different situation. Then I think

14:18:10 the President has to get it rescinded before he can spend it for other things. Am I wrong?

MR. ZIONTS: I do not think you are wrong, Your Honor. Right now in this court, and in courts around the country, there is a lot of litigation happening about the cancellation of contracts, the cancellation of grants. I don't think Your Honor has to comment on the merits of all of those cases.

This is a uniquely easy case where Congress has said this is in law, public law. It defined an amount that shall be allocated to one named recipient of the funds. And the government is just not providing what Congress said to do.

Your Honor, unless you have other questions about the merits of the case, I'll turn it over to Mr. Brugato to say more about the harm.

MR. BRUGATO: Good afternoon, again, Your Honor.

So RFE/RL has established irreparable harm here. Specifically, RFE/RL has established four separate categories of irreparable harm, any of which would be sufficient on its own to satisfy these temporary restraining order factors.

So to just briefly walk through those four categories, first is harm to RFE/RL's mission.

14:19:28 RFE/RL is being forced to terminate its freelancer contracts and furlough its staff starting April 1st, which gravely undermines its core mission, which is to provide accurate and uncensored news across 23 different countries.

Second, suffering harm to its reputation. Defaulting on leases and contracts, terminating freelancers, and furloughing employees will undermine the decades of investment that RFE/RL has made to become a credible, trusted source of the news, as well as a partner to its journalists and freelancers.

Third, RFE/RL is suffering the potential threat to its very ability to exist going forward.

As the Capus declaration says pointblank, "Without access to further funds, RFE/RL will have no choice but to close down the vast majority of the organization in April of 2025. RFE/RL will thus be forced to stop the vast majority of its journalistic work and will ultimately cease to exist as an organization."

And then finally, there are harms to its employees' well-being, including their physical safety.

RFE/RL journalists are the object of specific and credible threats from foreign governments and organized criminal elements associated with those governments. Without its funding, RFE/RL will no longer be able to

14:20:48 provide protections to its journalists who are subject to these threats.

14:20:52 So before talking in more detail about any of those categories, I do want to talk about the requested relief that we sought in our TRO motion.

14:21:01 It's because of the imminence and severity of all of these harms we've requested the approximately 7.5 million, which the government has now indicated will be disbursed. But we've also requested a pause to the grant closeout process, which I'll turn to in a moment.

14:21:16 But to be clear, even that relief is only a temporary solution to RFE/RL's problem. It's really a band-aid.

14:21:23 As the supplemental declaration we filed states: "Will delay some of these harms for a limited period of time, approximately two weeks." That's why we also requested a preliminary injunction in our motion because we need relief going forward to obtain the rest of our funds on a monthly basis in order for RFE/RL to continue its operations.

14:21:44 So because of the importance of that relief, we respectfully request that the Court hold the government to its deadline on the preliminary injunction motion, which is this Wednesday, to file an opposition, and promptly schedule a preliminary injunction hearing to

14:21:59 address those issues.

14:22:00 Now, I would like to just talk a little bit more about the grant closeout process, if that would be helpful to Your Honor.

14:22:06 So the March 15th letter invokes the closeout process and explains that we are required to promptly refund any unobligated funds that have been paid out but are not authorized to be retained, and states that "failure to do so will result in USAGM filing a report documenting your material failure to comply with the terms and conditions of the award and taking other appropriate enforcement actions, which could impact your eligibility for future grants.

14:22:34 And as I was outlining earlier, those closeout obligations impose an immediate obligation to start liquidating financial obligations incurred under the federal award and to make all reasonable efforts to discontinue costs.

14:22:50 I'll give just one very concrete example that the regulations at 2CFR200.472 specify with respect to leases. The regulations direct that the sub-recipient, a recipient of the grant, must make all reasonable efforts to terminate, assign, settle, or otherwise reduce the cost of the lease.

14:23:10 So the upshot of all this, Your Honor, is that the

7.5 million that the government is now indicating it will disburse really provides very limited, if any, relief to RFE/RL if we can't actually use the money, or even worse, if we're threatened with enforcement action if we spend that money and the government later claims: Well, actually, you weren't allowed to do that. That wasn't consistent with the closeout process.

