**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| RFE/RL, INC., <br><br>      Plaintiff, <br><br>   v. <br><br> KARI LAKE, in her official capacity, *et al.*, <br><br>      Defendants. | No. 25-cv-00799-RCL |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S**
**MOTION FOR A FURTHER TEMPORARY RESTRAINING ORDER**

**INTRODUCTION**

Less than 24 hours after receiving a proposed grant agreement from Defendants, Plaintiff RFE/RL, Inc. filed a motion for a further temporary restraining order seeking immediate disbursement of over $12 million despite there being no current grant agreement and no approved financial plan in place. *See* ECF No. 28. The reason? Plaintiff is unhappy with some of the terms in the grant agreement that Defendants proposed. But Plaintiff's dissatisfaction with the grant agreement offered only illustrates what lies at the heart of this case—a contract dispute. Such disputes, under the Tucker Act, can be heard only by the Court of Federal Claims. Most recently, the Supreme Court affirmed this in *Department of Education, et al. v. California, et al.*, 604 U.S. ---, 2025 WL 1008354, at *1 (April 4, 2025). And last month, another district court in this district also held that it had no jurisdiction in light of the Tucker Act, citing D.C. Circuit precedent holding that "jurisdiction could not lie in the district court because the suit was inherently contractual." *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 2025 WL 763738, at *6 (D.D.C. Mar. 11, 2025), *appeal docketed* USCA Case No. 25-5066, (citing *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985)); *see id.* ("[The plaintiff] asks the Court to order the Government to cancel the termination, pay money due, and reinstate the contracts. That is something this Court lacks the power to do."). Just so in this case.

Even if the proposed grant agreement was reviewable under the APA—and it is not—Plaintiff still is not entitled to relief. The unsigned proposed grant agreement is just that—a *proposed* grant agreement. It has no legal force and effect, nor is the consummation of the agency's decisionmaking process. It therefore is not final agency action reviewable under the APA. Moreover, Congress specifically provided that funds to Plaintiff shall be provided only via grant agreements and vests the agency broad discretion in setting those terms. *See, e.g.*, 22 U.S.C.

2

§ 6207(g); *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020) (Congress "[chose] to grant the USAGM CEO broad, unilateral powers over grant-making."), *opinion vacated as moot on other grounds, appeal dismissed*, No. 20-5195, 2021 WL 11096700 (D.C. Cir. Mar. 16, 2021). There are thus not judicially manageable standards to apply in determining appropriate grant terms—or at a minimum, not standards that are so clear as to justify extraordinary emergency relief.

Accordingly, the United States Agency for Global Media ("USAGM" or the "Agency"), Kari Lake, in her official capacity as Senior Advisor to the Acting CEO of USAGM, and Victor Morales, in his official capacity as Acting CEO of USAGM (together, the "Defendants" or the "Government") respectfully submit this opposition to Plaintiff's motion for a further TRO.

## BACKGROUND

Because the Court is familiar with the issues presented in this case, *see, e.g.*, ECF No. 9, Defendants do not present a full background but instead highlight a few pertinent items. On March 14, 2025, President Trump issued Executive Order 14238, which directed that USAGM's "non-statutory components and functions" be eliminated and that its "performance of [its] statutory functions and associated personnel" be reduced to "the minimum presence and function required by law." Exec. Order No. 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025).

On March 15, USAGM sent a letter to Plaintiff, a USAGM grantee, terminating Plaintiff's grant. In response, Plaintiff moved for a temporary restraining order and preliminary injunction on March 19, seeking immediate disbursement of $7,464,559 in funds for the period of March 1–14, 2025 and an order enjoining implementation of the termination letter. *See* ECF No. 6. USAGM voluntarily disbursed the sought funds on March 24. ECF No. 13. After a hearing on March 24, the Court entered a temporary restraining order on March 25, which ordered that "the

defendants and their agents take no steps and impose no obligations relating to closing out the plaintiff's grant." ECF No. 14 at 9 and Minute Entry (March 24, 2025).

