## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

RFE/RL, INC.,

          *Plaintiff*,

v.

KARI LAKE, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media;

VICTOR MORALES, in his official capacity as acting Chief Executive Officer of the United States Agency for Global Media; and

UNITED STATES AGENCY FOR GLOBAL MEDIA,

          *Defendants*.

Case No. 1:25-cv-799-RCL

## **PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 4

    **A.**    **RFE/RL Is an Independent Nonprofit That Has Been Funded by Congress for Decades.** ......................................................................... 4

    **B.**    **RFE/RL and USAGM Negotiate, and RFE/RL Signs, the February FY 2025 Master Grant Agreement.** ........................................................ 5

    **C.**    **USAGM Withholds Congressionally Appropriated Funds from RFE/RL and Terminates Its Grant.** ..................................................... 6

    **D.**    **RFE/RL Sues, Seeking Its Congressionally Appropriated Funds.** ................... 7

    **E.**    **USAGM Demands that RFE/RL Accept a New Grant Agreement Filled with Unlawful Conditions or Lose Its Congressionally Appropriated Funds.** ........................................................................... 8

    **F.**    **RFE/RL Attempts to Negotiate with USAGM But Is Rebuffed and then Ignored.** ...................................................................................... 9

    **G.**    **USAGM's Unlawful Withholding of Congressionally Appropriated Funds Threatens RFE/RL's Existence.** ............................................... 10

LEGAL STANDARD ......................................................................................... 12

ARGUMENT ...................................................................................................... 13

**I.**    **RFE/RL Is Likely to Succeed on the Merits.** ..................................... 13

    **A.**    **This Court Has Jurisdiction.** ........................................................... 13

    **B.**    **USAGM's Decisions to Cut Off RFE/RL's Funding and Impose Unlawful, Unreasonable, and Unworkable Grant Conditions Violate the APA.** ......................................................................................... 18

        **1.**    **USAGM's decisions are reviewable final agency actions.** ................... 18

        **2.**    **USAGM's decision to cut off RFE/RL's funding is contrary to law.** ......................................................................................... 24

        **3.**    **USAGM's imposition of grant conditions confirms its decision to decline to fund RFE/RL and contravenes the APA.** ........................ 27

**a)** **USAGM's imposition of grant conditions relating to RFE/RL's board is contrary to law.** ........................................... 28

**b)** **Numerous other grant conditions are likewise contrary to law.** ........................................................................ 30

**c)** **USAGM's imposition of unreasonable conditions is arbitrary and capricious.** ........................................... 36

**II.** **RFE/RL Will Suffer Irreparable Harm Without a Preliminary Injunction.** ............ 38

**III.** **The Balance of Equities and Public Interest Favor RFE/RL.** .................................. 42

**CONCLUSION** .................................................................................................................. 43

ii

# TABLE OF AUTHORITIES

Page(s)

## Cases

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
  2025 WL 752378 (D.D.C. Mar. 10, 2025), *appeal docketed* (D.C. Cir. No. 25-
  5098) ............................................................................................................................... 15

*Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*,
  121 F.4th 1314 (D.C. Cir. 2024) ....................................................................................... 12

*Am. Ass'n of Pol. Consultants v. U.S. Small Bus. Admin.*,
  613 F. Supp. 3d 360 (D.D.C. 2020), *aff'd*, 810 F. App'x 8 (D.C. Cir. 2020) .................... 38, 42

*State ex rel. Becerra v. Sessions*,
  284 F. Supp. 3d 1015 (N.D. Cal. 2018) .................................................................. 16, 20, 22

*\*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................................................ 19, 20, 22

*Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*,
  972 F.3d 83 (D.C. Cir. 2020) ............................................................................................. 19

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ..................................................................................................... 14, 15

*California v. U.S. Dep't of Educ.*,
  2025 WL 878431 (1st Cir. Mar. 21, 2025) ........................................................................ 17

*Cape May Greene, Inc. v. Warren*,
  698 F.2d 179 (3d Cir. 1983) ............................................................................................... 29

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) ........................................................................................... 38

*\*Ciba-Geigy Corp. v. EPA*,
  801 F.2d 430 (D.C. Cir. 1986) ............................................................................... 19, 20, 21

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) ........................................................................................................... 30

*City of Chicago v. Sessions*,
  264 F. Supp. 3d 933 (N.D. Ill. 2017) ................................................................................. 42

*City of Chicago v. Sessions*,
  321 F. Supp. 3d 855 (N.D. Ill. 2018) .................................................................... 16, 20, 22

*City of Los Angeles v. Sessions*,
  2018 WL 6071072 (C.D. Cal. Sept. 13, 2018) .......................................................................42

*City of Philadelphia v. Sessions*,
  280 F. Supp. 3d 579 (E.D. Pa. 2017) ....................................................................................42

*City of Philadelphia v. Sessions*,
  309 F. Supp. 3d 271 (E.D. Pa. 2018) ...................................................................16, 20, 30

*City of Providence v. Barr*,
  385 F. Supp. 3d 160 (D.R.I. 2019), *aff'd*, 954 F.3d 23 (1st Cir. 2020) ..................................25

*City of Providence v. Barr*,
  954 F. 3d 23 (1st Cir. 2020) ..................................................................................................26

*Climate United Fund v. Citibank, N.A.*,
  2025 WL 1131412 (D.D.C. Apr. 16, 2025) .....................................................................16, 18

*Climate United Fund v. Citibank, N.A.*,
  2025 WL 842360 (D.D.C. Mar. 18, 2025), *appeal docketed* (D.C. Cir. No. 25-
  5122) ......................................................................................................................................15

*Corley v. United States*,
  556 U.S. 303 (2009)...............................................................................................................26

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
  38 F.4th 1099 (D.C. Cir. 2022)......................................................................................13, 16

*CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*,
  637 F.3d 408 (D.C. Cir. 2011) ...............................................................................................20

*Dep't of Educ. v. California*,
  604 U.S. __, 2025 WL 1008354 (Apr. 4, 2025) ............................................................16, 17

*Doe v. Devine*,
  703 F.2d 1319 (D.C. Cir. 1983) .................................................................................27, 36, 37

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009)...............................................................................................................37

*Friedman v. FAA*,
  841 F.3d 537 (D.C. Cir. 2016) .......................................................................................23, 24

*FTC v. Bunte Bros.*,
  312 U.S. 349 (1941)...............................................................................................................29

*Giuseppe Bottiglieri Shipping Co. S.P.A. v. United States*,
  843 F. Supp. 2d 1241 (S.D. Ala. 2012)..................................................................................22

iv

*Louisiana Pub. Serv. Comm'n v. FCC*,
476 U.S. 355 (1986) .................................................................................................. 28

*Massachusetts v. Nat'l Insts. of Health*,
2025 WL 702163 (D. Mass. Mar. 5, 2025), *appeal docketed* (1st Cir. No. 25-
1343) ......................................................................................................................... 15

*Md. Dep't of Hum. Res. v. HHS*,
763 F.2d 1441 (D.C. Cir. 1985) ......................................................................... 14, 15

*Me. Cmty. Health Options v. United States*,
590 U.S. 296 (2020) ................................................................................... 16, 24, 25

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .................................................................................................. 23

*Ohio v. EPA*,
603 U.S. 279 (2024) ................................................................................................ 37

*Open Tech. Fund v. Pack*,
470 F. Supp. 3d 8 (D.D.C. 2020), *opinion vacated, appeal dismissed*, No. 20-
5195, 2021 WL 11096700 (D.C. Cir. Mar. 16, 2021) (per curiam) ........................ 28

*Open Tech. Fund v. Pack*,
No. 20-cv-1710, ECF 7, 2020 WL 7041426 (D.D.C. filed June 26, 2020) ............. 24

*Planned Parenthood of N.Y.C., Inc. v. HHS*,
337 F. Supp. 3d 308 (S.D.N.Y. 2018) .................................................................... 22

*U.S. ex rel. Polansky v. Pfizer, Inc.*,
914 F. Supp. 2d 259 (E.D.N.Y. 2012), *aff'd*, 822 F.3d 613 (2d Cir. 2016) ............. 31

*Robbins v. Reagan*,
780 F.2d 37 (D.C. Cir. 1985) ................................................................................. 38

*Ross v. Blake*,
578 U.S. 632 (2016) ................................................................................................ 29

*\*SecurityPoint Holdings, Inc. v. TSA*,
769 F.3d 1184 (D.C. Cir. 2014) ............................................................. 16, 23, 36, 37

*\*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
967 F.2d 598 (D.C. Cir. 1992), *abrogated in part on other grounds by Perry
Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ....................................... 14

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
578 U.S. 590 (2016) ................................................................................................ 20

*U.S. Conf. of Catholic Bishops v. U.S. Dep't of State*,
    2025 WL 763738 (D.D.C. Mar. 11, 2025), *appeal docketed* (D.C. Cir. No. 25-
    5066) .................................................................................................................. 17, 18

*West Virginia v. EPA*,
    597 U.S. 697 (2022) .......................................................................................... 29

*Wi-LAN USA, Inc. v. Apple Inc.*,
    830 F.3d 1374 (Fed. Cir. 2016) ......................................................................... 25

*\*Widakuswara v. Lake*,
    No. 25-cv-1015-RCL, ECF 99 (D.D.C. Apr. 22, 2025) ................................ *passim*

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*,
    2025 WL 1116157 (D.R.I. Apr. 15, 2025) .......................................................... 18

**Statutes**

5 U.S.C. § 702 ............................................................................................................ 15

5 U.S.C. § 704 ............................................................................................................ 18

5 U.S.C. § 706 ...................................................................................................... 30, 36

22 U.S.C. § 6201 .......................................................................................................... 3

*\*22 U.S.C. § 6204 ................................................................................................ passim*

*\*22 U.S.C. § 6207 ................................................................................................ passim*

22 U.S.C. § 6209 ........................................................................................................ 29

American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024) ..................... 5

B-316010, Consolidated Appropriations Act, 2008 ................................................... 26

Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-38, 138
    Stat. 1524 (2024) ................................................................................................. 5

Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat.
    460 (2024) ....................................................................................... 1, 5, 14, 25, 26

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No.
    119-4, 139 Stat. 9 (2025) ...................................................................................... 7

National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283,
    134 Stat. 3388 (2021) .......................................................................................... 29

National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, 136 Stat 2395 (2022)..................................................................................................28

United States International Broadcasting Act of 1994, Pub. L. No. 103-236, 108 Stat. 382 (1994)......................................................................................................5

**Other Authorities**

*Allocate*, Black's Law Dictionary (12th ed. 2024) ......................................................25

Def.'s Opp. to Pls.' Mot. TRO, *Open Tech. Fund v. Pack*, No. 20-cv-1710, ECF 7, 2020 WL 7041426 (D.D.C. filed June 26, 2020) ........................................24, 25

Executive Order "Continuing the Reduction of the Federal Bureaucracy." 90 Fed. Reg. 13,043 (Mar. 20, 2025)...........................................................................6, 7

*Guidelines*, Mellinkoff's Dictionary of American Legal Usage (1992) .......................31

Incorporation by Reference (Feb. 25, 2008), https://www.gao.gov/assets/b-316010.pdf..............................................................26

## INTRODUCTION

Unless this Court acts, in just a few weeks Radio Free Europe/Radio Liberty ("RFE/RL") will go dark. This will be the first time in 75 years that RFE/RL has been forced to halt its broadcasting. The reason? The United States Agency for Global Media ("USAGM") refuses to follow the law.

