## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **RFE/RL, INC.,** | |
| *Plaintiff,* | |
| **v.** | **Case No. 1:25-cv-799-RCL** |
| **KARI LAKE**, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media, *et al.*, | |
| *Defendants.* | |

## <u>MEMORANDUM ORDER</u>

Before the Court is Plaintiff RFE/RL's Motion for a Temporary Restraining Order (TRO)[1] seeking to enjoin the defendants, the U.S. Agency for Global Media (USAGM) and the acting leadership of the agency, to immediately disburse $12,178,590 in congressionally appropriated funds to cover RFE/RL's expenditures for the month of April 2025. For the reasons contained herein, the Motion is **GRANTED**.

## I.     BACKGROUND

Plaintiff RFE/RL, Inc., commonly known as Radio Free Europe/Radio Liberty, is a nonprofit news organization that provides reporting to twenty-three countries across Europe, Central and South Asia, and the Middle East. RFE/RL is funded almost entirely by congressional appropriations, which are disbursed from USAGM via grant agreements. *See RFE/RL, Inc. v. Lake*, No. 25-cv-799-RCL, 2025 WL 900481, at *1 (D.D.C. Mar. 25, 2025) (detailing the history

---

[1] In this lawsuit, RFE/RL has moved for two forms of preliminary relief: 1) a TRO, which is the motion at issue in the instant Order, and 2) a preliminary injunction (PI), which would order the defendants to effectuate a grant agreement with RFE/RL to disburse congressionally appropriated funds through September 30, 2025. *See* Mot. for TRO, ECF No. 28; Mot. for PI, ECF No. 41. With this Order, the Court only addresses the TRO Motion, while it takes the PI Motion under advisement.

of RFE/RL's funding by the United States government).  Because the has already discussed the

history of RFE/RL in some detail, *see id.*, the Court here adds only as much additional background

information as is essential for purposes of the pending TRO motion.

### A.  Typical Grantmaking Process between RFE/RL and USAGM

The United States International Broadcasting Act of 1994 (the "International Broadcasting

Act") provides that "[g]rants authorized under section [6204 of this title] for RFE/RL,

Incorporated, shall be available to make annual grants" for RFE/RL's operations.  22 U.S.C.

§ 6207(f).  To that end, every year, RFE/RL and USAGM enter into a Master Grant Agreement to

facilitate the disbursement of congressional appropriations.  Fourth Declaration of Stephan Capus,

President and CEO of RFE/RL ("Fourth Capus Decl.") ¶ 2, ECF No. 41-2.  Until the events at the

center of this lawsuit, RFE/RL and USAGM had been operating based off of a version of the

Master Grant Agreement dating back to 2011.  *Id.*  During typical annual grant negotiations, over

the course of a couple weeks, RFE/RL and USAGM will discuss and implement "minor" changes

to incorporate into that year's grant agreement.[2]  *Id.*  The Master Grant Agreement will typically

include, as an attachment, RFE/RL's Approved Financial Plan summarizing RFE/RL's planned

monthly spending.  *Id.* ¶ 3.  Normally, RFE/RL receives its monthly funding from USAGM at the

beginning of each month.  *Id.* ¶ 19.

### B.  Congressional Appropriations for FY 2025

In the 2024 Appropriations Act, Congress appropriated $857 million to USAGM for Fiscal

Year (FY) 2024 and mandated how those funds "shall be allocated" pursuant to an "explanatory

statement."  Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I,

---

[2] For example, the FY 2025 Master Grant Agreement signed by RFE/RL in February 2025 changed the frequency of certain required reports from "monthly" to "quarterly."  Fourth Capus Decl. ¶ 2.

138 Stat. 460, 735 (2024) (requiring funds to be allocated in accordance with a table in "the explanatory statement" described in section 4"). The explanatory statement sets forth a table, which earmarks $142.2 million for RFE/RL for FY 2024. Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024) (providing table designating how funds appropriated for international broadcasting "are allocated"). USAGM has limited discretion to "reprogram" a small fraction of these funds among different programs, but only if it gives the House and Senate Appropriations Committees fifteen days' advance notice. 2024 Appropriations Act, div. F, tit. I, 138 Stat. 735; *see* 170 Cong. Rec. at H2087. And in no event may any reprogramming reduce funding for a program by more than five percent of what Congress designated. *Id.*

In three continuing resolutions collectively covering FY 2025, Congress funded USAGM at the same levels, and subject to the same conditions, as it funded USAGM in FY 2024. *See* Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, div. A, § 101(11), 138 Stat. 1524–25 (2024) ("First Continuing Resolution") (appropriating funds as provided in certain FY 2024 appropriations laws and making them available through December 20, 2024); American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024) ("Second Continuing Resolution") (extending funding through March 14, 2025); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101 (2025) ("Third Continuing Resolution") (extending funding through September 30, 2025). As is relevant here, with the passage of the Third Continuing Resolution, signed into law on March 15, 2025, Congress appropriated approximately $77 million for RFE/RL through September 30, 2025. First Declaration of Stephen Capus, President and CEO of RFE/RL ("First Capus Decl.") ¶ 20, ECF No. 6-3.