So that's why we're here today still, Your Honor, on the TRO papers, because without some certainty around that, the money just doesn't have any -- as much practical value for RFE/RL and can't abate the harms we've outlined in our TRO papers.

So I'm glad to get into more detail on each of the irreparable harms, if that would be helpful.

THE COURT: I understand the issues, and I expect to act promptly on the preliminary injunction. But I think that they have until Wednesday or whatever it is to get their opposition to the PI. They wanted to do it separately, so I'll do it separately.

MR. BRUGATO: Okay. Thank you.

THE COURT: I understand you're new to the Department. Tell me a little about your background.

MS. STOUT: Yes, Your Honor.

So prior to joining the Department, I was at Jones Day here in D.C. And before that, I was clerking.

14:24:35 THE COURT: Good.

14:24:36 MS. STOUT: Pardon?

14:24:37 THE COURT: Good.

14:24:38 MS. STOUT: Yes, happy to be here, Your Honor.

14:24:40 So if it pleases the Court, I'd like to start with 14:24:45 the irreparable harm portion. So I want to emphasize 14:24:50 two things and kind of step back here.

14:24:53 First, we're here on a very limited basis: 14:24:56 Plaintiffs' TRO, which seeks approximately 7.5 million, 14:25:01 and then the closeout costs that plaintiffs just 14:25:04 referred to. And second, we contend that the Court's 14:25:08 analysis in this case can begin and end with irreparable 14:25:12 harm on this limited basis, on this TRO basis.

14:25:15 And this is because, as indicated and has been 14:25:18 discussed, defendants have disbursed the amount of 14:25:21 money -- the exact amount of money that plaintiffs seek 14:25:23 in their TRO. And this is important because the 14:25:28 irreparable harm that plaintiffs contend would be faced 14:25:32 by not having this amount of money has dissipated by 14:25:36 having it. Plaintiffs now rely just on the closeout 14:25:40 costs as keeping their TRO motion alive and creating the 14:25:44 irreparable harm that they face.

14:25:47 Your Honor, I want to emphasize that this TRO 14:25:50 posture that we're in is one of the most extraordinary 14:25:53 reliefs in the law. And to issue a TRO based on

closeout costs when plaintiffs have not connected that to the other harms that they've alleged are connected to the 7.5 million would be an improper use of the TRO power of this Court.

Irreparable harm is a high standard, and a TRO is an extraordinary remedy.

It is settled that economic harm is not irreparable except in very limited exceptions here, for example, if the loss threatens the very existence of the plaintiffs' business or if the claimed economic loss is unrecoverable.

Here, plaintiffs have not shown that closeout costs specifically would threaten the very existence of their business. And as for not being able to use the 7.5 million --

THE COURT: Well, they argue in their papers, I thought, that if you lose some of these translators and reporters, which they could lose by some period of being out of business, that they would be irreparably injured because these are people that would be behind the iron curtain of, I guess, China and Russia both, and they may not be able to use those as sources again if they were out of business. So I think that's what they would argue would be the irreparable injury.

Is that not right?

14:27:20 MS. STOUT: Your Honor, two responses to that. I think those kind of harms that they discuss are mainly connected to the lack of getting this immediate 7.5 million relief, which defendants have disbursed, so they do have access to that now.

14:27:33 And then, second, as plaintiffs just pointed out in their remarks up here today, they do have this two-week ability and window to be able to still continue to operate, which gives us time to, as you said, brief the PI motion and then come back on that preliminary injunction posture.

14:27:51 That's why we contend that in this limited setting today, the TRO relief would not be appropriate.

14:28:00 THE COURT: Okay.

14:28:03 MS. STOUT: Your Honor, on that economic harm point, subject to this very limited exception, economic harm is not irreparable. And we would just further emphasize the fact that the 7.5 million paid here, the bulk of what plaintiffs seek in their proposed order, that would take care and dissipate what plaintiffs are looking for in the TRO posture.

14:28:26 Also, on the other harms, turning past the economic harms, the reputational harms, and also the cybersecurity harms that plaintiffs discussed in their briefing and also in their remarks, we want to emphasize

the speculative nature of those harms. Specifically, in the reputational space, courts have held that harms to a business's goodwill or other things connected to the reputational costs are actually economic harms and, thus, would fall into that general rule that economic harms are not irreparable.