The next day, March 26, USAGM withdrew the termination of Plaintiff's grant—meaning that Plaintiff's grant was "back into effect." ECF No. 15 at 1. Defendants argued that the Court should deny Plaintiff's motion for preliminary injunction as moot and that, "[a]t a minimum, in light of the reinstatement of Plaintiff's grant, there is certainly no ongoing 'certain and great' irreparable harm that could justify injunctive relief." *Id.* (quoting *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

After a status conference on April 8, the Court *sua sponte* extended the temporary restraining order, which "temporarily enjoin[ed] the government from taking steps or imposing obligations relating to closing out RFE/RL's grant as detailed in the government's March 15 Termination Letter." ECF No. 22. In response, Defendants filed a motion to dissolve, arguing that the Court lacks jurisdiction over the case in light of the Supreme Court's decision in *Department of Education, et al. v. California, et al.*, 604 U.S. ---, 2025 WL 1008354, at *1 (April 4, 2025), and that the March 25 temporary restraining order enjoining Defendants from enforcing close out obligations of a rescinded letter is moot. ECF No. 29.

Since USAGM rescinded the March 15 termination letter on March 26, USAGM has been diligently working to review the terms and conditions of the grant agreement with RFE in accordance with its congressionally mandated supervisory role over such agreements. *See, e.g.*, 22 U.S.C. § 6204(a)(5) (The USAGM CEO shall have the authority "[t]o make and supervise grants and cooperative agreements for broadcasting and related activities in furtherance of the purposes of this chapter and on behalf of other agencies, accordingly."). Since the beginning of the FY 2025 year (October 2024), USAGM was providing FY 2025 funds through short grant

agreements that (a) carried over the terms of the FY 2024 agreement and (b) lasted in duration to cover specific funding periods.  A full FY 2025 grant agreement had never been previously finalized.  Because the funding was only through March, a new grant agreement needs to be signed between Plaintiff and USAGM to cover April onward.  Consistent with its statutory oversight responsibilities, USAGM sought to expeditiously draft and send a grant agreement to Plaintiff.  USAGM sent a proposed master grant agreement to Plaintiff on the morning of April 9—a mere two weeks after the grant termination was rescinded.  Plaintiff filed its motion for a further TRO less than 24 hours later, seeking over $12 million "that Plaintiff expends to operate in April 2025 based on the absence of an approved financial plan or lack of agreement on the new terms and conditions that Defendants sought to impose on April 9, 2025."  ECF Nos. 28, 28-6 at 3.

## LEGAL STANDARD

A preliminary injunction is 'an extraordinary remedy that should be granted only when the party seeking relief, by a clear showing, carries the burden of persuasion.'" *State v. Musk*, --- F. Supp. 3d ---, 2025 WL 520583, at *2 (D.D.C. Feb. 18, 2025) (quoting *Hulli v. Mayorkas*, 549 F. Supp. 3d 95, 99 (D.D.C. 2021)).  To warrant preliminary relief, the movant must satisfy a four-prong test, establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *accord Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).  The third and fourth factors of the analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Although the party attempting to establish these four factors may rely on "evidence that is less complete than in a trial on the merits," *NRDC v. Pena*, 147 F.3d 1012, 1023 (D.C. Cir. 1998), it nevertheless "bear[s] the burden of

produc[ing] . . . credible" evidence sufficient to demonstrate his entitlement to injunctive relief, *R.I.L-R v. Johnson*, 80 F.Supp.3d 164, 173 (D.D.C. 2015) (quotation omitted) (first alteration in original).

"Although the Court of Appeals has not yet expressly held that a plaintiff must make a clear showing on each of the four *Winter* factors, current caselaw in this jurisdiction favors that approach." *Cmty. Oncology All. v. Becerra*, No. 23-CV-2168 (CJN), 2023 WL 9692027, at *3 (D.D.C. Dec. 21, 2023); *see also In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (requiring proof on all four factors); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that, after *Winter*, "the old sliding-scale approach to preliminary injunctions—under which a very strong likelihood of success could make up for a failure to show a likelihood of irreparable harm, . . . is no longer . . . viable") (internal quotation and citation omitted). Indeed, relief that "deeply intrudes into the core concerns of the executive branch"—including foreign affairs and national security—may be awarded only upon "an extraordinarily strong showing" as to each element. *Adams v. Vance*, 570 F.2d 950, 954–55 (D.C. Cir. 1978).

Moreover, the particular form of injunction Plaintiff seeks here—an affirmative injunction ordering Defendants to change the status quo and immediately pay Plaintiff a lump sum of over $12 million—comprises a highly disfavored form of relief. Mandatory preliminary injunctions, which seek to alter rather than preserve the status quo by compelling affirmative action, "are disfavored as an even more extraordinary remedy than the typical preliminary injunction, especially when directed at the United States Government." *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (quotation marks and citations omitted); *see also*, *e.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000). Plaintiffs seeking such relief

"face a significantly heightened burden" of showing an entitlement to relief. *Feng Wang v. Pompeo*, 354 F. Supp. 3d 13, 20 (D.D.C. 2018). "[C]ourts exercise extreme caution in assessing" motions seeking affirmative injunctive relief, and as a general rule they deny such relief unless "the facts and law clearly favor the moving party." *Shipbrokers*, 560 F. Supp. 3d at 93 (quotation marks omitted).