Congress has instructed that USAGM "shall … make annual grants" to RFE/RL, 22 U.S.C. § 6207(f), and "shall … allocate[]" to RFE/RL a specific amount for Fiscal Year 2025. Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 735 (2024). These are clear statutory directives. Defendants have not contested this. Instead, Defendants have continued to search for ways to evade Congress's command. First, Defendants purported to terminate RFE/RL's grant. Once they realized that was impossible to defend in court, Defendants revoked the termination but did not resume RFE/RL's normal funding. Instead, Defendants now demand that RFE/RL accept a new Master Grant Agreement loaded with poison pills or else forfeit access to RFE/RL's congressionally appropriated funds. This is a false choice, as that Master Grant Agreement is filled with new conditions that effectively guarantee RFE/RL cannot continue operating using its congressionally appropriated funds.

Preliminary injunctive relief is urgently needed to halt Defendants' unlawful conduct and to stem the ongoing and irreparable harms to RFE/RL. First, RFE/RL is likely to succeed in showing that Defendants have violated the Administrative Procedure Act ("APA"), statutes, and the Constitution. Defendants' refusal to disburse RFE/RL's congressionally appropriated funds, and their imposition of unlawful and unreasonable conditions, is final agency action. This Court has "observe[d] that delayed, broken down grant negotiations and indefinite withholding of congressionally appropriated funds, with a statutorily created entity on the brink of collapse, creates a scenario begging for APA review." *Widakuswara v. Lake*, No. 25-cv-1015-RCL, ECF

99 at 25 n.23 (D.D.C. Apr. 22, 2025). That is exactly where we now are. Since this Court sent the parties to negotiate, RFE/RL has tried in vain to get Defendants to engage. Defendants' only response was to barely budge from their initial demands and to assert without elaboration that their new conditions are "reasonable." Then—after RFE/RL continued to engage and requested further responses—Defendants went silent for six days and counting.

Defendants have also ignored RFE/RL's repeated requests for a short extension to their existing agreement, like the "mini agreement" Defendants proposed and RFE/RL agreed to for March. If Defendants really meant to enter good-faith negotiations, they had no reason to deny a one-month extension to allow space for meaningful negotiation. Defendants' unexplained refusal to do so is itself arbitrary and capricious, and alone sufficient reason for this Court to promptly enter a TRO concerning April funds while the Court considers a preliminary injunction.

On the merits, Defendants have not disputed that the International Broadcasting Act and the relevant appropriations laws impose an unambiguous duty on USAGM to disburse funds to RFE/RL under a lawful grant agreement. Their failure to do so is contrary to law. So is Defendants' imposition of a variety of illegal, unreasonable, and unworkable conditions in the new Master Grant Agreement. Indeed, Defendants have taken the extreme step of demanding authority to determine the membership of RFE/RL's board—an authority that Congress briefly gave to USAGM but then specifically repealed. Further, Defendants' failure to explain the need for any of these extraordinary conditions, even after RFE/RL explained why they are so unreasonable, is arbitrary and capricious.

Second, RFE/RL is suffering, and will continue to suffer, irreparable harm from USAGM's unlawful withholding of funds. Already, RFE/RL has terminated nearly all of its contracts with freelance journalists, missed payments on leases, and furloughed 122 employees. Without

immediate access to its April funding, RFE/RL will begin the process of furloughing additional employees and canceling remaining contracts starting on May 1.  By the end of May, RFE/RL will be forced to cancel the contracts supporting its core live news broadcasting and reporting operations.  In June 2025, RFE/RL will almost entirely cease its operations.

This Court has already found that the balance of equities and public interest favor RFE/RL. It is always in the public interest for federal agencies to follow the law.  And Congress has made it clear that RFE/RL's continued operation as an independent broadcaster is in the public interest. *See* 22 U.S.C. § 6201(3).

The relief RFE/RL seeks is reasonable, warranted, and critically necessary.  RFE/RL asks that this Court order USAGM to restore disbursement of RFE/RL's congressionally appropriated funds on a monthly basis pursuant to a lawful and reasonable grant agreement pending resolution of this lawsuit.  USAGM has already demonstrated that it can execute month-to-month grant agreements, incorporating the terms of the prior fiscal year's grant agreement that both parties signed, to enable disbursement of this year's funds.  Granting relief will not require this Court to oversee line-by-line contract negotiations.   All it will require is enjoining Defendants from imposing unlawful and unreasonable grant conditions, which Defendants are only doing as a transparent pretext to achieve their objective of shutting down RFE/RL.

RFE/RL has weathered many challenges throughout the years—imprisonment of its journalists, persecution from authoritarian governments, and even a terrorist attack.[1]  Sadly, RFE/RL's greatest threat is now a federal agency's refusal to follow Congress's commands.

---

[1] *"RFE/RL Will Continue To Be Heard": Carlos the Jackal and The Bombing of Radio Free Europe/Radio Liberty, February 21, 1981*, available at: https://about.rferl.org/article/rfe-rl-will-continue-to-be-heard-carlos-the-jackal-and-the-bombing-of-radio-free-europe-radio-liberty-february-21-1981/.

Without relief from this Court, RFE/RL will cease to be the beacon of free and independent broadcasting that it has been for 75 years.  This would be a gift to authoritarians around the world, and render Congress's mandates meaningless.  Relief is needed now to enforce the rule of law and stop RFE/RL's voice from being silenced for the first time in three quarters of a century.

## BACKGROUND

### A.    RFE/RL Is an Independent Nonprofit That Has Been Funded by Congress for Decades.

RFE/RL, Inc. is a private, nonpartisan, nonprofit 501(c)(3) news organization.  Declaration of Stephen Capus ("First Capus Decl.") ¶¶ 2–3, ECF 6-3.[2]  Its mission is to provide "accurate, uncensored news and open debate in countries where a free press is threatened and disinformation is pervasive."  *Id.* ¶ 4.  Over the course of its 75-year existence, RFE/RL has developed into one of the most comprehensive news operations in the world: it reports to 23 countries in 27 languages and reaches more than 47 million people every week.  *Id.* ¶ 3.  RFE/RL has been funded by the U.S. government since its inception.  *Id.* ¶ 3.

USAGM is the federal agency tasked by Congress with making and supervising grants for broadcasting activities.  *See* 22 U.S.C. § 6204(a)(5).  RFE/RL operates under grants from USAGM, but it is not itself a federal government entity.  *See, e.g.*, *id.* § 6207.  Approximately 99% of RFE/RL's total funding comes from its congressional appropriations.  First Capus Decl. ¶ 12.

USAGM is required by statute to make grants specifically to RFE/RL.  The United States International Broadcasting Act of 1994 (the "International Broadcasting Act") provides that "[g]rants authorized under section [6204 of this title] for RFE/RL, Incorporated, *shall be available*

---

[2] For ECF references, citations to page numbers are to the ECF pagination.

*to make annual grants*" for RFE/RL's operations.  Pub. L. No. 103-236, 108 Stat. 382, 437 (1994)

(codified as amended at 22 U.S.C. § 6207(f)) (emphasis added).

Congress has appropriated funds for RFE/RL every year since the enactment of the International Broadcasting Act of 1973.  First Capus Decl. ¶ 11.  In 2024, Congress appropriated funds for RFE/RL in the Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, 138 Stat. 460 (2024) ("2024 Appropriations Act").[3]  This law provides that funds "shall be allocated in accordance with the table included under this heading in the explanatory statement described in section 4."  *Id.* at 735.  The table that Congress incorporated by reference in the text of the statute allocated $142,212,000 in funding for "Radio Free Europe/Radio Liberty" for the 2024 fiscal year (October 1, 2023, through September 30, 2024).  *See* H. Comm. on Appropriations, 118th Cong., Further Consolidated Appropriations Act, 2024, Legislative Text and Explanatory Statement at 1167 (Comm. Print 2024).

Congress renewed RFE/RL's funding through December 20, 2024, in the Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, 138 Stat. 1524 (2024) ("First Continuing Resolution").  Congress again renewed RFE/RL's funding in the American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024) ("Second Continuing Resolution"), through March 14, 2025.

**B.    RFE/RL and USAGM Negotiate, and RFE/RL Signs, the February FY 2025 Master Grant Agreement.**

In accordance with the International Broadcasting Act, *see* 22 U.S.C. § 6207(g), RFE/RL and USAGM have regularly entered into an annual Master Grant Agreement with respect to the funds Congress has appropriated for RFE/RL.  First Capus Decl. ¶¶ 13–14.  This Master Grant

---

[3] An addendum of relevant statutory provisions was attached to RFE/RL's first motion for a temporary restraining order and preliminary injunction.  *See* ECF 6-2.

Agreement contains the terms and conditions governing USAGM's disbursement of funds to RFE/RL. *See id.* The current form of the Master Grant Agreement dates back to 2011. Fourth Declaration of Stephen Capus ¶ 2 ("Fourth Capus Decl."), Exhibit A.

The last fully executed full-year Master Grant Agreement between RFE/RL and USAGM is the FY 2024 Master Grant Agreement, which obligated RFE/RL's congressionally appropriated funds for FY 2024. *See* Declaration of Joseph Lataille ("First Lataille Decl.") ¶ 3, ECF 33-1; *see also* FY 2024 Master Grant Agreement, ECF 33-2. Following the passage of the First and Second Continuing Resolutions, USAGM executed preliminary grant agreements obligating RFE/RL's appropriated funds through February 28, 2025. First Capus Decl. ¶ 18; *see also* First Lataille Decl. ¶¶ 4–5. These preliminary grant agreements extended the terms and conditions of the FY 2024 Master Grant Agreement. *See* First Lataille Decl. ¶¶ 4–5.

On February 14, 2025, USAGM began the usual process for executing the Master Grant Agreement by sending RFE/RL a draft FY 2025 Master Grant Agreement. *Id.* ¶ 6. Over the next week, RFE/RL and USAGM negotiated revisions to the agreement. *Id.* On February 27, USAGM represented that there was a final grant agreement and sent it to RFE/RL, requesting a "*signed* version of this Master Grant Agreement at your earliest convenience." *Id.* RFE/RL signed the FY 2025 Master Grant Agreement and returned it to USAGM for USAGM's signature. *Id.* USAGM confirmed receipt of the signed agreement on February 28, and confirmed that there were no "issues with countersigning the grant agreement." *Id.* ¶ 6. But USAGM never returned the countersigned grant agreement to RFE/RL, and provided no explanation for not doing so. *Id.* ¶ 7.

## C.    USAGM Withholds Congressionally Appropriated Funds from RFE/RL and Terminates Its Grant.

On March 14, 2025, President Trump announced the Executive Order "Continuing the Reduction of the Federal Bureaucracy." 90 Fed. Reg. 13,043 (Mar. 20, 2025). The order provided

that the "non-statutory components and functions of [USAGM] shall be eliminated to the maximum extent consistent with applicable law." *Id.* The Executive Order did not define what it considered the statutory or non-statutory components and functions of USAGM. *See id.*

On March 15, 2025, President Trump signed into law the Full-Year Continuing Appropriations and Extensions Act, 2025 ("Third Continuing Resolution"), which appropriated "[s]uch amounts as may be necessary, at the level specified … under the authority and conditions provided in applicable appropriations Act for fiscal year 2024" until September 30, 2025. *See* Pub. L. No. 119-4, 139 Stat. 9, 10 (2025). Congress thus appropriated approximately $77 million for RFE/RL for March 15, 2025, to September 30, 2025. First Capus Decl. ¶ 20.