### C.  Factual and Procedural History

The last fully executed full-year Master Grant Agreement between RFE/RL and USAGM is the FY 2024 Master Grant Agreement.  *See* Declaration of Joseph Lataille, Chief Financial Officer of RFE/RL ("First Lataille Decl.") ¶ 3, ECF 33-1.  Following the passage of the First Continuing Resolution extending FY 2024 appropriations through December 20, 2024, USAGM executed a preliminary grant agreement for RFE/RL that extended the terms and conditions of the FY 2024 Master Grant Agreement.  *Id.*  ¶ 4.  And following the passage of the Second Continuing Resolution appropriating funds through March 14, 2025, USAGM executed another preliminary grant agreement under those same terms, obligating funds to RFE/RL through February 28, 2025.[3]  *Id.* ¶ 5.

On February 14, 2025, USAGM began the usual process for executing a new Master Grant Agreement for the fiscal year by sending RFE/RL a draft FY 2025 Master Grant Agreement.  *Id.* ¶ 6.  Over the next week, RFE/RL and USAGM negotiated revisions to the agreement to cover funding appropriated to RFE/RL through September 30, 2025—the end of FY 2025.  *Id.*  On February 27, 2025, USAGM sent a final version of the grant agreement to RFE/RL and requested a "signed version of this Master Grant Agreement at your earliest convenience."  *Id.*  RFE/RL responded with the signed grant agreement that same day.  *Id.*  USAGM confirmed receipt of the signed agreement the next day, stating that there were no "issues with countersigning the grant agreement."  *Id.*  But despite this representation, USAGM never returned the countersigned grant agreement to RFE/RL and provided no explanation for not doing so.  *Id.* ¶ 7.

---

[3] In this preliminary grant agreement, USAGM did not at first obligate the March 1–14, 2025, funds.  Throughout December 2024, USAGM informed RFE/RL that the reason for not obligating the funds was a policy of not providing partial-month payments to grantees.  Compl. ¶ 32.  RFE/RL was therefore under the impression that it would receive funds for March 1–14 in the next grant agreement.

Then, on March 14, 2025, President Trump announced Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," which orders the elimination of "non-statutory components and functions" of USAGM "to the maximum extent consistent with the applicable law." Exec. Order 14238 (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/. The next day, on March 15, RFE/RL received a letter from USAGM terminating RFE/RL's grant agreements, stating that RFE/RL "no longer effectuates agency priorities" and citing the President's Executive Order directing that USAGM eliminate all "non-statutorily required" activities and functions.

RFE/RL filed its Complaint on March 18 and moved for preliminary injunctive relief the next day—specifically, RFE/RL sought a TRO for disbursement of funds for the March 1–15 period of performance, and a PI ordering USAGM to effectuate further grant agreements with RFE/RL to disburse the funds that Congress had appropriated through September 30, 2025. On March 24, just hours before a scheduled hearing on the TRO motion, USAGM disbursed RFE/RL's funds to cover the March 1–15 grant period, but the Court still granted RFE/RL's TRO to enjoin enforcement of the termination letter's command that RFE/RL initiate "close-out" procedures. *See RFE/RL*, 2025 WL 900481, at *2–5.

On March 26, the day after the Court issued its TRO, USAGM rescinded the termination letter. Notice of Withdrawal of Grant Termination, ECF No. 15. The grant was therefore "back in effect," according to USAGM. *Id.* On March 27, RFE/RL sent a funding request to USAGM requesting the remaining congressionally appropriated funds for March 15–31, as well as for April 2025. First Lataille Decl. ¶ 9. On April 3, 2025, USAGM responded by sending a short grant agreement to cover funding only for March 15–31, incorporating the the terms and conditions of

the FY 2024 Grant Agreement. *Id.* RFE/RL signed this agreement and received its appropriated funds for that period on April 8, 2025. *Id.* ¶ 12.