And then as to the other harms, as to third parties or cybersecurity harms, it's important, especially in this preliminary injunctive posture, that plaintiffs connect each of those harms to the relief that they sought. And here, they have not done that because it is based on speculation. It is based on -- for example, in the cybersecurity context, if funding were decreased, then potentially they would be exposed to more cybersecurity threats, which then might in turn potentially risk some kind of cybersecurity breach.

Here, that harm is too speculative and attenuated, especially in this TRO posture.

Now, although we think that this Court can decide this case on the irreparable harm point, because my friends on the other side did address the merits, I can say a brief word about that as well.

I want to begin with the impoundment piece, because a lot of the discussion was had on that. So, Your Honor, we would just want to reframe this case and

level-set here a little bit.

I think it's telling that plaintiffs did not bring a claim under the Impoundment Act, so they're actually not proceeding on an Impoundment Act claim here. And I think that's important because the impoundment context, at least the way I like to think about it is, say Congress appropriates 100 million for something, and the President decides I'm only going to spend 20 million on that item, that potentially would implicate the Impoundment Act.

But that's not what we have here, Your Honor. Here, we have the appropriations -- and plaintiffs talk about the rest of the fiscal year is about 77 million that Congress has appropriated. And here, we have a grant termination. That's very different than the President coming in and saying, I'm not going to spend money on a certain thing -- or on a certain thing that has been appropriated for.

The appropriations have gone out. The appropriations have happened. But now we're dealing with this separate issue of whether the grant contract was appropriately terminated.

In -- that leads me into a related point here. Plaintiffs repeatedly state that the statute, particularly the International Broadcasting Act statute,

and then also the Appropriations statute, creates a statutory obligation that Congress has to give funding to RFE/RL. But it's a little -- we submit that plaintiffs over-read the statute there.

This statute, especially the International Broadcasting Act, authorizes funds to go to RFE/RL, but it's just an authorization statute. Plaintiffs can point to no obligation that the statute imposes. Instead, it sets up a system where Congress can appropriate funds and then the CEO of RFE/RL can then -- disburses via a grant process.

And this is clear when you look at the statutory scheme. The statutory scheme lays out that it's -- RFE/RL is supposed to be a grantee and receive its money through the grant process.

So this isn't a direct -- in the International Broadcasting Act that: All right, we're giving you this amount of money or lump sum directly to RFE/RL. RFE/RL -- a lot of acronyms today.

Instead, the statute provides an authorization and then that gets carried out through the grant.

THE COURT: But once Congress appropriates the -- passes the appropriations and says this money shall be appropriated for Radio Free Europe, I'll call it, why -- if the President doesn't want to grant it to

them, what happens to the money?

If he doesn't get it rescinded, the money just stays in limbo? He can't reprogram it without going back to Congress; am I right?

MS. STOUT: Your Honor, we see the situation as a little bit different, that Congress actually has appropriated the money here. So the issue isn't really about appropriations or the President rescinding --

THE COURT: So he can just refuse to comply with the Appropriations Act?

MS. STOUT: Your Honor, here -- rather -- we think the Appropriations Act argument is a little bit of a red herring because the inquiry would be: Did the Agency -- was the termination of the grant a valid termination? And kind of: Okay, was there breach of contract or breach of the grant's terms and conditions in the grant agreement?

And that would be the inquiry, whether it was a valid termination of the grant rather than an appropriations argument.

And this is clear because the statute actually contemplates that a grant could be terminated. For example, in Section 6207(g) of the International Broadcasting Act, this subsection is titled "grant agreement." In subsection 3 of that act says that, "the

failure to comply with the requirements of this section may result in suspension or termination of a grant without further obligation by the Agency or the United States."

So the statute actually contemplates that the Agency could terminate a grant -- in fact, I should have backed up and started at the beginning of the section, because the beginning of 6207(g) states that, "Grants to RFE/RL, Incorporated by the Agency shall only made -- be made in compliance with the grant agreement. The grant agreement shall establish guidelines for such grants. The grant agreement shall include the following provisions."

And then it includes that part that, "The failure to comply with the requirements of this section may result in termination of the grant without further obligation by the Agency or the United States."