## ARGUMENT

### I.     Likelihood of success on the merits.

"[T]he first and most important" of these four factors is whether the movant "ha[s] established a likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014). If a plaintiff cannot show a likelihood of success on the merits, "there is no need to consider the remaining factors." *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011). Here, Plaintiff fails to carry its burden to show a likelihood of success on the merits for multiple independent reasons.[1]

### a.     The Court should deny the TRO because it lacks jurisdiction over this case, which involves a dispute over contract entitlement and seeks an order to pay money pursuant to a purported contractual agreement.

To begin, Plaintiff is unlikely to prevail on the merits because this Court lacks jurisdiction to adjudicate or enforce USAGM's grants. Plaintiff is only entitled to funds as paid "in compliance

---

[1] Plaintiff admits that it has not amended its complaint to reflect the allegations at issue in this motion. *See* ECF No. 28-1 at 2. Courts repeatedly deny TRO motions that are based on allegations and/or claims for relief that are unrelated to the complaint filed in the case because such claims are beyond the scope of the court's review. *See, e.g., Allen v. Reid*, No. 15-cv-1905, 2016 WL 3136859, at *4 (D. Minn. June 3, 2016) ("[T]o the extent that [plaintiff] seeks injunctive relief for alleged mistreatment and retaliation that are unrelated to the claims in his Amended Complaint, he is not entitled to such relief."); *Clark v. Bank of Am. N.A.*, No. 14-cv-232, 2015 WL 1433834, at *8 (D. Idaho Mar. 27, 2015); *Dennis v. Thomas*, No. 09-cv-1317, 2010 WL 3927488, at *1 (D. Ore. Oct. 4, 2010). Accordingly, relief is inappropriate in any respect absent an amended complaint.

with a grant agreement," 22 U.S.C. § 6207(g)(1)—and while that grant is funded via appropriated funds (as are almost all government grants and contracts), Plaintiff does not receive direct Congressional appropriations. Plaintiff's claims, fundamentally, are a contract dispute over the terms of a grant agreement—and the remedy it seeks, the disbursement of millions of dollars of funds it claims it is entitled to under that grant agreement, is contractual. That grant agreement is a contract with the federal government. And any claim based on "an express or implied contract with the United States" must be brought in the Court of Federal Claims. 28 U.S.C. § 1491(a)(1). Because Congress vested the Court of Federal Claims with exclusive jurisdiction over such claims, this Court lacks "the authority to afford the 'drastic' emergency relief that [Plaintiff] seeks." *U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, 2025 WL 763738, at *8 (D.D.C. Mar. 11, 2025), *appeal docketed* USCA Case No. 25-5066, (quoting *F.T.C. v. Exxon Corp.*, 636 F.2d 1336, 1343 (D.C. Cir. 1980)).

The Tucker Act, 28 U.S.C. § 1491(a)(1), provides for judicial review of breach claims for express or implied contracts over $10,000 in the Court of Federal Claims (or district court for claims less than $10,000) "unless such jurisdiction was explicitly withheld or withdrawn by statute." *Slattery v. United States*, 635 F.3d 1298, 1321 (Fed. Cir. 2011) (*en banc*). The D.C. Circuit has long "interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government." *U.S. Conf. of Catholic Bishops*, 2025 WL 763738, at *4 (quoting *Transohio Sav. Bank v. Dir. Off. Of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) (emphasis in original)). Put another way, "[t]he only remedy to which the United States has consented in cases of breach of contract is to the *payment of money damages* in either the Court of Claims [now the Court of Federal Claims], if the amount claimed is in excess of $10,000, 28 U.S.C. § 1491(a)(1), or the district courts, where the amount in controversy is $10,000 or less. 28 U.S.C.

8

§ 1346(a)(1)." *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989) (emphasis in original). And "[f]ederal courts do not have the power to order specific performance by the United States of its alleged contractual obligations." *Id.* at 3.