That same day, Defendant Kari Lake, Senior Advisor to the Acting CEO of USAGM, sent a letter to RFE/RL purporting to terminate RFE/RL's grant agreement. First Capus Decl. ¶ 21; Letter from Kari Lake to RFE/RL (Mar. 15, 2025), ECF 6-3. According to Defendant Lake, USAGM terminated RFE/RL's grant because it "no longer effectuates agency priorities," citing the President's executive order. *Id.* Defendant Lake provided no further explanation.

### D. RFE/RL Sues, Seeking Its Congressionally Appropriated Funds.

RFE/RL filed this lawsuit on March 18. *See* Compl., ECF 1. RFE/RL then filed a motion for a temporary restraining order ("TRO") seeking access to its congressionally appropriated funds for March 1–14, as well as an order that Defendants "take no steps and impose no obligations relating to closing out" RFE/RL's grant. *See* Proposed TRO Order, ECF 6-5. RFE/RL simultaneously moved for a preliminary injunction seeking access to its congressionally appropriated funds for the remainder of FY 2025. *See* ECF 6. On March 24, the day of the TRO hearing, Defendants notified RFE/RL and the Court that USAGM was planning to disburse RFE/RL's funds for March 1-14, and Defendants argued that this mooted RFE/RL's TRO motion. *See* ECF 13. The Court disagreed and entered a TRO. Order 7, ECF 14.

On March 26, the day that Defendants' opposition to RFE/RL's preliminary injunction motion was due, Defendants withdrew the March 15 letter terminating RFE/RL's grant.  ECF 15. Defendants again argued that this mooted RFE/RL's request for a preliminary injunction.  *Id.* RFE/RL responded that Defendants had not "ma[de] any mention of moving forward with timely disbursing RFE/RL's funds as the law requires."  Reply at 2, ECF 18.

RFE/RL continued its efforts to obtain its congressionally appropriated funds for March 15–April 30.  *See* First Lataille Decl. ¶ 9.  USAGM responded by sending another short preliminary grant agreement for March 2025.  *Id.*  RFE/RL promptly signed that agreement and returned it to USAGM, and RFE/RL received its remaining appropriated funds for March on April 8.  *Id.* ¶¶ 10–12.  USAGM did not, however, include April in the preliminary grant agreement or represent that it would disburse funds for April or the remainder of FY 2025 at that time.

### E.    USAGM Demands that RFE/RL Accept a New Grant Agreement Filled with Unlawful Conditions or Lose Its Congressionally Appropriated Funds.

Instead, on April 9, USAGM presented RFE/RL with the "RFE/RL FY-25 Master Grant Agreement" ("Grant Agreement").  *See* Ex. A to Mot. for Further TRO, ECF 28-2.  USAGM demanded that RFE/RL "provide a signed version of this Grant Agreement."  *Id.*  The Grant Agreement included numerous unprecedented terms.  USAGM did not invite feedback or negotiation over those terms.  *See id.*

The new terms and conditions in the Grant Agreement appear to be designed around two goals—to secure total USAGM control over RFE/RL, and to generate a pretext for again terminating RFE/RL's grant and continuing to withhold RFE/RL's congressionally appropriated funds. As discussed further below, the new terms do this in a number of ways.  Among them, the Grant Agreement gives the USAGM CEO power to approve—and remove—members of

RFE/RL's Board of Directors, even though Congress specifically *revoked* USAGM's authority to condition RFE/RL's grant on authority to determine membership of RFE/RL's Board.

A number of the Grant Agreement's new conditions are also impossible to comply with— meaning that RFE/RL would be found in material breach of the Grant Agreement shortly after signing. As just one example, RFE/RL cannot conceivably compile a list of every contact, "formal or informal," in the past 365 days by any of its "directors, employees, officers, contractors, staffers, affiliates and/or board members" with any Executive Branch employee, member of Congress, or congressional staffer. Art. V(b)(2) (ECF 28-3 at 6–7). RFE/RL promptly replied to USAGM after receiving the new Grant Agreement on April 9 requesting a discussion to clarify, but USAGM never responded. First Lataille Decl. ¶ 13.

### F. RFE/RL Attempts to Negotiate with USAGM But Is Rebuffed and then Ignored.

On April 15, the Court held a status hearing at which Defendants represented that they were "open to negotiation." Apr. 15 Hearing Tr. at 13:20. But as RFE/RL's subsequent communications with USAGM show, the agency is not willing to budge on any of the unreasonable conditions in the Grant Agreement (other than to adjust a few deadlines for some requirements that remain impracticable), and is refusing to explain why these conditions are needed, much less negotiate over them.

Specifically, shortly after the hearing, RFE/RL followed up on its April 9 email, to which USAGM had still not responded. RFE/RL Emails with USAGM at 6, Second Lataille Decl. Ex. 1 ("Second Lataille Decl. Ex. 1"). RFE/RL requested that USAGM (1) countersign the Master Grant Agreement that RFE/RL signed on February 27, 2025 (and which USAGM had previously confirmed was acceptable); or (2) agree to a one-month extension of the previous grant terms, as it had done for March funds, given the urgency of receiving April funding. *Id.* at 7. As to the new

FY 2025 Grant Agreement, RFE/RL requested that the agency, at minimum, remove six of the most egregious provisions. *Id.* at 7–8. USAGM ignored RFE/RL's request to countersign the FY 2025 Grant Agreement from February or enter into a one-month extension of the previous grant terms. *Id.* at 5–6. Its response was to ask for a redline of the Grant Agreement with RFE/RL's proposed changes, which RFE/RL promptly provided. *Id.* at 4–5. Rather than edit the document RFE/RL provided at USAGM's request—as would take place in a real negotiation—USAGM responded by asserting that the new terms in its version of the Grant Agreement are "reasonable," without any further explanation and reverting to the version that USAGM sent on April 9 with the only proposed revisions changing certain 24-hour deadlines to 14-day deadlines. *Id.* at 4.

RFE/RL responded the next day, on April 16, by providing additional explanation as to why these new provisions were problematic, and also (1) asked why the agency would not sign the February 2025 version of the grant agreement that RFE/RL already had signed at USAGM's request, and (2) stated its understanding that USAGM rejected its request to enter into a "mini-agreement" for the April 2025 funds. *Id.* at 1–3. RFE/RL requested a response by April 17 at noon. *Id.* at 3. USAGM has still not responded to that communication. Second Lataille Decl. ¶ 2.

### G. USAGM's Unlawful Withholding of Congressionally Appropriated Funds Threatens RFE/RL's Existence.

Absent relief from this Court, RFE/RL will be forced to close down the vast majority of its operations in May 2025. Fourth Capus Decl. ¶ 28.

Defendants' withholding of congressionally appropriated funding has already forced RFE/RL to significantly scale back its operations. First Capus Decl. ¶¶ 23–24; Supplemental Declaration of Stephen Capus ("Second Capus Decl.") ¶¶ 3–8, ECF 10-1; Fourth Capus Decl. ¶¶ 21–22. This includes furloughing approximately 122 employees, severing nearly all contracts with freelancers, and halting broadcasting programs produced by the Ukraine, Kyrgyz, Russia, and

Moldova Services. Fourth Capus Decl. ¶¶ 21–24. Within the next few weeks, RFE/RL will commence a large-scale wind-down of the remainder of its operations. *Id.* ¶¶ 26–28. This will include terminating its relationships with the rest of its freelance journalists, terminating its leases and contracts, and laying off staff. First Capus Decl. ¶¶ 23–34.

RFE/RL reaches over 47 million people every week. *Id.* ¶ 25. Stopping news coverage in countries where there may be few, if any, alternative news sources in the local language apart from state-controlled media means that millions of people will be cut off from access to free and independent media coverage of critical events. *Id.* This will irrevocably harm RFE/RL's reputation and credibility among those who rely on RFE/RL for independent news, in addition to jeopardizing RFE/RL's mission. *Id.*

RFE/RL's wind-down will necessarily impose unrecoverable financial losses on the organization. *Id.* ¶ 31. This will include missing payments for leases due in May 2025. Fourth Capus Decl. ¶ 25. Moreover, because USAGM is a co-obligor on RFE/RL's Prague lease, the agency's decision to withhold RFE/RL's funding will financially harm the agency itself. First Capus Decl. ¶ 31. RFE/RL has already cancelled leases for its bureaus in three locations and will cancel more absent additional funding. Fourth Capus Decl. ¶¶ 21, 25.

RFE/RL's furloughing and termination of the majority of its remaining employees and freelancers will irrevocably harm RFE/RL's reputation as an employer and ability to employ these same courageous journalists again. First Capus Decl. ¶ 32. RFE/RL operates in countries where associating with RFE/RL could mean imprisonment or worse. *Id.* ¶ 28; Second Capus Decl. ¶ 9. Developing and maintaining contact with journalists and contractors in these countries requires years of careful planning and trust-building. First Capus Decl. ¶ 32; Second Capus Decl. ¶ 9.

Suddenly laying off these employees will eradicate RFE/RL's ability to report the news in these countries where a free press is under threat. First Capus Decl. ¶ 32; Second Capus Decl. ¶ 15.

RFE/RL also will not be able to pay for security services for its journalists, or for security services that protect RFE/RL facilities and staff in a number of countries where RFE/RL journalists have been targeted for attack by terrorist organizations, criminal elements, and governments that are hostile to RFE/RL's reporting. First Landis Decl. ¶¶ 12–13, 16–18. Journalists who have fled from authoritarian countries such as Iran and Russia will likely be forced to return to their home countries. *Id.* ¶ 22. In many cases, these journalists could be tortured and imprisoned. *Id.*

Further, absent prompt judicial relief, RFE/RL's mission and reputation will be harmed long into the future. First Capus Decl. ¶ 32. RFE/RL cannot survive without its congressionally appropriated funding (approximately 99% of RFE/RL's funding comes from Congress). *Id.* ¶ 12. If RFE/RL is forced to cease operations, even for a short period of time, its credibility will be damaged. First Landis Decl. ¶ 33. If RFE/RL is not able to protect its current journalists, it will be very difficult for RFE/RL to persuade journalists to risk their personal safety and secure employment by joining RFE/RL in the future. *Id.*; *see also* First Capus Decl. ¶ 32.

## LEGAL STANDARD

To obtain a preliminary injunction, a movant must demonstrate "1) it is likely to succeed on the merits; 2) it is likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in its favor; and 4) the issuance of an injunction is in the public interest." *Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1324 (D.C. Cir. 2024) (cleaned up) (citing *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008)).

**ARGUMENT**

**I.      RFE/RL Is Likely to Succeed on the Merits.**

**A.      This Court Has Jurisdiction.**

As explained in RFE/RL's prior briefing, this Court, not the Court of Federal Claims ("CFC"), has jurisdiction over RFE/RL's claims.  *See* ECF 6-1, at 24–26; ECF 11, at 8–15; ECF 21, at 1–4; ECF 34, at 5–8.  RFE/RL does not here complain of a breach of any contract. Instead, RFE/RL claims that Defendants have violated statutory and constitutional duties and seeks equitable relief compelling Defendants to do what the law requires.  The fact that USAGM transmits RFE/RL's congressionally appropriated funds through a grant agreement is incidental to RFE/RL's claims—a grant is involved only because *Congress* requires USAGM to transmit congressionally appropriated funds to RFE/RL that way.  It is well settled that district-court jurisdiction is proper in these circumstances—indeed, this Court has already rejected the Government's arguments.  *Widakuswara*, ECF 99 at 18–20.