However, RFE/RL has still not received any funds for April 2025 or the rest of the fiscal year. Following a status conference, on April 9, 2025, USAGM sent an email to RFE/RL attaching the "RFE/RL FY-25 Master Grant Agreement." *Id.* ¶ 13. This new agreement "contains numerous new terms and conditions that RFE/RL had never seen before in any grant agreement with USAGM." *Id.* Upon receipt of this email, RFE/RL moved for a TRO, seeking immediate disbursement of congressionally appropriated funds for the period from April 1 to April 30, 2025, totaling $12,178,590. *See* Mot. for TRO, ECF No. 28. RFE/RL argues that it will soon be forced to shut down without access to its April funds, and that the proposed FY 25 grant agreement from USAGM is unreasonable and a pretext for denying RFE/RL its congressional appropriations. The defendants filed an Opposition to that Motion, *see* Resp. to Mot. for TRO ("TRO Opp'n"), ECF No. 32, and RFE/RL filed a Reply, ECF No. 34.

After holding another status conference on April 15, 2025, the Court declined to act on the pending TRO motion because negotiations over the new grant agreement were still ostensibly underway. Since that time, the Court has granted a preliminary injunction in a related case. *See Widakuswara v. Lake*, __ F. Supp. 3d. __, No. 25-cv-1015-RCL, 2025 WL 1166400 (D.D.C. Apr. 22, 2025). There, the Court ordered USAGM to restore the FY 2025 grants with USAGM Networks Radio Free Asia and Middle East Broadcasting Networks, but denied relief as to RFE/RL given the ongoing nature of the negotiations between the parties. *Id.* at *18; *see id.* at *12 n.23 ("[A]t this juncture, in the midst of negotiations, court intervention would be premature."). However, the Court opined that "delayed, broken down grant negotiations and

indefinite withholding of congressionally appropriated funds, with a statutorily created entity on the brink of collapse, creates a scenario begging for APA review." *Id.* at *12 n.23.

On April 22, RFE/RL filed a Motion for a Preliminary Injunction, seeking an order for the defendants to commit to funding RFE/RL through September 30, 2025 via a grant agreement. *See* Mot. for PI, ECF No. 41. In its Motion, RFE/RL revisits its prior TRO Motion by observing that USAGM has "ignored RFE/RL's repeated requests for a short extension to their existing agreement, like the 'mini agreement' Defendants proposed and RFE/RL agreed to for March . . . [which is] alone sufficient reason for this Court to promptly enter a TRO concerning April funds while the Court considers a preliminary injunction." *Id.* at 2. The Court held a hearing on RFE/RL's pending motions on April 28, 2025, at which both parties presented argument. At this juncture, with only one full day left in April, the Court now addresses RFE/RL's TRO motion for the immediate disbursement of April appropriations.

## II.    Legal Standard

A TRO should be granted if the movant meets its burden to show that 1) the movant is likely to succeed on the merits; 2) the movant is likely to suffer irreparable harm unless preliminary relief is granted; 3) the balance of the equities favors a TRO or preliminary injunction; and 4) a TRO is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in this Circuit have adopted a sliding scale approach to the TRO analysis, whereby a relatively strong showing on one of these factors may partially offset weakness in another, although some non-speculative showing of irreparable harm is essential. *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Where, as here, the government is a party, the latter two factors of the preliminary analysis merge into one, because the interest of the government is taken to be identical to the interest of the public. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### III.    DISCUSSION

### A.  The Court Has Jurisdiction to Entertain the TRO Request

The defendants argue that the Tucker Act, 28 U.S.C. § 1491(a)(1), is a jurisdictional bar to RFE/RL's claim.  TRO Opp'n at 9–13.  The Court has addressed this issue already in a related lawsuit, *see Widakuswara*, 2025 WL 1166400, at *9, but for the sake of comprehensiveness, will reproduce the relevant portions of the Court's reasoning here.

The Tucker Act mandates that suits to receive money damages for the government's alleged breach of contract must be heard in the Court of Federal Claims.  But a claim against the federal government falls within the exclusive jurisdiction of the Claims Court only if the claim is "at its essence" a contract claim.  *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022).  "Whether a claim is 'at its essence' contractual for the Tucker Act 'depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate).'"  *Id.* (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)).