So the statute itself actually contemplates the situation where the Agency can terminate the grant and there's no further obligation by the United States. And so that means the money would be appropriated but the Agency for, you know, whatever reason, terminated the grant.

And so really what we should be looking at here is: The termination of the grant, was that valid under the

required -- under the terms and conditions of the grant itself?

THE COURT: So why does Congress bother with the appropriation then? I don't understand.

Their appropriation is meaningless because the Agency can do anything they want to do and the President can do anything he wants to do?

MS. STOUT: I wouldn't say that the appropriations are meaningless, by any means. I think that -- especially this section -- parts of the statute, 6204, 6207, they talk about and contemplate authorizations that the Agency can provide grants to RFE/RL, but then it provides --

THE COURT: Well, Congress didn't just authorize it. They said we direct this money to go to this agency, right?

MS. STOUT: Your Honor, they -- I think the plaintiffs over-read that part of the statute a bit.

So we -- we do agree that the statute authorizes grants to go there, but if you look at the actual language of the statute, 6207(f), and this is -- actually, the subsection is "Limits on grants for Free Radio Europe and Radio Liberty." The statute says, "Grants authorized under Section 6204," which is --

THE COURT: Okay.

MS. STOUT: -- what gives the CO all of its authority.

THE COURT: That's in the Broadcasting Act.

MS. STOUT: Yes, Your Honor.

THE COURT: What about in the Appropriations Act?

MS. STOUT: In the Appropriations Act, the language there sets out a budgetary authority, and so it sets out a table. And RFE/RL is included in the line item saying that this is the money that's being appropriated.

THE COURT: It "shall be spent."

MS. STOUT: So the language "shall be spent" isn't -- I can turn to the statute really fast.

So the language in the Appropriations Act that I think Your Honor is referring to is that -- states that "the funds appropriated under this heading shall be allocated."

THE COURT: "Shall be allocated."

MS. STOUT: Which is, we submit, materially different than "shall be spent." Because it just provides that the appropriations shall be allocated in accordance with the table under this heading in the explanatory section described in Section 4.

So rather than saying, "shall be spent," it just

says, "shall be allocated," which, pursuant to the Broadcasting Act, means shall go to the grant program that Congress has set up with very specific, you know, limitations based on what the board of directors has to look like or, you know, those sorts of things.

And then the Appropriations Act takes that grant program set up in the Broadcasting Act and says, "The funds are appropriated and shall be allocated in accordance with the table." And then later on it says, "The funds appropriated under this heading shall be made available with the principles and standards set forth in 303(a) and (b) of the United States Broadcasting Act.

So it just says they should be made available; they should be allocated. These are Broadcasting Act and authorizing statute, and then this Act, just saying: Here's the money that's available.

But then it gets turned over to the Agency to run the grant program -- in accordance with the Broadcasting Act -- but then run the grant program accordingly.

And that's why we think that the Appropriations Act, the Broadcasting Act, it doesn't create a statutory obligation and actually permits and contemplates that the Agency might actually terminate the grant but, you know, provide limitations on what the grant process would look like.

THE COURT: Okay. I understand the argument. It's helpful.

MS. STOUT: Thank you, Your Honor.

Your Honor, I would just -- unless the Court has further questions, I would just close by circling back to the irreparable harm point and the -- emphasizing the temporary -- or, rather, limited relief in this TRO posture, which has been largely obviated by the Disbursement of Funds Notice that defendants filed earlier today.

THE COURT: If the Court denies the temporary restraining order, though, I take it the government's position was -- would be that in the interim, before I rule on the preliminary injunction, the plaintiff would be obligated to follow the closeout procedures in the meantime --

MS. STOUT: Your Honor --

THE COURT: Contractually obligated.

MS. STOUT: Your Honor, our understanding -- or that the closeout procedures in, I think is -- my friends on the other side read are not -- they have that 120-day window.

Let me double-check the footnote and the language on that, but my understanding is that...

So, Your Honor, the regulation that plaintiffs

cited, and is cited in their brief, does say, "According to those regulations, RFE/RL must liquidate all financial obligations incurred under the federal award no later than 120 calendar days after the conclusion of the period of performance."