The Supreme Court has recently reaffirmed this jurisdictional line. In *California*, the Supreme Court stayed a temporary restraining order that had "enjoin[ed] the Government from terminating various education-related grants." 2025 WL 1008354 at *1. The Supreme Court held that the government was "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA," reasoning that "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* at *1–2 (quoting 28 U. S. C. §1491(a)(1)). The same jurisdictional bar equally applies to Plaintiff's assertions in its TRO motion, which are based on its dissatisfaction with the terms of the grant agreement that USAGM offered and a request for a lump sum of money. *See, e.g.,* ECF No. 28-1 at 2–5 (arguing that Plaintiff is likely to succeed in showing that the new grant conditions are unlawful and expressing dissatisfaction with the grant terms). That is true regardless of whether Plaintiff's claim is framed as a dispute over new grant conditions and entitlements, or as a claim that Defendants improperly terminated its previous grant, to which it is still entitled to funds.

Defendants have raised this jurisdictional bar in their opposition to Plaintiff's initial motion for a temporary restraining order. *See* ECF No. 9, at 6–11. The Court did not address that argument in granting Plaintiff's motion, ECF No. 14, but the intervening decision by the Supreme Court now confirms that such claims cannot be heard in district courts.

The Supreme Court explained:

The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."

> 5 U.S.C. § 702.  Nor does the waiver apply to claims seeking "money damages."
> *Ibid*.  True, a district court's jurisdiction is "not barred by the possibility" that an
> order setting aside an agency's action may result in the disbursement of funds.
> *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988).  But, as we have recognized,
> the APA's limited waiver of immunity does not extend to orders "to enforce a
> contractual obligation to pay money" along the lines of what the District Court
> ordered here.  *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212
> (2002).  Instead, the Tucker Act grants the Court of Federal Claims jurisdiction
> over suits based on "any express or implied contract with the United States."  28
> U.S.C. § 1491(a)(1).

*California*, 2015 WL 1008354 at *1.  *See also U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*, No. 1:25-CV-00465, 2025 WL 763738 at *4 (D.D.C. Mar. 11, 2025) (explaining that the D.C. Circuit has long "interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government" (quoting *Transohio Sav. Bank v. Dir. Off. Of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992))).  And since *California*, courts have been reacting by withholding or staying orders that would have required the types of remedies sought here.  *See, e.g.*, *American Ass'n of Colleges for Teacher Education, et al. v. McMahon*, No. 25-1281 (4th Cir. Apr. 10, 2025) (granting the Government's motion to stay a preliminary injunction in light of *California*); Order, *New York v. Trump*, Case No. 1:25-cv-00039 (D.R.I. April 7, 2025) (temporarily staying enforcement of an order pending a ruling on defendants' *California*-based motion for reconsideration).

Since the beginning of this case, Plaintiff's claims, fundamentally, have been an effort to enforce payments it claimed it was entitled to under its grant agreement and to reinstate its grant agreement that it claims was improperly terminated.  USAGM then chose to withdraw the termination letter and send Plaintiff a new grant agreement.  Now, Plaintiff's latest TRO motion seeks disbursement of April funds *pursuant to the now-expired grant agreement* because it is unhappy with the terms in the grant that USAGM proposed—a quintessential contract dispute.  The D.C. Circuit has warned that a plaintiff cannot avoid the Court of Federal Claims simply by

artful pleading. *See Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985) ("We begin with the well-accepted proposition that a plaintiff may not avoid the jurisdictional bar of the [Contract Disputes Act, vesting jurisdiction in the Court of Federal Claims] merely by alleging violations of regulatory or statutory provisions rather than breach of contract.").  Plaintiff may point to statutes and regulations, but at the end of the day—as Plaintiff's TRO motion reveals—Plaintiff is unhappy with a proposed contract and wants Defendants to "pay[] up." *United States Conf. of Cath. Bishops*, 2025 WL 763738, at *5.  But the Supreme Court and the D.C. Circuit have rejected these arguments. *California,* 2025 WL 1008354 at *1; *Ingersoll-Rand Co.*, 780 F.2d at 78.  Neither the statute (where there is no grant agreement in place) nor the APA permits such a payment. *Conf. of Cath. Bishops*, 2025 WL 763738, at *5 (explaining that the district court cannot order the classic contractual remedy of specific performance and cannot order the Government to pay money on a contract); *California,* 2025 WL 1008354 at *1 (explaining that the APA's waiver of sovereign immunity does not apply to claims seeking money damages); *see also Ingersoll-Rand Co.*, 780 F.2d at 78 (explaining that even a contract termination that arguably violates certain other regulations does not transform the action into one based solely on those regulations—"where plaintiff was awarded contract and government terminated for convenience, cause of action is on the contract despite plaintiff's allegations of statutory and constitutional violations" (citation omitted)).