*Applicable standard.*  A claim against the federal government "falls within the exclusive jurisdiction of the Claims Court pursuant to the Tucker Act" only if the claim is "at its essence" a contract claim.  *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (emphasis omitted) (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982)). "Whether a claim is 'at its essence' contractual for the Tucker Act 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'"  *Id.* (quoting *Megapulse*, 672 F.2d at 968).  Here, both considerations demonstrate that RFE/RL's claims belong in this Court.

*Source of rights.*  The D.C. Circuit has explained that the jurisdictional question "depends not simply on whether a case involves contract issues, but on whether, despite the presence of a contract, plaintiffs' claims are founded only on a contract, or whether they stem from a statute or

13

the Constitution." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992), *abrogated in part on other grounds by Perry Capital LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017). "Crucially," the court explained, "litigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government." *Id.* at 610.

In referring to this case as "fundamentally about a government contract," ECF 35 at 4, Defendants mischaracterize RFE/RL's claims and disregard binding precedent. RFE/RL is seeking a lawful grant agreement without unlawful conditions, and disbursement of appropriated funds, because it claims entitlement to both those things *under laws passed by Congress*. *See* 22 U.S.C. § 6207(f) (USAGM "shall" make "annual grants" available to "RFE/RL, Incorporated" from appropriated funds); Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, 138 Stat. 460, 735 (2024) ("funds appropriated under this heading shall be allocated" to RFE/RL).

RFE/RL's claims therefore "stem from … statute[s] [and] the Constitution," and the fact that this case "involves contract issues" (namely, that USAGM is obligated by law to fund RFE/RL through a *bona fide* grant agreement) does not divest this Court of jurisdiction; RFE/RL's claims are plainly not "founded *only* on a contract." *Transohio*, 967 F.2d at 609; *see also Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988) (district court had jurisdiction over "a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money"); *Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441, 1449 (D.C. Cir. 1985) (district-court jurisdiction proper where claims "arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement"); *accord Widakuswara*, ECF 99 at 20 ("[A] claim of entitlement to congressional appropriations is certainly one over which the Court can exercise jurisdiction.").

*Relief sought.* The APA provides for judicial review of agency action where the plaintiff seeks "relief other than money damages." 5 U.S.C. § 702. "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen*, 487 U.S. at 893. "[M]oney damages" are "given to the plaintiff to *substitute* for a suffered loss." *Id.* at 895.

It is well established that a suit to enforce a statutory mandate—even one that requires payment of money—seeks equitable relief outside the scope of the Tucker Act. *See id.* at 900; *Md. Dep't of Hum. Res.*, 763 F.2d at 1446; *see* ECF 6-1, at 24–25. RFE/RL does not seek compensation for past harm. It seeks equitable relief in the form of "the very thing to which [it is] entitled," *Bowen*, 487 U.S. at 895: a lawful grant agreement and its congressionally appropriated funds.[4]

This Court's jurisdiction is underscored by RFE/RL's claim seeking to compel Defendants to enter into a *bona fide* grant agreement. RFE/RL claims that Defendants have violated their statutory and constitutional duties by impounding RFE/RL's congressionally appropriated funds. RFE/RL does so because Congress requires USAGM to transmit RFE/RL's appropriated funds through a grant agreement, and USAGM is refusing to enter a *bona fide* grant agreement. The D.C. Circuit has made clear that a case does not fall within the Tucker Act merely because a

---

[4] *See also Climate United Fund v. Citibank, N.A.*, 2025 WL 842360, at *6 (D.D.C. Mar. 18, 2025) (plaintiffs did not seek "money damages" because they sought "to avail themselves 'of statutory and regulatory provisions and procedures that may, or may not, entitle [them] to a monetary recovery.'" (quoting *Tootle v. Sec'y of Navy*, 446 F.3d 167, 175 (D.C. Cir. 2006))), *appeal docketed* (D.C. Cir. No. 25-5122); *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 2025 WL 752378, at *8 (D.D.C. Mar. 10, 2025) ("Plaintiffs are not seeking compensation for their losses due to the failure to pay them … ; Plaintiffs seek only invalidation of the policy, including the withholding of payment that flowed from it."), *appeal docketed* (D.C. Cir. No. 25-5098); *Massachusetts v. Nat'l Insts. of Health*, 2025 WL 702163, at *7 (D. Mass. Mar. 5, 2025) ("Plaintiffs do not bring claims for past pecuniary harms. Rather, like the petitioners in *Bowen*, their claims are to preserve their ongoing and prospective agreements with NIH."), *appeal docketed* (1st Cir. No. 25-1343).

contract is somehow involved in such an incidental manner; to trigger the Tucker Act, the plaintiff's claims must be "founded on a contract." *Crowley*, 38 F.4th at 1107; *see also id.* ("[W]e have explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" (quoting *Megapulse*, 672 F.2d at 967–68)).  A grant agreement is involved here only because the law requires USAGM to transmit RFE/RL's congressionally appropriated funds that way.

Further demonstrating that RFE/RL does not seek "in essence" monetary relief, *Crowley*, 38 F.4th at 1107, is the CFC's lack of the "general equitable powers of a district court to grant prospective relief." *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020) (quoting *Bowen*, 487 U.S. at 905).  The CFC could not grant RFE/RL's request for immediate equitable relief to prevent irreparable harm.  So as a practical matter, sending this case there would mean that RFE/RL could *never* obtain adequate relief.  *See Climate United Fund v. Citibank, N.A.*, 2025 WL 1131412, at *11 (D.D.C. Apr. 16, 2025) (concluding that the Tucker Act did not apply in part because "the Court of Federal Claims cannot provide the equitable relief [the] [p]laintiffs seek").  Courts of general jurisdiction, by contrast, regularly exercise their jurisdiction over APA claims challenging the imposition of conditions on government grants and contracts.  *See, e.g.*, *State ex rel. Becerra v. Sessions*, 284 F. Supp. 3d 1015 (N.D. Cal. 2018); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 865 (N.D. Ill. 2018); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 271, 280 (E.D. Pa. 2018); *SecurityPoint Holdings, Inc. v. TSA*, 769 F.3d 1184 (D.C. Cir. 2014).

**Defendants' authorities are inapposite.**  Defendants rely on the Supreme Court's *per curiam* order in *Department of Education v. California*, 604 U.S. __, 2025 WL 1008354 (Apr. 4,

2025), and the district court's decision in *United States Conference of Catholic Bishops v. United States Department of State*, 2025 WL 763738 (D.D.C. Mar. 11, 2025), *appeal docketed* (D.C. Cir. No. 25-5066). Both are inapposite. *See* ECF 11 at 12–15; ECF 34 at 5–8.

In both cases, the *only* source of the plaintiffs' claimed rights was their contracts with the government. *See California v. U.S. Dep't of Educ.*, 2025 WL 878431, at *1 (1st Cir. Mar. 21, 2025) (statutory scheme authorized the Secretary of Education to "use certain funds to make grants" without identifying particular entities); *Catholic Bishops*, 2025 WL 763738, at *1 (statutory scheme authorized the State Department to enter into agreements with private agencies, but did not require it to fund any particular entity).[5]

The contrast here could not be clearer. The sources of RFE/RL's claimed rights are statutes and the Constitution—not any contract. As this Court has explained, "[i]n *California*, the source of the rights relied on by the plaintiffs were contained *in the grant agreements*—the relevant statute did not entitle any particular grantee to the funds. Here, by contrast, the source of the Networks' rights is not rooted in the grant agreements with USAGM—grants are involved only as a vehicle to distribute congressionally appropriated funds to the Networks because Congress passed laws

---

[5] As previously noted, the government's briefing in both cases repeatedly emphasized that the only source of the plaintiffs' rights was the contracts themselves. *See, e.g.*, App. to Vacate, *California*, 2025 WL 945313, at *16 (U.S. filed Mar. 26, 2025) ("The ultimate source of the grantees' asserted right to payment is *the grant awards, not the grantmaking statutes* or … regulations that respondents claim the government violated" (emphasis added)); Defs.' Opp. to Pl.'s Mot. for PI, *Catholic Bishops*, No. 1:25-cv-465, ECF 25, at 13 (D.D.C. filed Feb. 26, 2025) (the plaintiff "is not seeking 'funds to which a statute allegedly entitles it'" because the statute at issue "does not require the [government] to reimburse [the] [p]laintiff for providing resettlement services—only the terms o[f] the cooperative agreements address it" (quoting *Bowen*, 487 U.S. at 895)); *see also* ECF 11 at 13; ECF 21 at 2–3.

directing USAGM to provide grants to specific grantees, and appropriated funds for those grantees specifically." *Widakuswara*, ECF 99 at 19–20.[6]

The fact that Defendants refuse even to enter into a *bona fide* grant agreement only further underscores the irrelevance of *California* and *Catholic Bishops*. Defendants are now maintaining that they are withholding RFE/RL's funds *because there is no grant agreement*. *See* ECF 32 at 12–13. There is no plausible basis for Defendants to continue to argue that "Plaintiff's claims, fundamentally, are a contract dispute," *id.* at 8, while in the next breath insisting that "there is no valid contract," *id.* at 13. The contention that *California* governs where Defendants say "there is no valid contract" is self-negating. *Id.*

**B.  USAGM's Decisions to Cut Off RFE/RL's Funding and Impose Unlawful, Unreasonable, and Unworkable Grant Conditions Violate the APA.**

**1.  USAGM's decisions are reviewable final agency actions.**

Defendants' impoundment of RFE/RL's congressionally appropriated funding, effectuated via the imposition of grant conditions that RFE/RL cannot accept and could never comply with, is final agency action reviewable under 5 U.S.C. § 704. "Agency action" includes an agency's "sanction," "denial" of "relief," and "failure to act." *Id.* § 551(13). "[S]anction" includes the "withholding of relief" or "property." *Id.* § 551(10)(B), (D). "[R]elief" is defined to include an agency's "grant of money" and an agency's "recognition of a claim [or] right." *Id.* § 551(11).

---

[6] Other district courts have for similar reasons concluded that *California* did not divest them of jurisdiction. *See Climate Fund*, 2025 WL 1131412, at *11 (district court jurisdiction proper where the "claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties"); *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, 2025 WL 1116157, at *14–15 (D.R.I. Apr. 15, 2025) (district court jurisdiction proper because "the proper source of the [n]onprofits' rights is federal statute and regulations and because the relief sought is injunctive in nature").

Here, USAGM is sanctioning RFE/RL by withholding relief in the form of RFE/RL's congressionally appropriated funds being provided via a *bona fide* grant agreement.

At its core, RFE/RL's claim is that USAGM has made a final decision to refuse to obligate and disburse RFE/RL's congressionally appropriated funds. Am. Compl. ¶ 8. That USAGM has made such a decision is clear: first, USAGM tried to terminate RFE/RL's grant and only withdrew that termination in the face of judicial scrutiny; second, USAGM has refused to provide further FY 2025 funding unless RFE/RL enters into a patently unlawful grant agreement; and third, USAGM has refused to enter into a short "mini-agreement" that would provide April 2025 funding under the same terms and conditions of the FY 2024 funding while negotiations over a master grant agreement could continue.

The decision to withhold RFE/RL's congressionally appropriated funding is final because USAGM's refusal to obligate and disburse RFE/RL's congressionally appropriated funds "mark[s] the consummation of the agency's decisionmaking process" and is an action by which "rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up).