Here, the Tucker Act does not divest this Court of jurisdiction because the source of RFE/RL's rights is not rooted in any grant agreement with USAGM, but rather, two statutory schemes: the International Broadcasting Act and the continuing resolutions to the 2024 Consolidated Appropriations Act.  The International Broadcasting Act instructs USAGM to provide grants on an annual basis to RFE/RL as a vehicle for dispensing congressionally appropriated funds.  And in the Consolidated Appropriations Act of 2024, Congress appropriated funds for RFE/RL—indeed, listing RFE/RL by name—allocating over $142 million in funding for that fiscal year.  Mot. for TRO at 7.  Congress has renewed RFE/RL's funding under those same conditions three times, most recently in the Third Continuing Resolution, appropriating funds through September 30, 2025.  In total, Congress appropriated approximately $77 million to

RFE/RL for performance between March 15, 2025 and September 30, 2025. But to date, USAGM has only dispensed $2.8 million to cover the period from March 15–31, 2025—withholding the $12 million that covers the period from April 1 to April 30, 2025. In so doing, USAGM is denying RFE/RL a significant sum of congressional appropriations that it is entitled to receive. The existence (or, in this case, non-existence) of a grant agreement between USAGM and RFE/RL is incidental to RFE/RL's claims—a grant is involved only as a vehicle to distribute congressionally appropriated funds because Congress requires USAGM to transmit funds to RFE/RL that way. *See Widakuswara*, 2025 WL 1166400, at *9. RFE/RL's entitlement to the funds, in other words, does not depend principally on the grant agreement.

The type of relief RFE/RL seeks is also not contractual in nature. RFE/RL is not seeking money damages; RFE/RL is seeking access to its congressionally appropriated funds. That is a request for specific relief based on the defendants' violation of federal statutes. The Supreme Court has recognized this distinction in no uncertain terms: "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). And seeking disbursement of congressionally mandated appropriations is a well-recognized example of this distinction in action. *See*, *e.g.*, *Md. Dep't of Hum. Res. v. Dep't of Health and Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) ("[Plaintiff] is seeking funds to which a statute allegedly entitles it, rather than money in compensation for the losses, whatever they may be, that [Plaintiff] will suffer or has suffered by virtue of the withholding of those funds."); *Nat'l Ctr. for Mfg. Scis. v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997) (concluding that "[the plaintiff's] demand for the release of the remaining funds referred to in the Appropriations Act is not a demand for 'money damages,'" and holding that the district court had jurisdiction to conduct APA review of the

plaintiff's claims).  Neither can it be fairly said that RFE/RL is seeking the contractual remedy of specific performance, because there *is no existing contract* for the disbursement of April funds. *See, e.g.*, *Brach v. United States*, 443 F. App'x 543, 546 (Fed. Cir. 2011) ("To invoke the court's jurisdiction" a plaintiff must "allege the existence of a contract as a basis for relief.").[4]  In other words, RFE/RL is claiming that the defendants are violating the APA by refusing to enter into a lawful and reasonable grant agreement to disburse April congressional appropriations.  The Court therefore finds that the Tucker Act does not pose a jurisdictional bar to this claim and will proceed to the merits of RFE/RL's claim.

### B.  RFE/RL Has Established a Likelihood of Success on the Merits of Its APA Claim

#### i.       Final Agency Action

The APA permits judicial review of "final agency action."  5 U.S.C. § 704.  To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177– 78 (1997).  Courts are to interpret the finality requirement in a "flexible" and "pragmatic" way. *Ciba-Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 435 (D.C. Cir. 1986).  In that vein, "[a]t some point administrative delay amounts to a refusal to act, with sufficient finality and ripeness to permit judicial review." *Env't Def. Fund, Inc. v. Hardin*, 428 F.2d 1093, 1100 (D.C. Cir. 1970).  Here, the final agency action that RFE/RL challenges is USAGM's refusal to enter a one-month extension of the prior grant agreement as a vehicle to disburse $12 million in congressionally appropriated funds to RFE/RL for April 1–30, 2025.

---

[4] Even if RFE/RL's requested remedy could be construed as one for specific performance (of an expired contract), courts are not "forbidden from granting injunctive relief merely because that relief might be the equivalent of ordering specific performance of a government contract." *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 611 (D.C. Cir. 1992).

The Court concludes this is a "final" agency action. Regarding the first *Bennett* factor, whether this action marks the "consummation" of USAGM's decisionmaking process, the record shows that USAGM has not once responded to RFE/RL's numerous inquiries about a one-month extension. Shortly after the Court's April 15 status conference, RFE/RL emailed USAGM asking for a one-month extension of the previous grant terms—like the one that USAGM had agreed to in order to disburse the March funds—given the urgency of receiving April funding. Mot. for PI at 9 (citing Second Lataille Decl. Ex. 1). USAGM ignored RFE/RL's request for a one-month extension, and responded only to the other parts of RFE/RL's email. *Id.* at 10. On April 16, RFE/RL expressed its understanding to USAGM that this amounted to a rejection of RFE/RL's request to enter into a "mini-agreement" for the April 2025 funds. *Id.* USAGM has still not responded to that communication. Second Lataille Decl. ¶ 2. At this Court's April 28, 2025 hearing, though RFE/RL brought up their request for a one-month extension several times (and the Court also conveyed its "understanding . . . that the defendant has refused to enter into a one-month extension agreement and has not disbursed the $12 million for April," *see* Tr. 3:15–19, ECF No. 47), the defendants did not directly engage with this issue, and instead argued that there is no final agency action to review. Tr. 26:25–27:4; 27:23–28:1; 30:19–31:2.