So we would submit the time of briefing of the preliminary injunction and then the Court's ruling would presumably precede that 120-day window. In any event, we would rest on our argument that the closeout costs do not rise to the level of irreparable harm that would permit this Court to grant the TRO.

THE COURT: Thank you.

Plaintiffs get the last word.

MR. ZIONTS: Thank you, Your Honor. I have three quick points on the merits, and then I think Mr. Brugato may have another point on harm.

First, we are talking about the language in the appropriations law, "shall be allocated." I do not understand how the government hears "shall be allocated" and says, Well, maybe we'll allocate it and maybe we won't.

This word was addressed -- we were talking about history before -- when President Nixon tried something like this. There is the case called *Train v. City of New York*. The statute there used the word, "allot,"

that the money "shall be allotted." And the Supreme Court said that has to be spent in full.

And there's actually a footnote, Footnote 9, where the Supreme Court says there was -- I forget if it was a report or an earlier version of the law that used the word "allocate" instead of "allotted." And the Court said, Well, that doesn't really matter. Allotted and allocated mean the same thing.

So for all intents and purposes --

THE COURT: Where is that in *Train*?

MR. ZIONTS: This is Footnote 9 of the *Train* decision. So when -- under *Train*, when Congress says "shall be allocated," the government has to spend that money.

Second point, and building on that, Your Honor asked if the government's interpretation would make an appropriation meaningless. It absolutely would.

If the government can say, Well, yes, Congress said that $142 million shall be allocated to RFE/RL, well, we could terminate the contract. We could just say we don't feel like having a grant with them. And because the only way to give them money under the statute is through a grant, well, I guess we don't have to allocate that $142 million that Congress said "shall be allocated." That cannot possibly be correct.

And just the third point, Your Honor. We were talking about section -- about the appropriations law. In the law itself, the government really emphasizes the part of 6207(g) that says the only way to give money --

THE COURT: There could be a whole song written about that exchange we just had there.

MR. ZIONTS: I think so, Your Honor. They want to talk about 6207(g) says the only way to give money to RFE/RL is through a grant. You can't read that in isolation. You have to read it with 6207(f), which says grants shall be available for funding the functions of RFE/RL.

You know, there may be in this statute various reasons why they might be able to terminate a grant, but the statute absolutely does not do, and it would make no sense for it to do, is for it to leave this blank check authority for the Agency to say: We've decided our priorities have changed; therefore, we don't want to make a grant anymore. Therefore, even if Congress said the $142 million shall be allocated, we don't want to allocate that money.

That's what's happening here, and that's why urgent relief is needed. And I'll turn it to Mr. Brugato to respond on the closeout obligations.

THE COURT: Thank you.

MR. BRUGATO: The main issue I'd like to turn to is the closeout procedures.

I think we and the government are just fundamentally talking past each other on this closeout issue. They keep suggesting that we're trying to seek closeout costs, which is a procedure by which certain costs during the closedown process are allowable and can be paid. Certain costs are not allowable and can't be paid.

To be clear, that is not what we are seeking. We are seeking a pause to the closeout process so RFE/RL can continue to operate as if this unlawful termination was no longer in effect while these issues can be adjudicated by this Court.

So we want to be free from these obligations to make all reasonable efforts to discontinue certain costs. And while the government correctly quoted the 120 days in the first regulation we cite in that footnote, importantly, the second regulation says we immediately need to discontinue these types of costs.

So the fundamental point I would just make, Your Honor, is that we're not seeking closeout costs. We're seeking a pause to the closeout process so we can operate.

Thank you, Your Honor.

14:45:29 THE COURT: All right. Thank you very much, Counsel. That's helpful to me. And I'll rule as promptly as possible on the temporary restraining order.

14:45:41 The court will be in recess.

14:45:46 And you're scheduled for Wednesday for your opposition to the preliminary injunction. If you'll file a prompt reply, I'll do something about that as promptly as I can.

14:45:57 (Court in recess, 2:45 p.m.)

----

CERTIFICATE

I, Chandra Kean, RMR, certify that the foregoing is a correct transcription from the record of proceedings in the above-titled matter.

Chandra Kean, RMR — March 24, 2025

DATE