Plaintiff's TRO motion seeks an immediate disbursement of a lump sum of money pursuant to an unapproved financial plan prepared (apparently) in accordance with the requirements of the previous, expired grant agreement because Plaintiff is unhappy with the grant agreement that Defendants proposed and desires to keep getting paid under some contract.  At bottom, Plaintiff brought suit—and is continuing to pursue its suit—based on its purported entitlement to funds

under some kind of a contract—apparently the now-expired previous grant agreement. *See* ECF No. 28-6, at 1 (seeking $12,178,590 "under the same terms and conditions that were previously in effect and governed the funds disbursed in March 2025"). Like the education grants at issue in *California*, this grant dispute should be resolved in the Court of Federal Claims. Accordingly, the Court should deny Plaintiff's motion for a further TRO.

> ### b. The Court should deny the TRO motion because Plaintiff has no legal basis to seek disbursement of funds absent a grant agreement.

Plaintiff has no legal claim to the April funds it seeks. Plaintiff's latest TRO motion seeks disbursement of April funds under the terms of the previous, now expired contract—despite the fact that there is no grant agreement in place and no approved April financial plan. *See* ECF No. 28-6 at 1.

The International Broadcasting Act of 1994 crafts a statutory scheme by which congressionally appropriated funds may be given to various recipients through a grant. For example, the statute permits USAGM's Chief Executive Officer to "make and supervise grants and cooperative agreements for broadcasting and related activities" and explains that grants "shall be available to" Plaintiff. 22 U.S.C. § 6207, § 6207. Notably, the statute contemplates that any congressionally appropriated funds would be disbursed through a grant process and mandates that "[g]rants to RFE/RL, Incorporated, by the Agency shall only be made in compliance with a grant agreement." 22 U.S.C. § 6207(g). For Plaintiff, that means that in order to receive funds pursuant to a grant agreement, a grant agreement must be in place and adhered to. Here, there is no grant agreement (or approved April financial plan) currently in place between the parties for April—or for the rest of the FY 2025.

Plaintiff seeks an immediate disbursement of money without a grant agreement in place and pursuant to an unapproved financial plan. Plaintiff admits that disbursement of money

pursuant to an unapproved financial plan is not consistent with the terms of the most recent grant agreement. *See* ECF No. 18 at 4. Essentially, Plaintiff is seeking the "the classic contractual remedy of specific performance" but without an existing contract. *United States Conf. of Cath. Bishops*, 2025 WL 763738, at *5. As discussed above, this Court lacks the jurisdiction to provide such a remedy. But even if it could, there is no valid contract or grant agreement that USAGM would be sending money pursuant to. Without a grant agreement in place between the parties, Plaintiff lacks a legal basis for requesting the money it seeks.

### c. The Court should deny the TRO motion because Defendants' grant agreement proposal is not final agency action reviewable under the APA.

Even assuming it applies, to state any claim under the APA, a plaintiff must allege that the conduct by the agency constitutes "final agency action." 5 U.S.C. § 704. Here, Plaintiff argues that USAGM's transmittal of an unsigned, proposed grant agreement to Plaintiff is "final agency action." But such a proposal is not agency action—must less final agency action. Accordingly, Plaintiff cannot state a claim under the APA.[2]

"Agency action" is a defined term of art under the APA and most often manifests in the form of a rule or order. 5 U.S.C. § 551(13) (defining "agency action" as including "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"). Plaintiff—who carries the burden to show agency action—fails to identify any rule, order, or other conduct that would meet the above criteria. A look at the posture of this case quickly

---

[2] Plaintiff also argues that the "grant terms are arbitrary and capricious in violation of the APA." ECF No. 28-1 at 11. But the Court does not need to reach the arbitrary capricious analysis because the grant proposal does not meet the threshold requirement of being final agency action. Nor does Plaintiff purport in their motion to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), *see generally* ECF No. 28-1 (not mentioning the phrase or provision and purporting to bring claim under section 706(2)).

reveals why.  The act of a grantor sending a contract or grant proposal to a grantee can hardly be considered an "agency action" as defined by the APA.  *See* 5 U.S.C. § 551.  Doing so would massively expand the types of actions that would be potentially reviewable under the APA and transform any contract negotiation or proposal between the Government and another party into a series of potential APA challenges and lawsuits.  Such a result would be paralyzing for agency operations.