It makes no difference that USAGM's decision not to fund RFE/RL is not memorialized in a public writing (or at least is not anymore since the putative revocation of the original termination): "the absence of a written memorialization by the agency does not defeat finality." *Bhd. of Locomotive Eng'rs & Trainmen v. Fed. R.R. Admin.*, 972 F.3d 83, 100 (D.C. Cir. 2020).

Defendants' imposition of unlawful grant conditions not only demonstrates that Defendants have decided to cut off RFE/RL's funding, but is also itself reviewable final agency action. "The finality requirement" is applied in a "'flexible' and 'pragmatic' way." *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986); *see also id.* at 435 n.7 (rejecting

"hypertechnical" application of finality); *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (noting the "'pragmatic' approach [the Supreme Court] ha[s] long taken to finality"). Under this flexible standard, an agency decision is final if it satisfies two prongs: it "mark[s] the consummation of the agency's decisionmaking process," and is a decision "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett*, 520 U.S. at 177–78 (internal quotation marks omitted); *see also CSI Aviation Servs., Inc. v. U.S. Dep't of Transp.*, 637 F.3d 408, 411 (D.C. Cir. 2011) (describing *Ciba-Geigy Corp.* as "complementary" to *Bennett*). Both prongs are met here.

The imposition of grant conditions constitutes "the consummation of the agency's decisionmaking process" here. *Bennett*, 520 U.S. at 178 (internal quotation marks omitted). Courts have consistently held that imposing conditions on the receipt of federal grants is final agency action. *See, e.g.*, *Becerra*, 284 F. Supp. 3d at 1031 ("By imposing the certification condition, the federal government … has rendered its final word, satisfying the first prong of the *Bennett* test."); *City of Chicago*, 321 F. Supp. 3d at 866 ("[T]he Attorney General's attachment of the [c]onditions is the end result of his decision-making process on this score. That satisfies the first requirement for finality under the APA." (citing *Bennett*, 520 U.S. at 177–78)); *City of Philadelphia*, 309 F. Supp. 3d at 280 ("[T]he Attorney General's decision to impose the conditions represents the agency's definitive position on the question, such that it is now final and ripe for this Court's review." (cleaned up)).

Here, Defendants represent that, since March 26, they have been "diligently working to review the terms and conditions of the grant agreement." ECF 32 at 4. That process was consummated on April 9, when USAGM demanded that RFE/RL accept those conditions. USAGM's transmission to RFE/RL did not describe the grant agreement as a "proposal" or the

20

terms and conditions as "proposed." USAGM called it "*the* <u>RFE/RL FY-25 Master Grant</u> <u>Agreement</u>," and directed RFE/RL to "provide a signed version of *this* Grant Agreement." ECF 28-2 at 2 (emphasis added).

Moreover, Defendants did not transmit the 2025 Master Agreement in a vacuum. This Court can "consider[] whether final agency action has resulted from a series of agency pronouncements." *Ciba-Geigy*, 801 F.2d at 435 n.7. In February, RFE/RL negotiated a grant agreement with USAGM that USAGM acknowledged was substantively final. First Lataille Decl. ¶ 6. At USAGM's direction, RFE/RL signed this grant agreement. But then the agency went silent, and next contacted RFE/RL to terminate the grant. *Id.* at ¶¶ 7–8; ECF 6-3. USAGM retracted that termination only after inquiry from this Court, went silent again for weeks, and finally presented "the RFE/RL FY-25 Master Grant Agreement," First Lataille Decl. ¶ 13, with a host of poison pills designed to effectuate the same termination of funding, ECF 28-1 at 8–11. And as Defendants well knew, RFE/RL was already furloughing employees and otherwise suffering irreparable harm, making it untenable to continue waiting for its funding. Declaration of Stephen Capus ("Third Capus Decl.") ¶ 2, ECF 28-5. Against that backdrop, the April 9 conditions cannot be considered the start of a good-faith negotiation process.

Since April 9, RFE/RL has tried in vain to get USAGM to enter good-faith negotiations. On April 15, 2025, RFE/RL followed up on its April 9 email seeking discussion, to which USAGM had still not responded. Second Lataille Decl. Ex. 1 at 6–8. RFE/RL requested that USAGM enable RFE/RL to receive its April funding by either countersigning the finalized February FY 2025 Master Grant Agreement or entering into a one-month extension of the previous grant terms. *Id.* RFE/RL also asked that, as a sign of USAGM's willingness to enter into good-faith negotiations, USAGM agree to remove the six most objectionable terms in the new Grant

Agreement.  *Id.*  In its response the following day, USAGM ignored both of RFE/RL's requested options that would enable disbursement of April funds—despite the fact that RFE/RL explained its desperate need for those funds to avoid further furloughs.  *Id.* at 4.  USAGM also refused to remove the objectionable conditions—asserting without explanation that they were "reasonable"—and instead offered only to replace a handful of the 24-hour deadlines with 14-day deadlines.  *Id.*  RFE/RL replied that same day with a further explanation of why specific terms are unlawful and unworkable.  *Id.* at 1–3.  Although RFE/RL requested that USAGM respond by the following day (April 17), USAGM still has not responded.  *Id.* at 3; Second Lataille Decl. ¶ 2.  In short, "the record does not show" that the agency "established these terms on a tentative or interlocutory basis, that it is amenable to further negotiation of them, or that it has been even slightly receptive to [RFE/RL's] recent efforts to reopen those discussions."  *Giuseppe Bottiglieri Shipping Co. S.P.A. v. United States*, 843 F. Supp. 2d 1241, 1247 (S.D. Ala. 2012).

The second prong of the finality inquiry—whether "the action [is] … one by which rights or obligations have been determined, or from which legal consequences will flow," *Bennett*, 520 U.S. at 178 (cleaned up)—is also satisfied.  As courts have explained, "legal consequences clearly flow from the imposition" of a grant condition, because "[r]eceipt of the grant[] is conditioned" on accepting it.  *Becerra*, 284 F. Supp. 3d at 1031–32; *see also City of Chicago*, 321 F. Supp. 3d at 866 (legal consequences flow from the choice presented by the agency because "[t]hey force [recipient] to choose between accepting the award with the [c]onditions or forgoing the award").  As in those cases, USAGM's imposition of new grant conditions is "final agency action" reviewable under the APA, because the agency presented the new conditions as a *fait accompli*, giving RFE/RL no option but to accept the terms presented in order to access its congressionally appropriated funds.  *See Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp.

22

3d 308, 328 (S.D.N.Y. 2018). The D.C. Circuit has likewise reviewed agency decisions to impose contractual terms as final agency action. *See SecurityPoint Holdings*, 769 F.3d at 1187; *see also Friedman v. FAA*, 841 F.3d 537, 543 (D.C. Cir. 2016) (describing *SecurityPoint* as holding that agency refusal to "lift a contracting requirement newly imposed" was final agency action).

The ultimate touchstone of finality is "whether the impact of the order is sufficiently 'final' to warrant review in the context of the particular case." *Friedman*, 841 F.3d at 542. The impact of USAGM's action is clear: RFE/RL can either agree to a host of unlawful grant conditions that will inevitably result in termination of RFE/RL's grant, or it can forgo its funding and ultimately be forced out of existence. *See also Widakuswara*, ECF 99 at 25 n.23 ("delayed, broken down grant negotiations and indefinite withholding of congressionally appropriated funds, with a statutorily created entity on the brink of collapse, creates a scenario begging for APA review").

In addition, this Court can review whether there has been agency action unlawfully withheld. USAGM's refusal to obligate and disburse RFE/RL's funding for April 2025 constitutes agency action "unlawfully withheld." The disbursement of RFE/RL's congressionally appropriated funds is a "discrete agency action" that USAGM is "required to take" by statute. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). The relevant statutory provision states that USAGM shall "make annual grants" to RFE/RL, "in compliance with a grant agreement" that contains "guidelines for such grants." 22 U.S.C. § 6207(f)–(g). USAGM has unlawfully withheld such a grant agreement: the Grant Agreement transmitted by USAGM in April is so unlawful, unworkable, and unreasonable that it is not a *bona fide* grant agreement containing guidelines for a grant, but rather an attempt to deny RFE/RL access to its congressionally appropriated funds. This "administrative inaction … has precisely the same impact on the rights of the parties as denial

of relief": the denial of RFE/RL's congressionally appropriated funds, which will inevitably force RFE/RL into dissolution. *Friedman*, 841 F.3d at 543.

**2.    USAGM's decision to cut off RFE/RL's funding is contrary to law.**

The core of this case is straightforward: USAGM has made a final decision to refuse to fund RFE/RL, despite having a statutory obligation to do so. Two different statutes require USAGM to disburse congressionally appropriated funds to RFE/RL.

*First*, the International Broadcasting Act grants USAGM authority to "make and supervise grants and cooperative agreements for broadcasting and related activities in furtherance of the purposes of [the International Broadcasting Act]." 22 U.S.C. § 6204(a)(5). The statute then instructs how USAGM must exercise that authority with respect to RFE/RL:

> Grants authorized under section 6204 of this title for RFE/RL, Incorporated, *shall be available to make annual grants* for the purpose of carrying out similar functions as were carried out by RFE/RL, Incorporated, on the day before April 30, 1994, with respect to Radio Free Europe and Radio Liberty, consistent with section 2 of the Board for International Broadcasting Act of 1973 … as in effect on such date.

*Id.* § 6207(f) (emphasis added).

By its plain language, § 6207(f) imposes a duty on USAGM to "make annual grants" to RFE/RL. The use of "shall" "connotes a requirement" that is nondiscretionary. *Me. Cmty. Health Options*, 590 U.S. at 310.

This is not a controversial reading of § 6207(f), but rather one USAGM embraced during President Trump's first term. As the agency acknowledged to this Court in 2020, the International Broadcasting Act "dictate[s] how the CEO [of USAGM] *must exercise* his § 6204 grant-making authority when dealing with [RFE/RL]." Def.'s Opp. to Pls.' Mot. TRO at 4, *Open Tech. Fund v.*

*Pack*, No. 20-cv-1710, ECF 7, 2020 WL 7041426 (D.D.C. filed June 26, 2020) (emphasis added).[7] The agency had it right in 2020: the International Broadcasting Act imposes a plain and unambiguous duty for USAGM to make grants to RFE/RL.