But the defendants fail to grapple with a crucial point: "[W]hen administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." *Hardin*, 428 F.2d at 1099. Such is the case here. Given the defendants' repeated refusal to engage with RFE/RL's request for a one-month extension, the Court comfortably interprets the defendants' action here as a denial of RFE/RL's request. By remaining silent, USAGM urges this Court to conclude that reconsideration is a possibility after further

negotiations—but turning a blind eye to the defendants' delay tactics would be a naïve conclusion, allowing the agency to indefinitely evade judicial review. The Court will instead apply this Circuit's "pragmatic" approach to finality and conclude that the apparent stonewalling from the defendants renders their decision here, to refuse an April extension, the "consummation" of the agency's decisionmaking process on the matter. *Ciba-Geigy,* 801 F.2d at 435; *Bennett*, 520 U.S. at 178.

The second *Bennett* factor is straightforward—USAGM's final decision to deny RFE/RL's request for a one-month "mini-agreement" for April constitutes a determination of "rights or obligations" because it results in the withholding of RFE/RL's congressionally appropriated funds for the month of April—an amount that, in the usual course of events, would have been disbursed at the end of March. As a consequence, RFE/RL faces a reality in which it will soon be forced to miss lease payments, furlough almost two-hundred additional employees, and shutter security defenses and other critical infrastructure—outcomes that the Court details further in Section III.C, *infra*. The Court therefore concludes that USAGM's decision to refuse a one-month mini-agreement to disburse RFE/RL's congressionally appropriated funds for April is a final agency action subject to judicial review.

### ii.    Arbitrary and Capricious

The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). An agency has a duty to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quoting *State Farm*, 463 U.S. at 43).

Here, the defendants have provided no explanation for their refusal to enter into a "mini-agreement" to disburse April funds, other than arguing in their opposition that RFE/RL "has no legal claim to the April funds it seeks" because there is no grant agreement in place and no approved April financial plan. PI Opp'n at 13, ECF No. 44. But this argument "entirely fail[s] to consider an important aspect of the problem": Congress has specifically appropriated funds to RFE/RL for the fiscal year, which gives RFE/RL a legal claim to the April funds.[5] The fact that there is no grant agreement in place is the very issue about which RFE/RL complains: that USAGM is using the absence of a grant agreement as a shield to prevent the disbursement of congressional appropriations. And the defendants appear to have no intention of disbursing RFE/RL's April appropriations unless RFE/RL signs the latest version of the FY 2025 Master Grant Agreement. *See*, *e.g.*, Tr. 30:23–25 ("If [RFE/RL] signed [USAGM's latest] grant agreement this afternoon, then the agency would begin the process of disbursing those funds"). But this is not a viable course of action for RFE/RL, because the current version of the grant agreement that USAGM has

---

[5] Though the defendants do not make this argument, the Court addresses it for the sake of comprehensiveness: there can be no reasonable dispute that RFE/RL has a legal claim to funds *on a monthly basis*. In other words, even if the defendants represented that they intend to disburse all congressionally appropriated funds before September 30, 2025 (a representation that they do not make), RFE/RL would still be entitled to the TRO relief here to ensure that disbursement is timely. In *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, the agency attempted to make the argument that "reliance interests only apply to the *receipt* of funds but not the *timing* of when they are received." No. 25-cv-239-LLA, 2025 WL 368852, at *11 n.8 (D.D.C. Feb. 3, 2025). The court rejected this argument because "having federal funds arrive on time and as scheduled is vital" to make payroll, afford rent, etc.—and it "defies logic" to ignore this reality. *Id.* This Court agrees—surely, when Congress enacted the relevant appropriations statutes here, it did not intend for a loophole in which the appropriations can be withheld until the receiving entity is forced out of existence.

presented contains provisions to which RFE/RL cannot lawfully or practically assent. For example, it includes a provision that would allow USAGM to determine the membership of RFE/RL's Board—an authority that Congress specifically repealed. *See* National Defense Authorization Act for Fiscal Year 2023, Pub. L. 117-263, 136 Stat 2395, 3915 (2022). In short, RFE/RL cannot sign the agreement in its current form. Against this backdrop, where RFE/RL has been appropriated funds by Congress, typically disbursed on a monthly basis, and USAGM has radically changed the grant agreement that governs the disbursement of those funds—well after the fiscal year has already begun—it is arbitrary and capricious for USAGM to refuse to enter a one-month funding extension to obligate RFE/RL's April appropriations.