The finality analysis—performed once an agency action has been identified—illustrates the same point.  In *Bennett v. Spear*, the Supreme Court explains that finality is marked by "the consummation of the agency's decisionmaking process" and is a decision "by which rights or obligations have been determined."  520 U.S. 154, 177–78 (1997) (quotations omitted).  Neither of those markers is present here.  Sending an *unsigned* grant agreement to a grantee—even with a request for the grantee to review and sign—is not the *consummation* of a decisionmaking process. At most, it is the first step in the interactions that occur between parties when signing a contract. Instead of seeking a TRO, Plaintiff could have very well voiced its concerns about the grant terms with USAGM and started a negotiation process.  Indeed, the very fact that it was unsigned by USAGM demonstrates that USAGM had not consummated the decisionmaking process.  And an *unsigned* grant agreement is definitionally not a decision by which rights or obligations have been determined because no one has been bound where there is an unsigned agreement.

Indeed, in the contractual context—which this is—a party sending an unsigned (or even a signed) contract to a counterparty does not create a binding contract.  Rather, that proposal must be *accepted* by the other party for it to have legal effect.  *See, e.g.*, Restatement (Second) of Contracts §§ 17, 50; *REO Acquisition Grp. v. Fed Nat'l Mortgage Ass'n*, 104 F. Supp. 3d 22, 28 (D.D.C. 2015) ("an enforceable contract requires both the intention of the parties to be bound and

also agreement as to all material terms") (internal citations, emphasis, and alteration omitted). That obviously has not occurred here. Accordingly, the proposed grant agreement is just that, a proposal, and does not itself have legal effect as a contract—and does not have legal effect as final agency action. Plaintiff's theory, by contrast, would hold that a contract proposal *does* have legal effect—notwithstanding centuries of the common law to the contrary. This Court should reject such a construction.

### d. The Court should deny the TRO motion because negotiating a grant agreement is committed to agency discretion by law.

Although the APA presumes that agency action can be judicially reviewed, "[t]his is 'just' a presumption . . . . [U]nder § 701(a)(2) agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'" *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)). Broadly speaking, courts have found that Section 701(a)(2) precludes review where "a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Lincoln*, 508 U.S. at 191 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)), including situations where the agency decision "involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* (quoting *Heckler*, 470 U.S. at 830). Such is the case here.

USAGM's decision to include certain grant terms and substantive grant provisions is uniquely within the expertise of the USAGM. Indeed, the D.C. Circuit has recognized that Congress "[chose] to grant the USAGM CEO broad, unilateral powers over grant-making." *Open Tech. Fund*, 470 F. Supp. 3d at 31. Indeed, the International Broadcasting Act tasks USAGM with a host of oversight responsibilities over the grants administered. *See, e.g.*, 22 U.S.C. § 6204. The statute mandates that grant agreements "shall establish guidelines" for the grants and even provides certain requirements that must be in each grant agreement. 22 U.S.C. § 6207(g). By its terms, the

statute commits the oversight responsibilities and establishment of grant guidelines and terms solely to the agency's discretion.

The lack of a meaningful standard for the specific terms of the grant agreement becomes evident once thought is given to the logical consequence of Plaintiff's position. It would put the Court in a position of going line by line through the grant agreement to evaluate the reasonableness of certain terms. Is a 24-hour notice reasonable for certain provisions? If not, what is? 72 hours? 72 days? The Court should decline to step into a contract dispute between two parties and referee its contract negotiations. As a broader matter, the Court should defer to the agency and its prerogative to craft grant agreements.

Plaintiff seeks to place this Court as the arbiter of the grant agreement terms between the parties. But doing so would put the Court in an improper policymaking role—Accordingly, even if the Court does find that USAGM's unsigned, proposed grant agreement is a final agency action, it is not reviewable because deciding the substantive content of the grant agreement is committed to USAGM's discretion and is unreviewable by this court.

## II.    The Court should dissolve the TRO because Plaintiff fail to show irreparable harm.

Plaintiff likewise fails to establish that it will suffer irreparable harm absent a temporary restraining order. To demonstrate irreparable harm, Plaintiff must meet a "high standard" and show that it faces injuries that are "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008) (citation omitted), and that are "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). Making that showing requires "proof" that the harm it identifies "is certain to occur in the near future." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). And the "moving party must

show that such harm is likely to occur absent injunctive relief." *Robert Half Int'l Inc. v. Billingham*, 315 F. Supp. 3d 419, 432 (D.D.C. 2018).