*Second*, Congress has enacted appropriations legislation requiring USAGM to provide a specific amount of funds to RFE/RL for fiscal year 2025.  In the 2024 Appropriations Act, Congress appropriated funds to USAGM, and then specified as part of the statutory text that "funds appropriated under this heading *shall be allocated* in accordance with the table included under this heading in the explanatory statement described in section 4." 138 Stat. 460, 735 (emphasis added). Again, the use of "shall" connotes a non-discretionary requirement.  *See Me. Cmty. Health Options*, 590 U.S. at 310.  And the word "allocate" means "to distribute."  *Allocate*, Black's Law Dictionary (12th ed. 2024); *see also Wi-LAN USA, Inc. v. Apple Inc.*, 830 F.3d 1374, 1383 (Fed. Cir. 2016) ("To 'allocate' something is to distribute it among multiple recipients."); *City of Providence v. Barr*, 385 F. Supp. 3d 160, 164 (D.R.I. 2019) (statutory requirement that DOJ "shall … allocate" grant funds imposed a "mandatory duty on the DOJ to pay the funds as soon as possible"), *aff'd*, 954 F.3d 23 (1st Cir. 2020).  The referenced table allocates $142,212,000 for RFE/RL in fiscal year 2024, which Congress extended for fiscal year 2025 via the First, Second,

---

[7] Defendants have cited *Open Technology Fund* to suggest that Congress granted "the USAGM CEO broad, unilateral powers over grant-making and oversight of USAGM grantees[.]"  Defs.' Opp'n Pl.'s Mot. for TRO & PI 21, ECF 9 (quoting *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 31 (D.D.C. 2020), *opinion vacated, appeal dismissed*, No. 20-5195, 2021 WL 11096700 (D.C. Cir. Mar. 16, 2021) (per curiam) (granting unopposed motion to dismiss appeal as moot and vacating district court order)).  Yet as RFE/RL has explained, at issue in that case was only the USAGM CEO's power to remove the head of the Open Technology Fund, not any question about denying grants or withholding appropriated funds.  *See id.* at 18.  Critically, *Open Technology* does not cite, much less analyze, the restrictions imposed on USAGM by 22 U.S.C. § 6207.  Further, any suggestion that the decision implies that some broader powers exist is undercut by the fact that Congress responded by amending the statute to *remove* the authority at issue, preventing the CEO from unilaterally removing the heads of grantees.  *See infra* Section I.B.3.a.

and Third Continuing Resolutions. *See* Background §§ A, C.[8]  In the most recent of those laws, which President Trump signed on March 15, Congress extended through September 30, 2025, the appropriations "at the level specified … under the authority and conditions provided in applicable appropriations Act for fiscal year 2024."  H.R. 1968, 119th Cong. § 1101(a) (2025).

USAGM is bound by the clear instructions from Congress in these relevant appropriations laws, *including* the specific amount allocated to RFE/RL in the table in the Explanatory Statement. Congress incorporated that table by reference into law, instructing in statutory text that USAGM's appropriation "shall be allocated in accordance with the table."[9]

In sum, USAGM is currently flouting not just one but two clear statutory directives from Congress: the requirement imposed by the International Broadcasting Act to make grants available to RFE/RL, and the requirement imposed by the relevant appropriations laws to provide RFE/RL the specific amount of funds Congress allocated to it.  The resulting violations of the APA, the relevant statutes, and the Constitution all stem from this basic and fundamental disregard of USAGM's statutory obligations.  *See* ECF 6-1 at 26–41.  *See also Widakuswara*, ECF 99 at 29–

---

[8] While Congress afforded USAGM a modicum of discretion to "reprogram[]" funds "within and between amounts designated in such table," it carefully circumscribed that authority to "no more than 5 percent" of the designated amount.  138 Stat. 460, 735.  That narrow conferral of discretion would have been superfluous had Congress meant to leave USAGM with the far more sweeping authority to deny funds to RFE/RL entirely.  *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[O]ne of the most basic interpretive canons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (cleaned up)); *see also Providence v. Barr*, 954 F. 3d 23, 43 (1st Cir. 2020) ("Why … would Congress have bothered to specify that the DOJ may withhold up to ten percent of a [specific] grant from a state [for reporting failures] … if [a] section [of the statute] allowed it to withhold the entire grant for the same reason through the imposition of a special condition?").

[9] Such incorporation by reference is a well-accepted tool of statutory design, and results in the incorporated text having the force and effect of law.  As the Government Accountability Office has explained (drawing on precedent from the Supreme Court, the D.C. Circuit, and this Court), when an appropriations law "incorporate[s] by reference an explanatory statement," "the affected agencies are required to obligate and expend the appropriations in accordance with the referenced provisions of the explanatory statement."  B-316010, Consolidated Appropriations Act, 2008 – Incorporation by Reference (Feb. 25, 2008), https://www.gao.gov/assets/b-316010.pdf.

30 (concluding that "defendants are likely contravening the APA by acting 'not in accordance' with several International Broadcasting Act provisions and congressional appropriations acts," as well as the Constitution).

### 3.    USAGM's imposition of grant conditions confirms its decision to decline to fund RFE/RL and contravenes the APA.

USAGM's position appears to be that it is not contravening its statutory obligations because it has provided RFE/RL a grant agreement and instructed RFE/RL to sign it. But the grant agreement that USAGM has imposed is riddled with unlawful, unworkable, and unreasonable provisions. Most notably, it contains provisions that would allow USAGM to approve or remove RFE/RL's Board of Directors—despite Congress having expressly revoked that authority only three years ago. Beyond that, the conditions established by the grant will set up RFE/RL to be in breach of the agreement, which would inevitably provide a pretext for USAGM to terminate RFE/RL's grant. USAGM's presentation of an illusory grant agreement on a take-it-or-leave-it basis does not satisfy USAGM's statutory obligation to "make annual grants" to RFE/RL through a grant agreement that contains "guidelines" governing the grant and respects RFE/RL's professional independence and integrity. 22 U.S.C. §§ 6204(b), 6207(f), (g). It is also arbitrary and capricious.

The D.C. Circuit has made clear that courts may, under the APA, review agency action in negotiating a contract to determine whether the agency's action is "consistent with the governing law" and "not unreasonable." *Doe v. Devine*, 703 F.2d 1319, 1326 (D.C. Cir. 1983). USAGM's actions with respect to the FY 2025 grant agreement fail on both counts.[10]

---

[10] *Doe* also stated that "[c]ourts reviewing a contract negotiation must be mindful of the considerable leeway an agency has in that setting to balance and accommodate competing interests." 703 F.2d at 1326. However, the court made clear that this "leeway" does not extend to agency action that is not "consistent with the governing law" or "unreasonable." Moreover, (continued…)

a)    **USAGM's imposition of grant conditions relating to RFE/RL's board is contrary to law.**

One of the most extraordinary new conditions in the Grant Agreement gives the USAGM CEO authority to approve and remove RFE/RL's Board of Directors, which is charged with making "all major policy determinations" of RFE/RL.  22 U.S.C. § 6207(a)(2); *see* Art. V(a) (ECF 28-3 at 6) ("[A]ll members of the Board of Directors [of RFE/RL] must be approved by the USAGM CEO.").  Yet Congress recently withdrew from USAGM the authority to impose *exactly such a condition*.  "An agency literally has no power to act … unless and until Congress confers power upon it," *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986), and Congress has made it abundantly clear that it did not confer this power on USAGM.

In 2017, Congress for the first time authorized USAGM to "condition, if appropriate, any grant or cooperative agreement to RFE/RL, Inc. [and certain other grantees] … on authority to determine membership of [USAGM grantees'] boards."  National Defense Authorization Act for Fiscal Year 2017 ("FY2017 NDAA"), Pub. L. No. 114-328, 130 Stat. 2000, 2550 (2016) (codified at 22 U.S.C. § 6204(20) (2017)).  USAGM's exercise of that authority with respect to another grantee sparked significant congressional and media attention, as well as litigation.  *See Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 14 (D.D.C. 2020).  Congress responded by repealing USAGM's authority to condition grants on USAGM having the power to determine membership of RFE/RL's board.  *See* National Defense Authorization Act for Fiscal Year 2023, Pub. L. No. 117-263, 136 Stat 2395, 3915 (2022) (amending 22 U.S.C. § 6204(a) by "striking paragraph (20)").  Congress also repealed part of another provision under which RFE/RL's "directors" had "serve[d]

---

whatever leeway the government may have in routine contract negotiations, it necessarily has less here, where Congress has made it clear that it wants a particular entity to have a grant in a particular amount.

at the pleasure of" the USAGM CEO.  *Compare* FY2017 NDAA, 130 Stat. at 2554 (codified at 22 U.S.C. § 6209(d) (2017)), *with* 22 U.S.C. § 6209(d).  *See also* National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388, 4021–24 (2021) (removing the USAGM CEO's authority to remove the heads of the grantees).  Accordingly, not only is the authority to regulate the Board of RFE/RL—a private nonprofit corporation—not included in the statute, it was deliberately and specifically excluded by Congress.

"When Congress amends legislation, courts must presume it intends the change to have real and substantial effect."  *Ross v. Blake*, 578 U.S. 632, 641–42 (2016) (cleaned up).  Consistent with this principle, the Supreme Court has held that agencies cannot assert regulatory authority that Congress has "considered and rejected."  *West Virginia v. EPA*, 597 U.S. 697, 731 (2022) (quotation omitted); *see also FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941) (agency's lack of authority "reinforced by the [agency's] unsuccessful attempt … to secure from Congress an express grant of [similar] authority"); *Cape May Greene, Inc. v. Warren*, 698 F.2d 179, 187 (3d Cir. 1983) (an agency cannot "us[e] its power to regulate grants" to "accomplish matters not included in [the relevant] statute").  It is frankly remarkable that USAGM would impose a condition that Congress so recently rejected.

For the same reasons, new conditions in the Grant Agreement that would give USAGM de facto authority to determine members of RFE/RL's Board of Directors are also unlawful.  *See* Arts. X(b), (d), (h).  For example, Article X(h) states that "an individual identified by the USAGM Director of Security to be an insider threat may not serve as a member of [RFE/RL's] Board of Directors."  ECF 28-3 at 22.  USAGM does not describe this "Insider Threat Program," and RFE/RL has never received any information about it.  Fourth Capus Decl. ¶ 18.  USAGM could

simply deem any RFE/RL board member an "insider threat" and remove them—doing exactly what Congress has said USAGM lacks authority to do.

Defendants have not attempted to defend the legality of these conditions based on any source of statutory authority. That is because there is no statutory basis for USAGM to impose these conditions. *See, e.g.*, *City of Philadelphia*, 916 F.3d at 286–87 (examining statutory language authorizing grants to determine whether DOJ had specific authority to impose certain conditions).

### b)    Numerous other grant conditions are likewise contrary to law.

RFE/RL is likely to succeed on its argument that other new grant conditions are "not in accordance with law" and "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2). When "agencies [are] charged with administering congressional statutes," "[b]oth their power to act and how they are to act is authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Three statutory limitations apply here: (1) that grants "shall be available"—not unavailable—to RFE/RL, 22 U.S.C. § 6207(f), (2) that the grant agreement "shall establish guidelines for such grants," *id.* § 6207(g), and (3) that USAGM "shall respect the professional independence and integrity of … the grantees of the agency," *id.* § 6204(b). Several of the new grant conditions violate one or more of these statutory limitations.

*First*, USAGM's imposition of grant conditions that are practically impossible to meet contravenes the International Broadcasting Act's mandate that "[g]rants" "shall be available" to RFE/RL "for the purpose of carrying out" RFE/RL's functions. 22 U.S.C. § 6207(f). As discussed, *supra* Section I.B.2, this is clear, mandatory language. Defendants' take-it-or-leave-it insistence on patently unreasonable terms would necessarily result in termination of the grant. In other words, the grant is not genuinely *available*.

*Second*, the new grant conditions far exceed the International Broadcasting Act's authorization of USAGM to "provide *guidelines* for such grants" in the grant agreement. 22 U.S.C.

§ 6207(g) (emphasis added). "Guidelines" are "more or less brief statements of policy … presumed to be for general guidance, as distinguished from detailed compliance." *Guidelines*, Mellinkoff's Dictionary of American Legal Usage (1992); *see also U.S. ex rel. Polansky v. Pfizer, Inc.*, 914 F. Supp. 2d 259, 262 n.3 (E.D.N.Y. 2012), *aff'd*, 822 F.3d 613 (2d Cir. 2016) (discussing this definition). The Grant Agreement's onerous micromanagement goes far beyond "guidelines."