Moreover, USAGM refused to enter into a bridge agreement without any apparent consideration of the reliance interests at stake. "When an agency changes course, as [USAGM] did here, it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). Here, RFE/RL has, for decades, relied on timely, monthly disbursement of its congressionally appropriated funds from USAGM. And since 2011, USAGM and RFE/RL have been operating off of the same version of a master grant agreement. Working off of this template, the parties fully negotiated a FY 2025 Master Grant Agreement back in February, which USAGM told RFE/RL to sign but which USAGM never countersigned thereafter. Then, USAGM abruptly changed course. USAGM presented a radically different grant agreement in the middle of April, with hardly any time for a meaningful negotiation to take place since RFE/RL is up against the clock as its funding quickly runs out. By refusing to enter into a one-month extension to keep RFE/RL afloat, in the

midst of this unprecedented course of action, USAGM has failed to consider RFE/RL's reliance interests, rendering its action arbitrary and capricious.

It appears to the Court, based on the defendants' unexplained refusal to throw RFE/RL a lifeline while negotiations could meaningfully take place, the defendants are trying to strongarm RFE/RL into signing their latest version of the Master Grant Agreement. *See*, *e.g.*, Tr. 18:9–16 (insisting that RFE/RL "has the ability to put an end to any irreparable harm it alleges at any point" by signing USAGM's latest grant agreement). This course of action upends the longstanding relationship between the parties and disregards RFE/RL's significant reliance interests, sounding the death knell for RFE/RL—a 75-year-old, statutorily created, congressionally funded entity. The Court concludes that this action is, at the very least, arbitrary and capricious.

### C. The Remaining TRO Factors Favor RFE/RL

The remaining three TRO factors are: whether the movant is likely to suffer irreparable harm; whether the balance of the equities favors a TRO; and whether a TRO is in the public interest. *Winter*, 555 U.S. at 20.

To demonstrate irreparable harm, the moving party must satisfy two requirements. "First, the harm must be 'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (alteration in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "Second, the harm 'must be beyond remediation.'" *Id.* at 8 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).

Here, RFE/RL receives 99% of its funding from its annual congressional appropriations. First Capus Decl. ¶ 12. "While ordinary economic injuries are usually insufficient to require injunctive relief, financial harm can "constitute irreparable harm . . . where the loss threatens the

very existence of the movant's business." *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698-TSC, 2025 WL 842360, at *10 (D.D.C. Mar. 18, 2025) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  Because of USAGM's refusal to disburse the April appropriations, RFE/RL has already begun the process of winding down its operations.  RFE/RL has terminated nearly all of its contracts with freelance journalists, missed payments on leases, and furloughed 122 employees—and without access to its April funding, RFE/RL will begin the process of furloughing additional employees and canceling remaining contracts starting on May 1.  Mot. for PI at 2.  An organization can only survive so many rounds of missed payments, broken contracts, and lost employees before it is gone for good; RFE/RL need not wait until it has crossed that threshold to be deserving of preliminary injunctive relief.

Additionally, RFE/RL currently stores the majority of its content on unarchived, external platforms or on leased servers, and losing funding means that RFE/RL will no longer be able to maintain these platforms, eliminating these records forever.  First Capus Decl. ¶ 33.  RFE/RL will also "be forced to shutter its cyber defenses" if it loses funding, which "virtually guarantees that cyber attackers will gain access to sensitive RFE/RL systems."  First Mot. for TRO, ECF No. 6 at 36; *see All. for Retired Ams. v. Bessent*, No. 25-cv-0313-CKK, 2025 WL 740401, at *22 (D.D.C. Mar. 7, 2025) (plaintiffs may show irreparable harm by "demonstrating that such a [data] breach or improper disclosure is likely in the absence of an injunction" (internal quotation marks omitted)).  The lack of April funding has also meant that RFE/RL has been forced to cancel contracts with certain vendors, including contracts for fire and safety inspections, security developer tools, and cloud services backups.  Fourth Capus Decl. ¶ 22.  Furthermore, RFE/RL will soon be forced to cancel security services that protect RFE/RL facilities and staff in a number of countries where RFE/RL journalists have been targeted by terrorist organizations, criminal

elements, and governments that are hostile to RFE/RL's reporting.  Mot. for PI at 40 (citing First Declaration of James Landis, Head of Corporate Security of RFE/RL ("First Landis Decl.") ¶ 17, ECF No. 6-4; Second Declaration of James Landis ("Second Landis Decl.") ¶ 5, ECF No. 41-4).