In its motion, Plaintiff claims that it must "immediately accept the conditions or face the irreparable harm of being denied the funding it needs to operate," arguing that "USAGM's continued refusal to provide RFE/RL's congressionally appropriated funds under the terms and conditions that were previously in effect thus threatens the very existence of RFE/RL."[3] ECF. No. 28-1 at 4, 10 (quotation omitted). As Plaintiff admits, Plaintiff has a choice to accept the grant agreement that USAGM proposed. If Plaintiff is unhappy, nothing is barring Plaintiff from negotiating with USAGM or offering a counterproposal to the grant agreement offered. The point is, Plaintiff has very obvious solutions to avoid the irreparable harm it claims. In light of that reality, Plaintiff's irreparable harm is hardly "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co.*, 587 F. Supp. 2d at 11 (D.D.C. 2008).

In any event, Plaintiff's alleged economic injuries are insufficient to show irreparable harm. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)). Rather, it is black-letter law that economic harm is generally not irreparable. *Wis. Gas Co.*, 758 F.2d at 674 (describing that principle as "well-settled"). The only exceptions are "where the loss threatens

---

[3] Plaintiff also appears to incorporate its previous irreparable harm arguments and argue that the Court should adopt its prior irreparable harm analysis. ECF No. 28-1 at 9 ("RFE/RL is currently in essentially the same position it was when it filed its original TRO and PI motion and demonstrated irreparable harm"); *id.* at 10 (explaining the Court's previous irreparable harm finding "applies equally today"). But the circumstances have changed. Notably, the grant termination letter has been withdrawn and the agency has offered Plaintiff a new grant agreement. Nonetheless, Defendants likewise incorporate its irreparable harm arguments from its prior response in opposition to Plaintiff's TRO. ECF No. 9.

the very existence of the movant's business," *id.* (citation omitted), or "where the claimed economic loss is unrecoverable." *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36 (D.D.C. 2014) (citation omitted).

The first exception is a narrow one—it encompasses only cases where the plaintiffs demonstrate "extreme hardship to the business" or a threat to the business's "very existence." *Gulf Oil Corp. v. Dep't of Energy*, 514 F. Supp. 1019, 1025 (D.D.C. 1981).  Plaintiffs may be forced to make difficult choices and lose profits in critical areas of their business without incurring irreparable harm sufficient to warrant injunctive relief.  *Cf. Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 118–19 (D.D.C. 2003) ("[T]he forced sale of a house, a boat or stock. . . do[es] not rise to the level of 'irreparable' harm necessary to warrant the extraordinary remedy of a preliminary injunction.").  And plaintiffs must document any claim that an alleged harm is a threat to the business's very existence with specific details.  *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 51–52 (D.D.C. 2011) (plaintiff needed to "offer a projection of anticipated future losses, tie that to an accounting of the company's current assets, [and] explain with . . . specificity how he arrived at the conclusion that he would be forced out of business in eighteen months" to show irreparable harm on this theory).  Here, Plaintiff alleges that a lack of funds "'threatens the very existence" of the organization," ECF No. 28-1 at 12 (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669 (D.C. Cir. 1985)), but supplies none of the detailed projections required under the caselaw to substantiate such a claim.

The second exception, for monetary harms unrecoverable because a defendant enjoys sovereign immunity, likewise does not apply.  As discussed above, *supra* at 6–7, Plaintiff's economic injuries are reparable through the Tucker Act for contract disputes concerning monetary

18

payments. Sovereign immunity is not an obstacle for monetary recovery on Plaintiff's claims because of that statute. *See Safari Club Int'l*, 47 F. Supp. 3d at 37.

### III.    The Balance of the Equities (Including the Public Interest) Does Not Favor a Temporary Restraining Order.

A temporary restraining order also is not appropriate because the balance of the equities and the public interest tip in Defendants' favor. *See Nken*, 556 U.S. at 435 (holding that "[t]hese factors merge when the Government is the opposing party"). In this setting, granting the temporary restraining order that Plaintiff seeks would disrupt USAGM's oversight of its grantees to ensure taxpayer money is stewarded well, as intended by the statutory scheme that Congress provided.