*Third*, the new grant conditions are contrary to law because they fail to "respect the professional independence and integrity of" RFE/RL. 22 U.S.C. § 6204(b). RFE/RL's independence from USAGM is central to the International Broadcasting Act's statutory structure.

RFE/RL highlights the most problematic new grant conditions below.[11]

***Restrictions Regarding Contracts and Leases.*** The Grant Agreement provides that "[a]ny default or late payment made on any real property or real estate occupied by the Recipient shall be deemed a material breach of this grant agreement." Art. I(c) (ECF 28-3 at 4). RFE/RL has already made a late payment on real estate *because of USAGM's withholding of its congressionally appropriated funds* and, absent immediate disbursement of April funds, will miss additional payments on May 1. *See* Fourth Capus Decl. ¶¶ 10, 25. And if in subsequent months USAGM again withholds funding, and RFE/RL cannot obtain judicial relief before a lease payment is due, it would again violate this condition. This provision would thus inevitably lead to RFE/RL breaching the Grant Agreement *based on USAGM's own actions*.

***Deletion of Language Services.*** The Grant Agreement provides that "[i]nsofar as [RFE/RL] has duplicative programming with USAGM's other entities, [RFE/RL] shall immediately reduce and delete language services upon notice by USAGM within [14 days] of such

---

[11] RFE/RL also has serious concerns about other provisions in the Grant Agreement and reserves its rights regarding them.

notice.  Any refusal to delete language services within [14 days] of such notice shall be deemed a material breach of this agreement and shall result in the grant being terminated."[12]  Art. III(b) (ECF 28-3 at 4–5).  A "language service" refers to RFE/RL's news reporting operations in a particular language and includes all of the journalists, technical and administrative support, and freelancers working in that language.  Fourth Capus Decl. ¶ 8.  Deleting entire language services in 14 days is not possible.  As an example, *s*hutting down the Ukrainian Service would require closing three offices and terminating over 100 employees (who would be entitled to notice pay and severance), some of whom report from the front lines.  RFE/RL cannot possibly shut down such a complex operation in 14 days.  *Id.*

 ***Reporting Regarding Contact with Congress and the Executive Branch.***  The Grant Agreement requires that RFE/RL "must inform the USAGM CEO of communications or meetings," whether "formal or informal," and by any of its "directors, employees, officers, contractors, staffers, affiliates and/or board members," with "House and Senate staff and Members and any other entity within the Executive Branch," and "provide the USAGM CEO a complete accounting of all such communications and meetings" from the prior year.  Art. V(b)(2) (ECF 28-3 at 6–7).[13]  RFE/RL cannot possibly comply with this requirement.  RFE/RL has over 1,000 employees around the world (not to mention contractors), many of whom report on events

---

[12] RFE/RL has noted in brackets where Defendants have indicated they would change certain 24-hour deadlines to 14-day deadlines.  *See* Background § F.

[13] The negotiated and finalized FY 2025 Master Grant Agreement from February 2025 includes language that "In order to facilitate coordinated communications among the elements of U.S. international broadcasting, the Recipient *will endeavor* to inform the USAGM Office of Congressional Affairs of communications or meetings with the State Department, House and Senate staff and Members."  ECF 33.3 at 6 (emphasis added).  However, the Grant Agreement has since been edited by USAGM to *require* RFE/RL to inform the USAGM CEO of such communications, and the requirement has been expanded to include "any other entity within the Executive Branch," not just the State Department.  Art. V(b)(2) (ECF 28-3 at 6–7).

occurring in the United States and regularly contact persons in the U.S. government for journalistic purposes.  Fourth Capus Decl. ¶¶ 7, 13.  Furthermore, during 2024 RFE/RL personnel had many communications with U.S. government representatives every week regarding the incarceration of RFE/RL journalist Alsu Kurmasheva in Russia.  *Id.* ¶ 7.  There is no way for RFE/RL to compile this information, particularly given the backwards-looking nature of this requirement, which would require RFE/RL to somehow reconstruct all prior communications during a period RFE/RL had no reason to expect a retroactively-imposed reporting requirement.  *Id.*

 ***Reviews and Audits Within 24 Hours.***  The Grant Agreement authorizes USAGM to "at any time hire an independent audit of all Recipient books, financials, security protocols and/or operations."  Art. XII(c) (ECF 28-3 at 24).  The Agreement further requires RFE/RL to "provide all requested information and access to USAGM and/or its designated auditors/inspectors to all books, records, facilities, and technical systems within 24 hours' notice in whatever manner, electronic or otherwise, deemed appropriate by USAGM" or be in "material breach."  *Id.*  Requiring additional audits would impose substantial costs on RFE/RL, which already conducts annual audits by an accredited, independent auditor and is also audited by the Government Accountability Office.  Fourth Capus Decl. ¶ 11.  These audits take approximately 800 hours of time from 25 staff members.  *Id.*  Moreover, as an independent organization, RFE/RL cannot accept being subjected to additional audits by auditors chosen by USAGM without any parameters set on their qualifications or their overlap with RFE/RL's existing, accredited auditors.  *Id.*

 ***On Site Reviews Within 24 Hours.***  The Grant Agreement entitles USAGM "to site visits within 24 hours notice to" RFE/RL's domestic and overseas headquarters sites and to selected bureaus.  Art. VII(e) (ECF 28-3 at 15).  USAGM will not be required to provide RFE/RL with a checklist of items to review and discuss in advance.  *Id.*  Yet RFE/RL is required to "arrange the

site visit with the appropriate … personnel" and "have all books and records available for inspection on site at all times." *Id.*  RFE/RL has bureaus or offices in 20 countries, and employees operating in unstable areas.  Fourth Capus Decl. ¶ 15.  Such a requirement is unworkable because, depending on the location, RFE/RL may not be able to arrange security for the visit or have the relevant personnel available on such short notice.  *Id.*  RFE/RL has prepared for site visits from USAGM in the past, but this has usually been with at least a few weeks' notice.  *Id.*

    ***Records Review Within 24 Hours.***  The Grant Agreement provides that "USAGM or Any Designated Contractor may review … all [RFE/RL's] financial records either in-person, electronically, or through other means as reasonably requested by the Agency" with 24 hours' notice.  Art. VII(f) (ECF 28-3 at 15).  RFE/RL maintains servers containing archives of its information, in some cases including financial information, in Almaty, Belgrade, Bishkek, Bucharest, Chisinau, Dushanbe, Kyiv, Lviv, Sarajevo, Skopje, Pristina, Riga, Tbilisi, Vilnius, Washington, and Yerevan.  Fourth Capus Decl. ¶ 16.  Broadly requiring RFE/RL to provide access to these records, in any form required by USAGM, within 24 hours would likely be unworkable for RFE/RL's security and IT teams.  *Id.*

    ***Prohibition on Outside Fundraising.***  Previously, RFE/RL could raise outside funds. Fourth Capus Decl. ¶ 12.  Under the Grant Agreement, RFE/RL "may not engage in fundraising from outside sources.  Should the entity want to raise outside funds, they must forgo their grant funds in their entirety."  Art. IX(a) (ECF 28-3 at 20).  This puts RFE/RL in a catch-22: it cannot rely on USAGM for funding going forward where the agency has made clear its intent to defund RFE/RL, but RFE/RL cannot explore other funding sources without losing its grant.

    ***Supplemental Accountability Report.***  Within "5 calendar days of the execution" of the Agreement, RFE/RL must "provide a supplemental accountability report to" USAGM, including

an "accounting of all expenditures of funds provided under this Agreement made to any non-profit organization or to any provider of legal services," an "accounting of any and all beneficial owners of any recipient of any expenditure of funds," "[r]esumes" of all employees, and identification of all beneficial owners who have previously served as an employee or contractor of USAGM, RFE/RL, and any other organization with which USAGM maintains a grant agreement, among other things. Art. VII(d)(8) (ECF 28-3 at 14–15). This includes expenditures made by "grant, sub-grant, fellowship, contract, or any other payment." *Id.* RFE/RL does not collect information in the normal course of business regarding the beneficial owners of its fund recipients. Fourth Capus Decl. ¶ 14. Furthermore, in addition to its full-time staff, RFE/RL employs numerous freelance journalists and contractors. First Capus Decl. ¶ 9. Many of these employees and contractors operate in circumstances where access to communication networks is limited. Fourth Capus Decl. ¶ 14. Compiling all of this information, particularly in five days, is not possible given the complexity of RFE/RL's operations.

  ***Financial Plan Approval.*** RFE/RL currently presents a financial plan for USAGM's approval that summarizes, at a high level, RFE/RL's monthly operating costs. *See id.* ¶ 3; *see also* Fourth Capus Decl. Ex. 1 (FY 2024 Approved Financial Plan). The Agreement changes the financial plan requirement to "include a detailed breakdown of where grant funds are being spent with specificity including but not limited to the salary for every employee, contractor, fellow/fellowship and a detailed breakdown of every contract, contractor, grant, sub-grant, vendor, and supplier including the beneficial ownership information of each of those entities for every owner with any ownership share in any entity receiving funds from the Recipient." Art. VII(b)(2) (ECF 28-3 at 9). For any entities that RFE/RL funds, "that entity must also provide a breakdown of all individuals and organizations to funds [sic] are paid for that fiscal year." *Id.* Every individual

35

must "attest in a notarized writing" to "any potential conflict of interest." *Id.* Failure to provide "accurate information" "shall be deemed a material breach." *Id.* Any spending outside the "Approved Financial Plan" "shall be deemed a material breach." Art. I(b) (ECF 28-3 at 3). The Grant Agreement does not define "potential conflict of interest," providing an avenue for USAGM to find RFE/RL in material breach because an individual did not attest to what USAGM later claims is a potential conflict of interest. Art. VII(b)(2) (ECF 28-3 at 9). Moreover, arguably every time RFE/RL changes an employee's salary, enters into a new contract, or makes any adjustment at all to its spending, RFE/RL would breach the Agreement absent approval from USAGM. Additionally, the requirement to report beneficial ownership at the subrecipient level is simply unreasonable. This is setting RFE/RL up to fail. At best, this is extraordinary micromanagement of RFE/RL that falls far short of respecting RFE/RL's "professional independence" from USAGM.

### c) USAGM's imposition of unreasonable conditions is arbitrary and capricious.

RFE/RL is also likely to succeed on its argument that the new terms and conditions are arbitrary and capricious. 5 U.S.C. § 706(2)(a).

*First*, USAGM provided no explanation for these unprecedented terms that depart from years of practice between USAGM and RFE/RL across administrations. That Defendants have failed to provide any explanation, let alone a satisfactory one, is sufficient to find the agency's action arbitrary and capricious. *See, e.g.*, *SecurityPoint Holdings*, 769 F.3d at 1187 (noting in the context of an agency imposing contract provisions that the agency must provide "reasoning" and "articulate a satisfactory explanation for its actions"); *Doe*, 703 F.2d at 1326 (agency must provide "a coherent" "statement of the agency's bargaining objectives and concerns" and the agency's judgment must not be "unreasonable").

*Second*, USAGM's lack of explanation is particularly problematic where years of consistent grant agreements between USAGM and RFE/RL have "engendered serious reliance interests" on RFE/RL's part. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). USAGM thus has the burden of providing a "detailed justification" for such a dramatic reversal in its standard practices. *Id.* Yet, in imposing the unprecedented terms and in its subsequent refusal to amend them, the agency has not acknowledged this change in position, let alone explained it. *See Fox*, 556 U.S. at 515 ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position.").