Based on this significant and comprehensive showing of harm amounting to a complete gutting of RFE/RL's infrastructure, the Court concludes that RFE/RL has demonstrated likely irreparable harm by showing that the defendants' actions "threaten the very existence of [the] business," *Wis. Gas Co.,* 758 F.2d at 674, and the "obstacles" created by defendants' conduct "make it more difficult for the [plaintiffs] to accomplish their primary mission." *Newby*, 838 F.3d at 9.

Regarding the final two TRO factors, the balance of the equities and the public interest favor RFE/RL.  These factors "merge when the government is the opposing party." *Am. Ass'n of Pol. Consultants*, 613 F. Supp. 3d at 365 (quoting *Nken*, 556 U.S. at 435).  The Court has explained that RFE/RL is likely to succeed on the merits of its APA claim, and "[t]here is generally no public interest in the perpetuation of unlawful agency action"—here, the refusal to disburse over $12 million in congressionally appropriated funds for the month of April.  *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021) (quoting *Newby*, 838 F.3d at 12).  "There is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (citation omitted).  And furthermore, Congress has enshrined into law that "[i]t is in the interest of the United States to support broadcasting to other nations," and for the last seventy-five years has specifically identified RFE/RL as the entity through which the United States will carry out this mission.  International Broadcasting Act, 22 U.S.C. § 6201(3).

Our Constitution provides that laws are enacted by the Congress and enforced by the Executive. When money has been appropriated by Congress, "the Executive has no residual constitutional power to refuse to spend these appropriations." *Guadamuz v. Ash*, 368 F. Supp. 1233, 1243–44 (D.D.C. 1973). The Court finds that all four TRO factors weigh in favor of granting RFE/RL's requested relief.

### D. The Court Will Neither Impose Bond nor Order a Stay Pending Appeal

Because RFE/RL is seeking the payment of a particular sum, i.e. $12,178,590, the defendants ask the Court to order the posting of a bond equal to that size. TRO Opp'n at 20–21. However, "where the defendants are already constitutionally required to distribute funds in accordance with the yearly appropriations bill . . . a bond would merely impose a financial barrier to litigation for plaintiffs seeking to vindicate their statutory and constitutional rights." *Widakuswara*. 2025 WL 1166400, at *17. For the same reasons articulated in *Widakuswara*, the Court declines to impose bond here.

The Court also will not stay this order pending appeal as the defendants request in their opposition, because a stay would defeat the purpose of the Court's relief. It is now the end of April and RFE/RL has received none of its appropriated funds for the month. A stay pending appeal would exacerbate the irreparable harms detailed in Section III.C, *supra*.

### IV. CONCLUSION

As a parting word on this matter, the Court sees fit to briefly address some ideas and tropes that have been percolating in the national media for the last few months. In interviews, podcasts, and op-eds, people from both inside and outside government have variously accused the courts—myself included—of fomenting a constitutional crisis, usurping the Article II powers of the Presidency, undercutting the popular will, or dictating how Executive agencies can and should be

run. The subtext, if not the headline, of these accusations is that federal judges are motivated by personal political agendas. Of course, the media zeitgeist does not—and must not—influence my view of the law, and plays no role in any decision I make as a judge. However, these circulating notions reflect a fundamental misunderstanding of the role of the federal judiciary, and indeed of the Constitution itself. So the Court will take this opportunity to clear up some of the misconceptions that are now unfortunately permeating the national mediascape.

For all of the ubiquitous commentary pitting the federal judiciary against the Presidency, the first branch of government—Congress—is often conspicuously absent from these conversations. It is, after all, *Congress* that makes the laws in this country. In this case, for example, it was *Congress* who ordained that the monies at issue should be allocated to RFE/RL.

Congress, however, does not make the law by itself. The Constitution provides that, for a bill to become law, it must be signed by the President.[6] On March 15, 2025, in accordance with this constitutional design, President Trump signed the very continuing resolution that allocated the funds discussed herein to RFE/RL, as well as Voice of America and the network grantees named in the related *Widakuswara* case. In other words, the Court did not make the law at the center of these disputes; the people's duly elected representatives, in the legislature and the Oval Office, did that.