In another case in which a grantee sought preliminary equitable relief against USAGM, the Court recognized that "thwarting the lawful exercise of authority of a duly appointed official would be inequitable and disserve the public interest." *Open Tech. Fund*, 470 F. Supp. 3d at 31. The Court held: "[s]etting USAGM's priorities and managing, at a broad level, U.S. international broadcasting is the prerogative of the USAGM CEO—not that of plaintiffs, and certainly not of this Court. Moreover, Congress's choice to grant the USAGM CEO broad, unilateral powers over grant-making and oversight of USAGM grantees is itself 'a declaration of public interest and policy which should be persuasive in inducing courts to give relief.'" *Id.* (quoting Va. *Ry. v. Sys. Fed'n No. 40*, 300 U.S. 515, 552 (1937)).

Moreover, in addition to concluding that the defendants were likely to succeed on their Tucker Act arguments, the Supreme Court's decision in *California* indicates that the balance of harms favors Defendants rather than Plaintiff. *See California*, 2015 WL 1008354 at *1 ("[R]espondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed."). As here, "[n]o grantee promised to return withdrawn funds

should its grant termination be reinstated,' and the District Court declined to impose bond." *Id.* (internal quotations omitted).

Meanwhile, Plaintiff, as discussed above, is not suffering certain harm where it has the ability to sign or negotiate the grant agreement, which would obviate any of the harm it alleges in its TRO motion. On these facts, the balance of the equities and the public interest align against the entry of relief.

## IV. Plaintiff Cannot Make the Heightened Showing Required for the Mandatory Injunctive Relief It Seeks.

Here, Plaintiff asks the Court to change the status quo and order USAGM to make an affirmative payment of over \$12 million. Yet Plaintiff proffers insufficient grounds supporting this especially extraordinary form of relief. Mandatory injunctions, which seek to alter rather than preserve the status quo by compelling affirmative action, "are disfavored as an even more extraordinary remedy than the typical preliminary injunction, especially when directed at the United States Government." *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 92–93 (D.D.C. 2021) (quotation marks and citations omitted); *see also*, *e.g.*, *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000). Plaintiffs seeking such relief "face a significantly heightened burden" of showing an entitlement to relief. *Feng Wang v. Pompeo*, 354 F. Supp. 3d 13, 20 (D.D.C. 2018); *accord Archdiocese of Wash. v. Wash. Metro Area Transit Auth.*, 897 F.3d 314, 319 (D.C. Cir. 2018). "[C]ourts exercise extreme caution in assessing" motions seeking affirmative injunctive relief, and as a general rule they deny such relief unless "the facts and law clearly favor the moving party." *Shipbrokers*, 560 F. Supp. 3d at 93 (quotation marks omitted).

## V. Plaintiff Should Be Ordered to Post Security in Connection with Any Temporary Injunctive Relief and this Court should stay any order to allow the Government to determine whether to seek an emergency stay pending appeal

For the reasons stated above, Defendants submit that the Court can and should deny

Plaintiff's motion in its entirety.  However, should the Court be inclined to order any injunctive relief, the Court should also order Plaintiff to post security.  Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c).  In the event the Court issues a temporary restraining order here, the Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any such temporary order.  *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").  As Plaintiff is seeking the payment of a particular sum, *i.e.* $12,178,590, the Court should order the posting of a bond equal to the size of any payment that the Court orders on a preliminary basis here.  Without such a protective measure, there may be no way to recover the funds lost to United States taxpayers if the Court were later to find that Defendants were "wrongfully enjoined."  *See* Fed. R. Civ. P. 65(c).

Finally, this Court should stay any order requiring disbursement of funds for at least seven days to allow the Solicitor General to determine whether to authorize the Government to seek a stay pending appeal.  *See California*, 2015 WL 1008354 at *1–2.

## CONCLUSION

The Court should deny Plaintiff's motion for a further TRO.

Dated: April 11, 2025                     Respectfully submitted,


                                          YAAKOV M. ROTH
                                          Acting Assistant Attorney General

                                          ERIC J. HAMILTON
                                          Deputy Assistant Attorney General
                                          Civil Division, Federal Programs Branch

JOSEPH E. BORSON
Assistant Branch Director
Federal Programs Branch


/s/ *Abigail Stout*
ABIGAIL STOUT
(DC Bar No. 90009415)
*Counsel*
U.S. Department of Justice
Civil Division
950 Pennsylvania Avenue, NW
Washington, DC 20530
Telephone: (202) 514-2000
Email: Abigail.Stout@usdoj.gov

/s/  *Julia A. Heiman*
JULIA A. HEIMAN (D.C. Bar No. 986228)
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, N.W.
Washington, DC  20005
Tel. (202) 616-8480 / Fax (202) 616-8470
julia.heiman@usdoj.gov

*Attorneys for Defendants*