*Third*, USAGM's decision is arbitrary and capricious because it failed to consider "an important aspect of the problem": that many of these conditions are unworkable and as a practical matter would generate significant costs and inefficiencies. In *SecurityPoint*, the D.C. Circuit held that a Transportation Security Administration decision to mandate a contractual provision requiring airports to provide certain indemnities to the agency was arbitrary because it failed to consider "potential harms … from insistence of the new provisions." 769 F.3d 1184. Here, as in *SecurityPoint*, Defendants have demanded that RFE/RL comply with virtually impossible obligations without consideration of the significant costs and inefficiencies resulting from the new conditions, let alone the downstream harms to RFE/RL's mission and global audience.

*Fourth*, USAGM's imposition of these grant conditions fails the basic requirement that an agency decision be "reasonable." *Ohio v. EPA*, 603 U.S. 279, 292 (2024); *Doe*, 703 F.2d at 1326 (agency's contract provisions must not be "unreasonable"). For the reasons given above, the decision to impose these grants conditions was unreasonable.

*Fifth*, USAGM's imposition of these grant conditions is arbitrary and capricious because they run counter to the statutory goal, which is for grants to be "available" to RFE/RL to carry out

its "functions." 22 U.S.C. § 6207(f). Where an "agency action is found to not be reasonably consistent" with a statute's "goal," "then the courts must invalidate it." *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985); *see also id.* at 48 ("When Congress limits the purpose for which a grant can be made, it can be presumed that it intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion ….").

*Sixth* and finally, USAGM's decision not to enter into a short "mini-agreement" to provide RFE/RL its April 2025 funding was unexplained and unreasonable. USAGM is well aware of RFE/RL's dire financial condition, and its refusal to enter into such a temporary agreement pending further negotiations demonstrates that it is not interested in good-faith negotiations. Indeed, its refusal stands in stark contrast with the agency's actions only several months ago: RFE/RL and USAGM previously entered into two extender agreements in October 2024 and December 2024. First Lataille Decl. ¶ 9.

## II.    RFE/RL Will Suffer Irreparable Harm Without a Preliminary Injunction.

To establish irreparable harm, an "injury must be both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Am. Ass'n of Pol. Consultants v. U.S. Small Bus. Admin.*, 613 F. Supp. 3d 360, 370 (D.D.C. 2020), *aff'd*, 810 F. App'x 8 (D.C. Cir. 2020) (internal quotation marks omitted); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (injury is irreparable if it cannot later be remedied by "compensatory or other corrective relief").

RFE/RL remains in essentially the same position it was when it filed its original TRO and PI motion and demonstrated irreparable harm. *See* Third Capus Decl. ¶ 2. RFE/RL has yet to receive any of its congressionally appropriated funds for April 2025, and RFE/RL is in a

"substantially similar financial position as it was at the time RFE/RL first moved for relief from the Court in March 2025," when USAGM had not yet disbursed RFE/RL's congressionally appropriated funds for March.  *Id.*

This Court already found in March that RFE/RL had demonstrated irreparable harm, Order Granting TRO at 6–8, ECF 14, and that finding applies fully today.  As explained in its prior briefing and its undisputed declarations, RFE/RL will be irreparably harmed in a multitude of ways if it does not immediately receive its congressionally appropriated funds.  *See* Pl.'s Mem. in Support of Mot. for TRO and Prelim. Inj. at 43–48, ECF 6-1; Pl.'s Reply in Support of Mot. for TRO at 23–29, ECF 11; Pl.'s Mem. in Support of Mot. for Further TRO, ECF 28-1; Pl.'s Reply in Support of Mot. for Further TRO, ECF 34; First Capus Decl.; Second Capus Decl.; Third Capus Decl.; Fourth Capus Decl.; First Landis Decl.; Second Landis Decl.

RFE/RL currently has approximately $15 million of cash on hand.  Fourth Capus Decl. ¶ 20.  If RFE/RL were to maintain normal operations, these funds would run out by the end of May 2025.  *Id.*  To avoid that result, RFE/RL is continuing to furlough staff, halt certain broadcasting and news operations, and sever contracts with its freelance journalists.  *Id.* ¶¶ 21–24.  Because of the lack of April funding, RFE/RL has already furloughed approximately 122 employees, and will need to furlough an additional 166 employees if funding is not restored.  *Id.* ¶ 21.  RFE/RL has also severed contracts with the vast majority of its freelance journalists due to the lack of funding. *Id.*  As RFE/RL has previously explained, RFE/RL will likely be unable to reestablish contact with some of these journalists and freelancers due to the sensitivity of their work.  *See* First Capus Decl. ¶ 32; Second Capus Decl. ¶ 15.  The loss of employment for journalists who depend on RFE/RL for their visas means that some of these journalists may face imminent deportation and return to

their home countries, where they face likely criminal prosecution.  *See* First Capus Decl. ¶ 27; Second Capus Decl. ¶ 9.

Additionally, due to the lack of April funding, RFE/RL has already been forced to halt certain operations, including morning shows produced by the Ukrainian Service; a streaming platform called Votvot for Russian-language cultural content that is censored inside Russia; "Sisterhood," a program for women, "Azattyk+," a program for young viewers, and the "Experts Discuss" debate program, each produced by the Kyrgyz Service; and all podcasts produced by the Moldovan Service.  Fourth Capus Decl. ¶ 24.  Halting these services cuts off news coverage in countries where there may be few, if any, alternative content sources apart from state-controlled media.  First Capus Decl. ¶ 25.  RFE/RL's absence, even temporarily, means that state-controlled or state-influenced media in these countries will fill the gap with coverage that is skewed towards the particular narratives favorable to the local governments, rather than objective reporting.  *Id.* ¶ 34.  That will irrevocably harm RFE/RL's reputation and credibility as an independent news source.  *Id.* ¶ 25.

If RFE/RL's funding is not restored, it will not be able to pay for security services for its journalists, or for security services that protect RFE/RL facilities and staff in a number of countries where RFE/RL journalists have been targeted for attack by terrorist organizations, criminal elements, and governments that are hostile to RFE/RL's reporting.  First Landis Decl. ¶ 17; Second Landis Decl. ¶ 5.  For example, RFE/RL has reduced local guard coverage at RFE/RL's journalistic headquarters in Prague, Czech Republic and closed the main entrance due to security concerns.  Second Landis Decl. ¶ 7.  RFE/RL will not be able to renew its emergency SMS notification system due to the lack of funds.  *Id.* ¶ 12.  RFE/RL will be forced to terminate guard services for its bureau in Yerevan, Armenia, if it does not receive its April funding.  *Id.* ¶ 8.  Further, RFE/RL will be

forced to terminate security and medical services for its Ukrainian news crews if it does not receive its April funding.  *Id.* ¶ 9.  And, without its April funding, RFE/RL will not be able to fund emergency relocation for its journalists that are targeted or threatened in their home countries.  *Id.* ¶ 10.

The lack of April funding has also meant that RFE/RL has been forced to cancel contracts with certain vendors, including contracts for fire and safety inspections, security developer tools, and cloud services backups.  Fourth Capus Decl. ¶ 22.  RFE/RL has cancelled leases in Osh, Kyrgyzstan; Banja Luka, Bosnia and Herzegovina; and Almaty, Kazakhstan; and will have to cancel additional leases if funding does not resume.  *Id.* ¶ 21.  RFE/RL has already missed lease payments in Brussels and was late paying rent in Prague.  *Id.* ¶ 25.  On May 1, RFE/RL has payments due on leases in 24 locations and is in jeopardy of missing or making them late.  *Id.* Absent additional funding, RFE/RL will not be able to make these lease payments.  *Id.*  Therefore, absent immediate disbursement of its April funds, RFE/RL will likely need to close the vast majority of its operations over the next few weeks.  *Id.* ¶ 28.  As this Court has recognized, "[w]hile ordinary economic injuries are usually insufficient to require injunctive relief, financial harm can 'constitute irreparable harm … where the loss threatens the very existence of the movant's business.'"  ECF 14 at 7 (quoting *Climate United Fund, N.A.*, 2025 WL 842360, at *10).

RFE/RL cannot forestall this irreparable harm by signing the current Master Grant Agreement.  Fourth Capus Decl. ¶ 4; *see also id.* ¶¶ 5–18.  As RFE/RL has explained, if RFE/RL signed the Grant Agreement, it would promptly be in material breach of numerous unreasonable and unworkable terms and USAGM would terminate the grant, putting RFE/RL in the same position it is in now without a signed agreement.  *See* ECF 28-1 at 7; *supra* § I.B.3.  That presents RFE/RL with a false choice: sign the agreement and lose all funding soon thereafter, or refuse to

sign the agreement and remain without funding. Either way, RFE/RL suffers the irreparable harm of having to shutter its operations because USAGM refuses to disburse its congressionally appropriated funding. *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017) ("forcing the City either to decline the grant funds based on what it believes to be unconstitutional conditions or accept them and face an irreparable harm, is the type of 'Hobson's choice' that supports irreparable harm"); *City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 657 (E.D. Pa. 2017) (similar); *City of Los Angeles v. Sessions*, 2018 WL 6071072, at *3 (C.D. Cal. Sept. 13, 2018) (similar).

And, as described above, RFE/RL's attempts to negotiate with USAGM have been unsuccessful. In any event, even assuming that USAGM is engaging in good-faith negotiations and that those negotiations continue (an assumption contrary to the record), RFE/RL would still suffer these irreparable harms while negotiations took place, which could take months. RFE/RL needs access to its congressionally appropriated funding now in order to remain in operation while any negotiations take place.

## III.    The Balance of Equities and Public Interest Favor RFE/RL.

The final two factors—the balance of the equities and the public interest—"merge when the Government is the opposing party." *Am. Ass'n of Pol. Consultants*, 613 F. Supp. 3d at 365 (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Here, these factors weigh strongly in favor of a preliminary injunction.

*First*, "[t]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" Order Granting TRO at 8, ECF 14 (quoting *League of Women Voters of the U.S v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation omitted)). *Second*, as the Court has explained, "the continued operation of RFE/RL," "in keeping with Congress's longstanding determination," is in the public interest. *Id.* at 9. *See* Third Capus

Decl. ¶ 2 (RFE/RL is in a substantially similar financial position as it was at the time RFE/RL first moved for relief from the Court in March 2025).

## CONCLUSION

For the reasons set forth herein, this Court should grant the motion for a preliminary injunction.[14]

April 22, 2025                                Respectfully submitted,

                                             /s/ Marney L. Cheek
                                             Marney L. Cheek (D.C. Bar No. 470596)
                                             David M. Zionts (D.C. Bar No. 1013523)
                                             Thomas Brugato (D.C. Bar No. 995170)
                                             COVINGTON & BURLING LLP
                                             850 Tenth Street NW
                                             Washington, DC 20001-4956
                                             (202) 662-6000
                                             mcheek@cov.com
                                             dzionts@cov.com
                                             tbrugato@cov.com

                                             *Attorneys for Plaintiff RFE/RL, Inc.*

---

[14] For the reasons this Court has explained, a bond should not be required. *Widakuswara*, ECF 99 at 35–36.

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2025, I filed the foregoing document and all attachments with the Clerk of Court for the United States District Court for the District of Columbia using the court's CM/ECF filing system, which will send notification of such filing via e-mail to all counsel of record.

Respectfully submitted,

/s/ Marney L. Cheek
Marney L. Cheek (D.C. Bar No. 470596)
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001-4956
(202) 662-6000
mcheek@cov.com

*Attorney for Plaintiff RFE/RL, Inc.*