What, then, is the Court's proper role in our constitutional system? Certainly it is not to dictate how best to run the Executive Branch or to subvert the country's political processes. Although I have, in the past, praised the work of Voice of America and RFE/RL, I have no personal stake in the outcome of this case or any of the related cases. Nor do I have any opinion about how, as a matter of policy, USAGM should be run in the future—or even if it should continue to exist

---

[6] Or else the President's veto must be overridden by a two-thirds supermajority in each house of Congress.

at all, in light of all the competing demands for taxpayer funding of important programs. I also have no animosity whatsoever toward this administration or the President, and no loyalty to the plaintiffs. Indeed, even if I had private sentiments about this dispute or the parties to it, I would not let those sentiments cloud my view of the law; when President Reagan nominated me to this bench in 1987 and the Senate unanimously confirmed my nomination, I swore that I would discharge my duties "without respect to persons . . . faithfully and impartially . . . under the Constitution and laws of the United States." I am governed by that oath every day. I am not a political actor, and I have no agenda to press. I believe that the same is true of my colleagues on the federal bench.

The role of the courts is something far more circumscribed: We interpret the laws and the Constitution and declare what the law is, and we do so *only* when the people or the government call upon us to do so. We rely on the good faith, cooperation, and trust of the government and the American people to give effect to our interpretations. Indeed, we could not do otherwise: When our Founding Fathers set about convincing the American people to ratify the Constitution, they pitched the federal judiciary as the branch "least dangerous to the political rights of the Constitution[.]" The Federalist No. 78 (Alexander Hamilton). The federal judiciary has no army and no police, lacks the power of the purse, and employs a workforce less than 1% the size of the Executive Branch.[7] We have no constitutional authorization to legislate, a task assigned to Congress; nor do we have the right or even the means to independently enforce the laws, functions that are solemnly entrusted to the Executive.

---

[7] *Compare* U.S. Courts Annual Report 2021, https://www.uscourts.gov/data-news/reports/annual-reports/directors-annual-report/annual-report-2021#:~:text=Throughout%2C%20we%20also%20stayed%20on,all%20of%20our%2030%2C000%20employemp., *with* The Executive Branch, https://www.whitehouse.gov/government/executive-branch/.

This Opinion, and the related one in *Widakuswara*, reflect my best and most sincere efforts to fulfill my constitutional duty to dispassionately apply the law, as I understand it, to the set of facts the parties have placed before me.  In short: The current Congress and President Trump enacted a law allocating funds to the plaintiffs.  Under the Administrative Procedure Act, actors within the Executive Branch do not have carte blanche to unilaterally change course, withhold funds that the President and the Legislature jointly agreed to spend, and functionally dismantle an agency that the President and Legislature jointly agreed to support.  If the Executive wishes to withhold or reallocate these funds, there is a statutory rescission process in place for them to seek the approval of Congress to do so.  This process assures that the will of the people, expressed through their elected representatives, is borne out.  But the defendants have not followed that process here.  As I see it, if the defendants are aggrieved by these decisions, their problem is not with the Court, but with Congress and the President, and it is with them that the defendants should seek redress.

Reasonable people can reach different conclusions in complicated legal disputes such as this.  That is why we have the Courts of Appeals and the Supreme Court: to hear challenges to judicial decisions, and reverse them if they go astray.  It is also why we have Congress, which—except where the Constitution itself commands otherwise—is free to change the law after a court has ruled.

 "[T]he great security against a gradual concentration of the several powers in the same department, consists in giving to those who administer each department the necessary constitutional means . . . to resist encroachments of the others . . . ."  The Federalist No. 51 (James Madison).  By enjoining the defendants' efforts to dismantle the plaintiff networks, actions which I perceive to be contrary to the law, I am humbly fulfilling my small part in this very constitutional

paradigm—a framework that has propelled the United States to heights of greatness, liberty and prosperity unparalleled in the history of the world for nearly 250 years. If our nation is to thrive for another 250 years, each co-equal branch of government must be willing to courageously exert the authority entrusted to it by our Founders.

Therefore, upon consideration of the plaintiff's Motion [ECF No. 28] for a Temporary Restraining Order, the defendants' Opposition thereto, the plaintiff's Reply, and the entire record herein, it is hereby

**ORDERED** that the plaintiff's Motion for a Temporary Restraining Order is **GRANTED**; and it is further

**ORDERED** that Defendants are enjoined to immediately enter into a grant agreement with Plaintiff covering April 2025 under the same terms and conditions applicable to the most recent master grant agreement between the parties, in materially identical terms to the agreement between the parties pertaining to March 2025; and it is further

**ORDERED** that Defendants are enjoined to immediately disburse RFE/RL's April funding in the amount of $12,178,590; and it is further

**ORDERED** that Defendants file a status report within 48 hours of the issuance of this Order, on May 1, 2025, apprising the Court of the status of their compliance with this Order, including documentation sufficient to show the disbursement to Plaintiff of the funds Congress appropriated through April 30, 2025.

**IT IS SO ORDERED.**

Date: April 29, 2025
4:35 p.m.

Royce C. Lamberth
United States District Judge

22